JAMS ARBITRATION TRIBUNAL
NEW YORK, NEW YORK

GARY GREENBERG, ART FUND III LLC, COLORADO
ART HOLDINGS LLC, GB FUND LLC, LOANS ON FINE
ART LLC, AND LOTUS INVESTMENT CORP.,

                        Claimants,

              -against-

IAN S. PECK, ACG ARRANGEMENT SERVICES LLC,
ACG CAPITAL COMPANY, LLC, MODERN ART
SERVICES, LLC, PATRIOT CREDIT COMPANY LLC,
AND PEGASUS CREDIT COMPANY LLC,

                     Respondents.

JAMS Ref No. 1425034873

# MEMORANDUM OF LAW IN OPPOSITION TO
# MOTION FOR SUMMARY DISPOSITION

**PRESS KORAL LLP**
641 Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 922-1111
Facsimile: (347) 342-3882
mpress@presskoral.com

# CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................................... 2

   A.   Greenberg's Fraud and Misconduct ............................................................. 2

   B.   Greenberg Extorts the Settlement Agreement .............................................. 3

   C.   Respondents Enter into an Exclusive Agreement to Purchase the Painting ............ 4

      1.   *Empire Chesapeake Obtains an Exclusive Agreement to Purchase the Painting* ............... 5

      2.   *Bonito Memorializes the Precontractual Agreement in Writing* ........................ 6

      3.   *Ansible Brings a Confidential Arbitration Against Bonito and Obtains an Injunction Restraining Bonito from Moving the Painting* ........................ 6

      4.   *The Parties Agree to Extend the Term of the Revised Note* ........................ 7

      5.   *Empire Chesapeake Enters into a Contract with the Greenberg in Reliance Upon Bonito's Promise of Exclusivity* ........................ 8

      6.   *Bonito Fails to Deliver the Painting to Mana* ........................ 8

   D.   Respondents Attempt to Work with Christie's .......................................... 8

   E.   Respondents Retain Nicholas Hall as a Consultant in Connection with the Painting ........................ 9

   F.   Claimants' Obtain a TRO, Effectively Preventing Respondents from Acquiring the Painting ........................ 10

**III.     ARGUMENT** ................................................................................................................. **11**

**A.     Claimants Are Not Entitled to Summary Disposition of Their Claims Against**

**Respondents** ...................................................................................................................... 11

*1.     Respondents Did Not Breach the Settlement Agreement* ...........................................11

*2.     Claimants Cannot Establish Their Claims of Replevin and Conversion, Because They Do*

*Not Have a Present Possessory Right in the Painting* ........................................................17

**B.     Claimants Are Not Entitled to Summary Disposition of Respondents'**

**Counterclaims** ................................................................................................................... 18

*1.     ACG Has a Valid and Timely Fraud Claim Against Greenberg* ..................................19

*2.     ACG is Entitled to Declaratory Relief that the Settlement Agreement was the Product of*

*Extortion* .............................................................................................................................21

*3.     Respondents Have Valid Counterclaims for Breach of Contract* ...............................24

**IV.     CONCLUSION** ....................................................................................................... **26**

# TABLE OF AUTHORITIES

**Cases**

*1877 Webster Ave. Inc. v. Tremont Ctr., LLC*, 72 Misc. 3d 284, 289, 148 N.Y.S.3d 332, 338 (N.Y. Sup. Ct. 2021) ............................................................................................................ 16

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ........................................................ 11

*Ange v. Holley-Ange*, 121 A.D.3d 595, 596, 996 N.Y.S.2d 227, 228 (1st Dep't 2014) ............... 18

*Bastell v. Vill. of Rye Brook*, 71 Misc. 3d 1216(A), 144 N.Y.S.3d 556 (N.Y. Sup. Ct. 2021) ..... 20

*Brash v. Richards*, 195 A.D.3d 582, 149 N.Y.S.3d 560 (2nd Dep't 2021) .................................... 20

*Burnside 711, LLC v. Nassau Reg'l Off-Track Betting Corp.*, 67 A.D.3d 718, 720, 888 N.Y.S.2d 212, 213 (2nd Dep't 2009) ........................................................................................................ 15

*Colavito v. N.Y. Organ Donor Network, Inc*., 8 N.Y.3d 43, 827 N.Y.S.2d 96, 860 N.E.2d 713, 717 (2006) ............................................................................................................................... 18

*Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 558, 46 N.Y.S.3d 25, 27 (1st Dep't 2017) ............................................................................................ 15

*Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 370 (S.D.N.Y. 2015) ..................................................................................................................... 17

*E. End Labs., Inc. v. Sawaya*, 79 A.D.3d 1095, 914 N.Y.S.2d 250, 251 (2010) ......................... 18

*Foy v. State*, 71 Misc. 3d 605, 608, 144 N.Y.S.3d 285, 288 (N.Y. Ct. Cl. 2021) ........................ 20

*Inter-Am. Dev. Bank v. Nextg Telecom Ltd*., 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) ........... 16

*Kalimantano GmbH v. Motion in Time, Inc.*, 939 F.Supp.2d 392, 416 (S.D.N.Y. 2013) ........... 18

*Kolodin v. Valenti*, 115 A.D.3d 197, 200, 979 N.Y.S.2d 587, 589 (1st Dep't 2014) ............. 15, 17

*Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280, 285 (S.D.N.Y. 1998) .............................. 22

*Lloyd Capital Corp. v. Pat Henchar, Inc*., 80 N.Y.2d 124, 127, 589 N.Y.S.2d 396, 603 N.E.2d

    246 (1992) ...................................................................................................................... 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) ..................... 11

*People v. Dioguardi*, 8 N.Y.2d 260, 269, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960) ............... 22

*People v. Kacer*, 113 Misc.2d 338, 448 N.Y.S.2d 1002, 1007 (Sup. Ct., N.Y. County 1982)..... 22

*Reade v. Stoneybrook Realty, LLC*, 63 A.D.3d 433, 434, 882 N.Y.S.2d 8, 9

    (1st Dep't 2009) .................................................................................. 15, 17

*Schmidt v. Lorenzo*, 70 A.D.3d 1362, 894 N.Y.S.2d 641, 642 (2010) ......................................... 18

*Schupak Group, Inc. v. Travelers Cas. & Sur. Co. of Am*., 716 F. Supp. 2d 262, 267 (S.D.N.Y.

    2010) ............................................................................................................................. 11

*Silverman v. New York Univ. Sch. of Law*, 193 A.D.2d 411, 411, 597 N.Y.S.2d 314, 315 (1993)

    ...................................................................................................................................... 11

*Sky Top Farms, Inc. v. Bilinski Sausage Mfg. Co*., 73 A.D.3d 538, 538, 904 N.Y.S.2d 2, 2 (1st

    Dep't 2010) .................................................................................................................... 11

*Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 319, 567 N.Y.S.2d 623, 569 N.E.2d

    426 (1991) ...................................................................................................................... 17

*State v. Spectra Eng'g, Architecture & Surveying P.C*., 73 Misc. 3d 1224(A), 155 N.Y.S.3d 541

    (N.Y. Sup. Ct. 2021) ..................................................................................................... 20

*Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (1948)...................................................... 22

*Truman v. Brown*, 434 F. Supp. 3d 100, 114 (S.D.N.Y. 2020) .................................................... 22

*United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)............................................................. 11

*VFS Fin. v. Ins. Servs. Corp*., 111 A.D.3d 505, 505, 974 N.Y.S.2d 444, 445 (1st Dep't 2013) ... 11

*Williams v. Smith Ave. Moving Co.*, 582 F. Supp. 2d 316, 325 (N.D.N.Y. 2008)........................ 17

**Federal Rules**

Fed. R. Civ. P. 56(c) ................................................................................................. 10

**State Statutes**

N.Y. Penal Law § 155.05(2)(e)(v) ............................................................................. 22

**Treatises**

§ 20:13. FORCE MAJEURE, 28A N.Y. PRAC., CONTRACT LAW § 20:13 ......................................... 15

Respondents Ian Peck, ACG Arrangement Services, ACG Capital Company, LLC, Modern Art Services, LLC, Patriot Credit Company LLC and Pegasus Credit Company LLC (collectively, "Respondents" or "ACG"), by and through their undersigned attorneys, submit this memorandum of law in opposition to the motion of Claimants Gary Greenberg, Art Fund III LLC, Colorado Art Holdings LLC, GB Fund LLC, Loans on Fine Art LLC and Lotus Investment Corp. (collectively, "Claimants" or "Greenberg") for summary disposition.

## I.    INTRODUCTION

Claimants request summary disposition of both their own claims and Respondents' counterclaims upon the premise that the prior preliminary injunction hearing in this matter wholly resolved these claims. However, at the time of the preliminary injunction hearing, Respondents lacked access to discovery and critical information, including concerning why they were unable to obtain the Painting from a third-party that had promised them the exclusive right to purchase it, Virginia Bonito. In addition, upon the limited record before him, the Emergency Arbitrator simply got the facts and law of this case wrong.

As shown below, Claimants' motion fails for several reasons. Contrary to Claimants' contentions, Respondents did not breach the parties' Settlement Agreement, but instead at all times tried to perform under it. On the other hand, Claimants breached the Settlement Agreement by rejecting the advice of a renowned Old Masters expert, Nicholas Hall, who recommended that the Painting not be abruptly sold in the April 2021 Christie's auction, but instead be properly restored and sold in the fall. Respondents specifically bargained for the right to adjourn deadlines in the contract upon the recommendation of such an expert, and nothing in the parties' contract limited Respondents from obtaining such an opinion after the initial dates for evaluation and consignment in § 1(a)(i) of the Settlement Agreement.

Separately, Respondents were excused from performing by the initial deadlines in the Settlement Agreement because Bonito concealed from them an arbitrator's secret order which prohibited her from delivering the Painting to Mana Fine Arts, where Respondents agreed to provide access to Christie's for evaluation and consignment. Unbeknownst to Respondents, it was impossible for them to perform under the contract. Accordingly, under the force majeure clause in § 8 of the Settlement Agreement, and the doctrine of impossibility, Respondents were excused from performing under the contract—at least by the initial deadlines, before Hall provided his valid opinion.

Claimants also are not entitled to summary disposition on their claims for replevin and conversion, and Respondents are entitled to dismissal of those claims, because Claimants had no right to the possession of the Painting and Respondents plainly did not exercise unauthorized dominion over a Painting they did not possess.

Nor are Claimants entitled to summary disposition of Respondents' counterclaims. Respondents' fraud claim against Greenberg is neither released nor untimely and presents triable issues of fact. Respondents' extortion defense and breach of contract claims against Claimants likewise present triable issues of fact.

Accordingly, Claimant's motion for summary disposition should be denied.

## II.      STATEMENT OF FACTS

### A.      Greenberg's Fraud and Misconduct

Greenberg presents a self-serving story, which relies upon a great deal of projection. Without providing any specifics, Greenberg accuses Respondents of unspecified fraud and of operating an alleged "Ponzi" scheme in connection with art loan participation agreements. However, it is Greenberg who has defrauded Respondents.

In February 2015, Greenberg asked ACG to provide a $1 million dollar art loan, secured by a mobile by Alexander Calder, to a French national named Dominique Pinault—who Greenberg represented to be of the family of the billionaire Francois Pinault—so that Pinault could pay most of the proceeds to Greenberg. *See* Affidavit of Ian S. Peck in Opposition to Motion for Preliminary Injuction ("Peck Aff.") ¶ 3. Greenberg provided ACG with a package of due diligence materials he had assembled to establish the means of the borrower and the validity of the collateral, including a screenshot of a bank account reflecting a balance of $1,055,000. *See id.* & Exhs. 1 & 2.

In reliance upon Greenberg's due diligence disclosures, ACG made the loan to Pinault, who paid substantially all of the proceeds to Greenberg. *See id.* ¶ 4. However, Pinault soon defaulted on the loan, paying ACG nothing. *See id.* Upon subsequent investigation, the screen shot of Pinault's alleged bank statement, provided by Greenberg, proved to be a fraud. *See id.*

ACG would not have extended the loan with Pinault had it known that the bank statement disclosure was false. *See id.* ¶ 5. Furthermore, ACG subsequently learned that the Calder Foundation had not authenticated the sculpture provided as collateral for the loan, rendering it worth a fraction of its apparent value. *See id.* Finally, ACG learned that Pinault was only a distant cousin of Francois Pinault—and was neither wealthy himself nor had access to sufficient capital to pay the loan. *See id.* Indeed, Pinault had declared bankruptcy ten years earlier, in 2005. *See id.* & Exh. 3.

After the Pinault loan went into default, ACG ceased paying Greenberg amounts he was due under loan participation agreements until it could be determined the amount of an appropriate offset for Greenberg's fraud upon ACG. *See id.* ¶ 6.

### B.    Greenberg Extorts the Settlement Agreement

In 2019, Greenberg adopted a strategy to force ACG to pay amounts Greenberg claimed were due to him, without paying amounts ACG claimed from Greenberg, including compensation

for the Pinault loan. *See* Peck Aff. ¶ 7. Specifically, Greenberg claimed he hired an attorney in New York to prepare a "dossier" of alleged "criminal acts" by Ian Peck and ACG, which Greenberg would provide to prosecutors if ACG did not enter into a "settlement agreement" and pay certain amounts to Greenberg. *See id.* & Exh. 4. Greenberg flew from Colorado to New York on October 2, 2019 to meet with Peck and show him the threatening dossier. *See id.* Several days later, on October 8, 2019, Greenberg sent Peck an email entitled "Global settlement deadline," which confirmed a "deadline" of October 24, 2019 for ACG to "settle" with Greenberg—*i.e.*, to pay Greenberg amounts that he demanded in exchange for not providing the dossier to prosecutors. *See id.* & Exh. 5.

Although ACG denied Greenberg's allegations, Peck determined for business reasons to hold his nose and enter into Greenberg's proposed "settlement." *See id.* ¶ 8. Between October 2019 and January 2021, the "settlement" took shape, ultimately in the form of the Settlement Agreement at issue in this case,[1] in which ACG agreed to provide Greenberg a profit share in the sale of Portrait of a Nobleman, by Andrea Del Sarto (the "Painting"). *See id.*

C.    **Respondents Enter into an Exclusive Agreement to Purchase the Painting**

In early 2020, an affiliate of Respondents, Empire Chesapeake Holdings, LLC ("Empire Chesapeake"), began negotiating with Virginia Bonito, an owner of the Painting, for the purchase of the Painting. *See* Affirmation of Ian S. Peck in Opposition to Motion for Preliminary Injunction by Virginia Ann Bonito ("Peck Bonito Aff.") ¶ 2.

A number of issues needed to be resolved by Bonito before the parties could close on the transaction. *See* Peck Aff. ¶ 3. First, a prior creditor of Bonito, Ansible Ventures, Inc. ("Ansible"),

---

[1] Notably, §§ 7 & 15 of the Settlement Agreement expressly seek Greenberg's assurances that he has not sought to induce criminal investigations of ACG, and that Greenberg would destroy the purported "dossier" and other extortion materials. *See id.* & Exh. 6.

had a $80,000 lien against the Painting, which needed to be removed before Empire Chesapeake could complete the purchase. *See id.* Second, the Painting was located at the Sherman Fairchild Center for Objects Conservation of the Metropolitan Museum of Art (the "Met") and became inaccessible due to the Covid-19 pandemic. *See id.* Third, the Painting needed substantial restoration before it could be brought to market and needed to be carefully inspected, so a restoration plan could be developed. *See id.*

Thus, before Empire Chesapeake could complete the purchase, Bonito needed to move the Painting from the Met so it could be physically inspected. *See* Peck Bonito Aff. ¶ 4. For this purpose, Bonito agreed that she would move the Painting to Mana Fine Arts, in Jersey City, New Jersey ("Mana"). *See id.* however, Bonito did not disclose to Mr. Peck that her secured creditor, Ansible, strongly objected to moving the Painting from the Met unless it first received payment. *See id.*

### 1. *Empire Chesapeake Obtains an Exclusive Agreement to Purchase the Painting*

During the course of the negotiations, in 2020, Bonito advised Mr. Peck that she was in desperate need of money. *See* Peck Bonito Aff. ¶ 5. She thus requested that Empire Chesapeake and/or Chelsea make immediate cash advances that would be credited against the purchase price of the Painting. *See id.*

Empire Chesapeake was amenable to making such cash advances, upon the condition that (1) it be granted the exclusive right to purchase the Painting and right of first refusal until December 31, 2020; (2) it be granted a security interest in the Painting; (3) it be credited with, not only the advances, but with all other amounts expended by Empire Chesapeake and/or Chelsea in connection with the purchase transaction, including insurance payments, expert expenses and attorneys' fees; and (4) such credited advances and expenses would give Empire Chesapeake

and/or Chelsea a present direct ownership interest in the Painting proportional to the purchase price (the "Precontractual Agreement"). *See* Peck Bonito Aff. ¶ 6.

In order to obtain the cash advances that she needed, Bonito agreed to each of the terms of the Precontractual Agreement. *See* Peck Bonito Aff. ¶ 7. To secure the Precontractual Agreement, in 2020, Empire Chesapeake made cash advances to Bonito and paid for insurance for the painting together totaling $43,800. *See* Peck Bonito Aff. ¶ 8. Empire Chesapeake also incurred attorneys' fees in excess of $100,000.00. *See id*.

### 2.    *Bonito Memorializes the Precontractual Agreement in Writing*

In December 2020, Respondents were in discussions with Greenberg concerning the Settlement Agreement. *See* Peck Bonito Aff. ¶ 9. Mr. Peck thus advised Bonito that, as a condition to proceeding, the parties needed to memorialize their prior Precontractual Agreement in writing. *See id.* Bonito was amenable to doing so. *See id.* Bonito did so in an email dated December 8, 2020 (the "Revised Note"), which attached a document stating, among other things, "it is agreed and understood that the seller grants the purchaser the right of exclusivity and a right of first refusal as it relates to the purchaser closing by December 31, 2020 as noted, on the acquisition on the previously agreed terms." Peck Bonito Aff., Exh. 5 (emphasis added).

### 3.    *Ansible Brings a Confidential Arbitration Against Bonito and Obtains an Injunction Restraining Bonito from Moving the Painting*

On December 15, 2020, Bonito's creditor, Ansible, brought a confidential arbitration proceeding against her before the American Arbitration Association (the "Ansible Arbitration") and obtained a series of restraining orders which, among other things, prevented her from freely moving the Painting. *See* Affirmation of Matthew J. Press in Opposition to Motion for Preliminary Injunction by Virginia Anne Bonito ("Press Bonito Aff.") ¶ 3. The Ansible Arbitration was not of public record. *See id.*

Commencing on December 15, 2020, the arbitrator in the Ansible Arbitration entered a series of orders which required Bonito to keep the Painting at the Met and did not allow her to move the Painting to any other location without the written approval of Ansible or the arbitrator. *See* Press Bonito Aff., Exh. 2. Ansible obtained further restraining orders, on December 21, 2020 and March 16, 2021, directing the Bonito to obtain insurance on the Painting and to move the Painting to UOVO Art LLC, 41-54 22nd St, Queens, NY 11101, an art storage facility specifically mandated by the insurer. *See* Press Bonito Aff., Exhs. 3 & 4. Finally, in an order on March 26, 2021, the arbitrator ordered Bonito to allow pickup of the Painting and delivery to UOVO on March 30, 2021. *See* Press Bonito Aff., Exh. 5.

Bonito fraudulently concealed from Empire Chesapeake the existence of the Ansible Arbitration, let alone any of the limitations placed on Bonito by the arbitrator in the Ansible Arbitration. *See* Peck Bonito Aff. ¶ 15. Respondents did not learn of the Ansible Arbitration until Bonito's counsel mentioned it to counsel to Empire Chesapeake nearly a year later, in October or November 2021. *See id.*

### 4. *The Parties Agree to Extend the Term of the Revised Note*

Due to Bonito's undisclosed limitations, the parties were unable to close on the purchase and sale of the Painting by December 31, 2020. *See* Peck Bonito Aff. ¶ 16. In order to induce Empire Chesapeake to continue negotiating towards the purchase of the Painting, and to receive further cash advances from Empire Chesapeake, in January 2021, Bonito agreed to extend the terms of the Revised Note in exchange for further cash advances and the parties continued to negotiate towards a closing. *See* Peck Bonito Aff. ¶ 17 & Exh. 6.

Empire Chesapeake made these advances in reliance upon Bonito's promise to move the Painting to Mana, in Jersey City, where it could be evaluated by Christie's in connection with the Settlement Agreement. *See id.*

5.    ***Empire Chesapeake Enters into a Contract with the Greenberg in Reliance Upon Bonito's Promise of Exclusivity***

In reliance upon Bonito's promise to extend the terms of the Revised Note, on January 20, 2021, Respondents entered into the Settlement Agreement with Greenberg. *See* Peck Bonito Aff. ¶ 20. Respondents would not have entered into the contract with Greenberg had it known about the Ansible Arbitration and the restraining orders obtained by Ansible against Bonito, which effectively prevented Bonito from delivering the Painting for inspection at Mana. *See* Peck Bonito Aff. ¶ 21.

6.    ***Bonito Fails to Deliver the Painting to Mana***

In January 2021, Empire Chesapeake had assembled the purchase price for the Painting and was prepared to close. *See* Peck Bonito Aff. ¶ 22. However, before it could do so, Bonito needed to deliver the Painting to Mana, so it could be inspected and evaluated by Christies pursuant to the Settlement Agreement. *See id.*

Despite agreeing to deliver the Painting to Mana—and despite requesting and receiving an additional $7,000 in advances in February 2021 alone—Bonito failed to do so. *See* Peck Bonito Aff. ¶ 23. Nevertheless, stringing Empire Chesapeake along, in hope of obtaining further advances, Bonito repeatedly promised that she was on the verge of doing delivering the Painting to Mana. *See id.*

Respondents now know that Bonito had been ordered by the arbitrator in the Ansible Arbitration to move the painting only to UOVO Fine Art and, by March 30, 2021, the Painting had been moved to UOVO Fine Art.

D.    **Respondents Attempt to Work with Christie's**

On January 31, 2021, Peck and Greenberg had an introductory call with Joshua Glazer, of Christies, during which Peck explained that an affiliate company was in contract to acquire the

painting—but had not yet closed. *See* Peck Aff. ¶ 9. Peck soon learned that, in an attempt to railroad ACG into an early sale, Greenberg had informed employees of Christie's that ACG was required to sell the painting in an auction on April 22, 2021—confidential settlement information that should not have been disclosed. *See id.* Peck thus found himself with diminished bargaining power in a negotiation over the terms of a consignment, which would result in ACG obtaining less at auction for this valuable work. *See id.*

### E.    Respondents Retain Nicholas Hall as a Consultant in Connection with the Painting

In § 1(a)(i) of the Settlement Agreement, Respondents bargained for the right to change the schedule for the evaluation, consignment and auction or sale date of the painting based upon "advice regarding the sale date from the Auctioneer, or from Robert Simon or another comparable expert." Respondents retained Nicholas Hall, an esteemed expert in old master paintings who previously ran the Old Masters department at Christie's. *See* Peck Aff. ¶ 10. Hall executed a non-disclosure agreement on March 15, 2021. *See id.*, Exh. 7. Thereafter, Respondents and Hall negotiated a Consulting Agreement, which was executed by Hall on March 26, 2021. *See id.*, Exh. 8.

Throughout this period, Hall was unequivocal on his advice that the painting should not be sold imminently in the April 2021 Christie's auction. In an email, dated March 29, 2021, Hall explained his reasoning as follows, in relevant part:

> I would like to confirm that it is my strong advice that you do not consign the Andrea del Sarto portrait to Christie's April sale. There are several reasons for this.
>
> 1) There is no time to do the necessary marketing to maximise the value of the Painting.
>
> 2) The auction market, while strong in Asia and Post War and Contemporary is still recovering for Old Masters. Buyers will not be

> able to, or want to, travel to New York to see the Painting in person this April.
>
> 3) My understanding of the April sale as it now stands is that there is nothing remotely close to the del Sarto portrait in terms of value. This would leave it exposed. Conversely, one wants to put a painting with good upside in a sale with other works of high value, though not in direct competition.
>
> In conclusion, I think you should take your time to develop a more long term sale strategy. Putting the painting in Christie's April sale is not going to achieve your objectives. I would reiterate what I told Terence, that I am not questioning Christie's ability to get a good price for the painting, I just think that the April sale is far too soon.

Peck Aff., Exh. 9. Hall was not then aware of the dispute between ACG and Greenberg, and stated this opinion based exclusively on his encyclopedic knowledge and wealth of experience in the art market, and specifically the market for esoteric Old Masters paintings. *See* Peck Aff. ¶ 12.

After the April 2021 Christie's auction took place, Hall advised Respondents that the auction went terribly, and that Respondents were wise to avoid a sale under those circumstances. *See id*. Hall recommends that the painting be restored and sold privately in the fall of 2021. *See id.*

### F.    Claimants' Obtain a TRO, Effectively Preventing Respondents from Acquiring the Painting

At the time that the TRO in this matter was entered, Respondents still sought to complete the acquisition of the Painting. *See* Peck Aff. ¶ 13. Respondents intended to perform their obligations under the Settlement Agreement but could not do so because the TRO—and later the preliminary injunction—prohibited any encumbrance of the Painting. *See id.* Thus, Respondents' capital sources were unwilling to provide the funds necessary to complete the acquisition of the Painting.

### III.    ARGUMENT

Summary judgment is appropriate only where there is a no genuine dispute as to material facts, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In assessing a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in the affidavits, attached exhibits, and depositions submitted must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### A.    Claimants Are Not Entitled to Summary Disposition of Their Claims Against Respondents

As demonstrated below, Claimants are not entitled to summary disposition of their claims against Respondents. Respondents have, at a minimum, established triable issues of fact on Claimants' claims of breach of contract. Claimants' remaining claims for replevin and conversion are so obviously deficient that they should be dismissed.

### 1.    *Respondents Did Not Breach the Settlement Agreement*

To establish a breach of contract, a plaintiff must plead (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.[2] A claim for breach of contract must be dismissed where it is contradicted by the plain language of the contract itself.[3]

---

[2] *See, e.g., Schupak Group, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 716 F. Supp. 2d 262, 267 (S.D.N.Y. 2010) (finding breach of contract not adequately pled where plaintiff alleged only conclusory assertions of its performance).

[3] *See, e.g., VFS Fin. v. Ins. Servs. Corp.*, 111 A.D.3d 505, 505, 974 N.Y.S.2d 444, 445 (1st Dep't

> **a)** **Respondents Did Not Misrepresent that they "Owned" the Painting, But Rather Accurately Disclosed that they Had an Exclusive Contract to Purchase the Painting**

Claimants first contend that Respondents "falsely" represented in the Settlement Agreement that they "owned" the Painting. But this contention is demonstrably incorrect. Nowhere in the Settlement Agreement does ACG represent that it "owned" the Painting. Section 6(a) of the Settlement Agreement states only that "ACG has the right to consign the Painting to the Auctioneer for sale consistent with the terms of this Agreement."

It is undisputed that, consistent with ACG's representations in the Settlement Agreement, its affiliate, Empire Chesapeake, had a written exclusive agreement for the purchase of the Painting, and a right of first refusal, with the title holder of the Painting, Virginia Bonito. *See* Peck Bonito Aff. Exhs. 4 & 5; May 20, 2021 Hrg. Tr. at 73-75. In view of the exclusive purchase agreement, ACG understood that it had a right to consign the Painting to an auctioneer, pursuant to § 1 of the Settlement Agreement. However, Bonito fraudulently misrepresented to Empire Chesapeake that she had the unrestricted ability to deliver the Painting to Empire Chesapeake for purposes of consignment.

As Greenberg himself admitted, both before and after the Settlement Agreement, he knew that ACG did not own the Painting, but only had "a right to purchase" it. *See* Hrg. Tr. at 35. Greenberg further admitted that during the initial "handoff" teleconference between himself, Peck and Glazer, Mr. Peck told them that he "hadn't yet closed on title to the painting." *Id.* at 109.

---

2013) (finding plaintiff's breach of contract claims were contradicted by plain language of agreement); *Sky Top Farms, Inc. v. Bilinski Sausage Mfg. Co.*, 73 A.D.3d 538, 538, 904 N.Y.S.2d 2, 2 (1ˢᵗ Dep't 2010) (dismissing breach of contract claim where the termination clause of the parties' contract allowed defendant to terminate the contract due to plaintiff's failure to purchase meat products from it for four consecutive time periods); *Silverman v. New York Univ. Sch. of Law*, 193 A.D.2d 411, 411, 597 N.Y.S.2d 314, 315 (1993) (finding plaintiff "fails to state a cause of action for breach of contract, since his allegations that defendants violated certain provisions of the Student Handbook are flatly contradicted by the Handbook itself").

Testifying about the same call, Glazer recalled that Mr. Peck said he expected to obtain title to the Painting "as soon as it arrived in New Jersey," Hrg. Tr. at 171, but the Painting had not yet arrived in New Jersey. *See id.*

Respondents thus breach the Settlement Agreement by purportedly misrepresenting that they "owned" the Painting.

> a) **Respondents Validly Exercised Their Right to Adjourn the Evaluation, Consignment and Auction Under § 1(a)(i) of the Settlement Agreement**

Next, while the Settlement Agreement did provide target dates for the evaluation and consignment of the Painting—respectively, of February 12 and February 19, 2021—in § 1(a)(i) of the Settlement Agreement, Respondents specifically bargained for the right to change the schedule for "the evaluation, consignment and auction" of the Painting based upon "advice regarding the sale date from the Auctioneer, or from Robert Simon or another comparable expert." Respondents insisted on this provision precisely to avoid being railroaded into an immediate distress sale, which would prevent Respondents from realizing the full value of the Painting.

From the inception of the contract, Mr. Peck believed that the proposed auction and consignment dates of February 12 and 19 were too aggressive and consulted with Hall, an Old Master painting expert of impeccable credentials. It is undisputed that Hall advised that the Painting should not be sold in the April 2021 Christie's auction, but instead should be restored and sold privately in the fall of 2021. Hall's opinion was no sham. Hall did not even know about the dispute between Greenberg and ACG, but simply gave his unvarnished expert opinion.

Contrary to the Emergency Arbitrator's prior ruling, nothing in the Settlement Agreement addresses at what point in time and in what form an expert must render his or her expert advice. There is simply nothing in the language of the Settlement Agreement that forecloses Respondents from obtaining an extension of the auction date under § 1(a)(i) after either February 12 or February

13

19, 2021. Neither the Emergency Arbitrator nor Claimants have cited any legal authority for the proposition that Respondents could only obtain an extension of the "evaluation, consignment and auction dates" before February 12—less than two weeks after the execution of the Settlement Agreement.

Hall rendered his advice in February and March 2021, and Respondents timely advised Claimants of Hall's involvement and opinion. Prior to the April 2021 auction (a) Hall communicated his opinion to Glazer; and (b) ACG's counsel communicated Hall's opinion to Greenberg's counsel. *See* Hrg. Tr. at 177.

Even if Respondents been able to provide Christie's access to the Painting by February 12, 2021, for an evaluation, and had entered into a consignment agreement with Christie's before February 19, 2021, Hall gave his opinion no later than March 29, 2021—substantially before the April 22, 2021 Christie's Auction. Regardless of any harmless alleged prior breach, Respondents plainly were entitled to extend the auction date under § 1(a)(i) of the Settlement Agreement.

Thus, Respondents did not breach § 1(a)(i) of the Settlement Agreement. On the contrary, Claimants breached this provision by refusing to accept Hall's expert opinion and adjourn the auction date.

      **b)**      **Respondents' Performance of the Settlement Agreement Was Excused as Impossible Due to Bonito's Fraud and Breaches of Contract**

It is undisputed that Bonito failed to disclose to Respondents that, despite the parties' exclusive purchase agreement, due to the orders of the arbitrator in the Ansible Arbitration, she was unable to provide Respondents with the Painting—on initial the timetable set forth in § 1(a)(i) of the Settlement Agreement or, indeed, at all. This unknown and unforeseen circumstance—beyond the control of either of the parties—excused Respondents from performing under the Settlement Agreement.

Section 8 of the Settlement Agreement, entitled "Force Majeure," provides:

> ***Neither party will be responsible for any failure or delay in its performance under this Agreement due to causes beyond its reasonable control***, including, but not limited to, labor disputes, strikes, lockouts, shortages of or inability to obtain labor, energy, raw materials or supplies, war, acts of terror riot, acts of God, or governmental action. The parties are not currently aware of any facts or circumstances that would constitute a force majeure.

Settlement Agreement § 8 (emphasis added).

Such force majeure provisions are interpreted in accord with their purpose, which is "to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties" *Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*, 146 A.D.3d 557, 558, 46 N.Y.S.3d 25, 27 (1st Dep't 2017).[4] For example, in *Reade v. Stoneybrook Realty, LLC*, 63 A.D.3d 433, 434, 882 N.Y.S.2d 8, 9 (1st Dep't 2009), the court found that a TRO entered by court constituted force majeure event excusing a party's performance of a contract.

Similarly, under the doctrines of impossibility and frustration of purpose, a party is excused from performing under a contract "when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible."[5] Such impossibility can be physical, as in where the subject matter of a contract literally has been destroyed, or can be legal in nature. *See Kolodin*, 115 A.D.3d at 200, 979 N.Y.S.2d at 589 (finding so ordered stipulation

---

[4] *See* § 20:13. FORCE MAJEURE, 28A N.Y. PRAC., CONTRACT LAW § 20:13 ("The basic purpose of the clause is to relieve a party from its contractual duties when its performance has been prevented by an event beyond its control or when the purpose of the contract has been frustrated.8 The clause also limits damages where circumstances beyond the parties' control have frustrated their reasonable expectations.").

[5] *Kolodin v. Valenti*, 115 A.D.3d 197, 200, 979 N.Y.S.2d 587, 589 (1st Dep't 2014) (finding stipulation prohibiting direct contact between parties rendered recording and music management contracts impossible to perform); *Burnside 711, LLC v. Nassau Reg'l Off-Track Betting Corp*., 67 A.D.3d 718, 720, 888 N.Y.S.2d 212, 213 (2nd Dep't 2009) (finding ordinance prohibiting legal betting rendered lease impossible).

15

rendered performance impossible). "Resolution of the defense of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of such fault. In all but the clearest cases this will involve issues of fact that preclude summary judgment."[6]

Here, unbeknownst to ACG, on December 15, 2020, Ansible commenced confidential arbitration proceedings against Bonito in which the arbitrator issued a series of temporary restraining orders, commencing on December 15, 2020, which required Bonito to keep the Painting at the Sherman Fairchild Center for Objects Conservation of the Metropolitan Museum of Art, and did not allow her to move the Painting to any other location without the written approval of the claimant or the arbitrator. *See* Press Bonito Aff., Exh. 2. In violation of this order, Bonito apparently moved the Painting to her home. When the claimant discovered this fact, it obtained further restraining orders, dated December 21, 2020 and March 16, 2021, directing Bonito to obtain insurance on the Painting and to move the Painting to UOVO Art LLC, 41-54 22nd St, Queens, NY 11101, an art storage facility specifically mandated by the insurer. *See* Press Bonito Aff., Exhs. 3 & 4. Finally, in an order on March 26, 2021, the arbitrator ordered Bonito to allow pickup of the Painting and delivery to UOVO on March 30, 2021. *See* Press Bonito Aff., Exh. 5.

Between January and April 2020, Respondents continued to seek access to the Painting from Bonito, so they could provide it to Christie's for an estimate and potential consignment. Bonito made a series of excuses for her delay, but always claimed that she was about to provide

---

[6] *Inter-Am. Dev. Bank v. Nextg Telecom Ltd.*, 503 F. Supp. 2d 687, 696 (S.D.N.Y. 2007) (Kaplan, J.); *see 1877 Webster Ave. Inc. v. Tremont Ctr., LLC*, 72 Misc. 3d 284, 289, 148 N.Y.S.3d 332, 338 (N.Y. Sup. Ct. 2021) (finding issues of fact precluding summary judgment on defense of impossibility of nightclub lease due to Covid-19 pandemic).

the Painting. Respondents now know that Bonito misrepresented her ability to provide access to the Painting, which was limited as of December 15, 2020.

Unaware of this limitation, Respondents entered into the Settlement Agreement, on January 31, 2021, upon the assumption that Bonito would comply with her contractual obligations and provide access to the Painting. As it turned out, through no fault of Respondents—but instead due to the breach by Bonito, entirely beyond Respondents' control—Respondents were unable to obtain access to the Painting during the timeframe in §1(a) of the Settlement Agreement.

As in *Reade*, 63 A.D.3d at 434, 882 N.Y.S.2d at 9 and *Kolodin*, 115 A.D.3d at 200, 979 N.Y.S.2d at 589, the unknown orders of the arbitrator in the Ansible Arbitration, which Bonito fraudulently failed to disclose, were circumstances beyond the parties' control and excused both parties from performing under the Settlement Agreement.

**2.    Claimants Cannot Establish Their Claims of Replevin and Conversion, Because They Do Not Have a Present Possessory Right in the Painting**

Next, Claimants claims for replevin and conversion fail—and should be dismissed—because, fundamentally, a plaintiff cannot seek replevin, or claim conversion, of a chattel it does not own from a defendant that does not have possession.

"To establish a cause of action in replevin, a plaintiff must show that he has an immediate and superior right of possession of the property and the one in possession refuses to return the property." *Williams v. Smith Ave. Moving Co.*, 582 F. Supp. 2d 316, 325 (N.D.N.Y. 2008) (citing *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 319, 567 N.Y.S.2d 623, 569 N.E.2d 426 (1991)). Similarly, to state a claim for conversion, a plaintiff must demonstrate that (1) it has legal ownership or an immediate possessory right superior to that of defendants; and (2) that the

defendants exercised unauthorized dominion over the property to the exclusion of the plaintiff's rights.[7]

Each of these claims by Claimants fails because Claimants are not, and have never been, the legal owners of the Painting, and do not have a right of possession superior to Respondents. Furthermore, as shown above, an essential element of each theory is that the defendant is in ***actual possession of the property*** and exercising unauthorized dominion to the exclusion of the plaintiff's rights. Here, however, it is undisputed that Respondents never obtained actual possession of the Painting—and, obviously, are not exercising dominion over what they did not possess.

Claimants' conversion claim fails for the additional reason that, where a written agreement exists between two parties, "[t]hat agreement governs the parties' transaction and thus precludes recovery based on a cause of action for conversion." *Schmidt v. Lorenzo*, 70 A.D.3d 1362, 894 N.Y.S.2d 641, 642 (2010).  Thus, "[a] conversion claim must be dismissed when it does not stem from a wrong independent of the alleged breach of contract." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F.Supp.2d 392, 416 (S.D.N.Y. 2013).[8] Claimants' rights related to the sale of the Painting are exclusively a creature of the Settlement Agreement, governed by its carefully wrought terms. Thus, for this additional reason, Claimants' claim for conversion fails.

### B.    Claimants Are Not Entitled to Summary Disposition of Respondents' Counterclaims

---

[7] *See Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 370 (S.D.N.Y. 2015); *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 827 N.Y.S.2d 96, 860 N.E.2d 713, 717 (2006) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right to possession."); *Ange v. Holley-Ange*, 121 A.D.3d 595, 596, 996 N.Y.S.2d 227, 228 (1st Dep't 2014) (finding first spouse did not have superior right of possession to retirement benefits received by subsequent spouse).

[8] *See also E. End Labs., Inc. v. Sawaya*, 79 A.D.3d 1095, 914 N.Y.S.2d 250, 251 (2010) (dismissing conversion claim where "the complaint failed to set forth allegations which would constitute a wrong separate and distinct from an alleged breach of contract which could give rise to independent tort liability").

Claimants also are not entitled to summary disposition of Respondents' valid counterclaims of fraud, extortion and breach of contract against Claimants.

### 1.    ACG Has a Valid and Timely Fraud Claim Against Greenberg

First, contrary to Claimants' assertions, ACG has established triable issues of fact on its claim of fraud against Greenberg in connection with the Pinault Loan.

#### a)    Respondents Did Not Release ACG's Fraud Claim in the Settlement Agreement

Claimants first contend that, in the Settlement Agreement, ACG released its claim that Greenberg defrauded it into issuing the Pinault Loan. But this is mistaken. A release, like any other contract provision, must be enforced according to its plain language. By its terms, the release in § 2 of the Settlement Agreement is limited strictly to "the agreements or investments" ***between ACG and Greenberg*** "in which GB has a direct or indirect interest." In other words, the release is limited to claims arising from Greenberg's agreements or investments ***with ACG***.

As set forth in Respondents' Counterclaims, the Pinault Loan was a loan running exclusively between ACG, on the one hand, and Pinault on the other. *See* Press Dec., Exh. 2. Although Greenberg induced Pinault to use the proceeds of the Pinault Loan to pay Greenberg, Greenberg did not have either a direct or indirect interest in the loan agreement with Pinault itself, which was exclusively between Pinault and ACG. *See id.* ACG's claim against Greenberg—which arise from his inducement of the Pinault Loan—thus is not within the scope of the release.

#### b)    ACG's Fraud Claim Against Greenberg is Timely Due to the Governor's Covid-19 Tolling Orders

Nor is ACG's fraud claim based on the Pinault loan untimely. It is undisputed that the limitations period for a claim of fraud is six years from the date of the last fraudulent act.

Greenberg induced ACG to disburse the loan funds on April 2, 2015. Ordinarily, the limitations period for ACG's claim would run six years later, on April 2, 2021. However, it is well-established that former Governor Cuomo's Executive Orders in connection with the Covid-19 pandemic tolled the limitations periods for the commencement of all claims in New York by 228 days.[9] Accordingly, 228 days must be added to the limitations period of any claim that was still timely on March 20, 2020. *See State v. Spectra Eng'g, Architecture & Surveying P.C.*, 73 Misc. 3d 1224(A), 155 N.Y.S.3d 541 (N.Y. Sup. Ct. 2021).

ACG brought the present claim well within 228 days of April 2, 2021, or November 16, 2021. Thus, ACG's fraud claim is timely.

### c)    ACG Has Established Triable Issues of Fact on Greenberg's Fraud

Contrary to Claimants' assertions, ACG has amply established triable issues of fact concerning Greenberg's fraud in connection with the Pinault Loan.

In or about January 2015, Greenberg contacted Peck and proposed that ACG make a loan to Pinault, secured by the Calder, which would enable Pinault to pay amounts owed to Greenberg by Pinault. *See* Peck Aff. ¶¶ 3-4 & Exhs. 1 & 2.

On February 1, 2015, Greenberg presented a package of due diligence materials to Peck, on behalf of Pinault, in connection with the proposed loan. *See* Peck Aff. ¶ 3 & Exhs. 1-2. Included in the due diligence materials was an estimate by Christie's auction house which purported to value the Calder at between $800,000 and $1,200,000. *See id.* Greenberg did not disclose that the Calder had not been accepted by the Calder Foundation as a genuine work of Alexander Calder. *See id.*

---

[9] *See Brash v. Richards*, 195 A.D.3d 582, 149 N.Y.S.3d 560 (2nd Dep't 2021) (finding Governor's executive orders tolled limitations period for time to take appeal); *Foy v. State*, 71 Misc. 3d 605, 608, 144 N.Y.S.3d 285, 288 (N.Y. Ct. Cl. 2021) (finding Governor's executive orders tolled limitations period to commence all claims by 228 days); *Bastell v. Vill. of Rye Brook*, 71 Misc. 3d 1216(A), 144 N.Y.S.3d 556 (N.Y. Sup. Ct. 2021) (same).

Also included in the due diligence materials was a screenshot of Account No. 3427639876 at TD Bank (the "TD Bank Account"), with a purported balance of $1,055,000, which Greenberg and Pinault were offering, along with the Calder, as collateral for the requested loan. *See* Peck Aff. ¶ 3 & Exhs. 1-2. On April 7, 2015, Greenberg again emailed Peck a screenshot of the TD Bank Account, this time showing a balance of $1,055,434.27. *See id.*

Greenberg was a business partner of Pinault and an investor in Pinault's fund, Artemis Hedge Fund, L.P. ("Artemis"). *See* Press Dec., Exh. 1. Under the circumstances, Mr. Peck reasonably relied upon Greenberg to present reliable business information in connection with the proposed loan.

In reliance upon the affirmative misrepresentations and omissions in the due diligence materials presented by Greenberg, ACG made a loan to Pinault in the amount of $1,000,000 (the "Pinault Loan"), secured by the Calder and TD Bank Account. *See* Peck Aff. ¶ 4; Press Aff., Exh. 3. At the direction of Greenberg and Pinault, on or about April 2, 2015, the proceeds of the Pinault Loan were paid substantially to GB Fund and Lotus with only approximately $140,568.00 going to Pinault himself. *See* Press Aff., Exh. 3.

Shortly after the consummation of the Pinault Loan, Pinault went into default. *See* Peck Aff. ¶ 6. Upon further investigation, ACG discovered that the statement of the TD Bank Account, provided by Greenberg to ACG, was false. *See id.* ¶¶ 4-5. To date, Pinault has not paid a penny of what is due to ACG. *See id.*

Upon these facts, Respondents have amply established triable issues of fact concerning its claims of fraud against Greenberg.

      **2.**      **ACG is Entitled to Declaratory Relief that the Settlement Agreement was the Product of Extortion**

Respondents also have adduced triable issues of fact on their claim and defense that the Settlement Agreement, which was procured through an unlawful campaign of extortion, is void and unenforceable.

> **a)    Respondents Have Established Triable Issues of Fact that Greenberg Procured the Settlement Agreement Through Unlawful Extortion**

Illegal agreements "are, as a general rule, unenforceable" in a breach of contract action. *See Truman v. Brown*, 434 F. Supp. 3d 100, 114 (S.D.N.Y. 2020) (citing *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127, 589 N.Y.S.2d 396, 603 N.E.2d 246 (1992)). "It is the settled law of [New York] (and probably every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object." *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (1948).

> Under New York law, a person commits extortion if she compels or induces another to transfer property to her by instilling in that person a fear that if the property is not delivered, the actor or someone working with her will "[e]xpose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule." N.Y. Penal Law § 155.05(2)(e)(v). Attempted extortion is also a crime. *See id.* § 110.00. In cases involving contracts found to be extortionate, New York courts have dismissed claims of breach, on the grounds that such contracts are illegal and unenforceable. *See Yao v. Bult*, 245 A.D.2d 136, 666 N.Y.S.2d 159, 160 (1st Dep't 1997).

*Truman*, 434 F. Supp. 3d at 114–15.

Extortion may be a threat, from the person seeking the property, that she will expose the controversial secret or fact. *See People v. Dioguardi*, 8 N.Y.2d 260, 269, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960); *see also* N.Y. Penal Law § 155.05(2)(e)(v). Such a threat can be implied, as opposed to explicit. *See Kraft Gen. Foods, Inc. v. Cattel*l, 18 F. Supp. 2d 280, 285 (S.D.N.Y. 1998); *People v. Kacer*, 113 Misc.2d 338, 448 N.Y.S.2d 1002, 1007 (Sup. Ct., N.Y. County 1982).

Greenberg claims he invested over $4 million in loan participation agreements with ACG. *See* Hrg. Tr. at 12-13. In May 2019, Greenberg began making extortionate threats to Peck with the goal of obtaining "a sum of money." *Id.* at 83 & 88. In response to Greenberg's threats, ACG offered to "cash in [Greenberg's] chips," proposing a buyout of his interests. *See id.* at 25-28. The original settlement proposal which Claimants cite, was not offered in a vacuum, but in response to Greenberg's unlawful extortionate threats.

In August 2019, Greenberg had two attorneys prepare the "criminal acts dossier" and showed it to Peck in New York on October 2, 2019. *See id.* at 84-86. Greenberg prepared and brandished the dossier because Greenberg "didn't think [Peck] was taking [Greenberg's threats] seriously." *Id.* at 31. Greenberg then gave ACG a "deadline" for a "global settlement" in which Greenberg or his entities were "paid a sum of money." *Id.* at 90.

At the time, Greenberg had no intention of suing ACG for racketeering, *see id.* at 32, so the sole and obvious purpose of the dossier was extortion. While Greenberg claims he never explicitly threatened to hand over the dossier to criminal or regulatory authorities, the implication was clear and it had the effect Greenberg intended, coercing a settlement.

As reflected in §§ 7 & 15 of the Settlement Agreement itself, the major motivation of Respondents to enter into the agreement was to avoid Greenberg's threatened release of a "criminal acts report," or "dossier," which Greenberg threatened to provide to an Assistant United States Attorney if Respondents did not agree to cut Claimants into the proceeds of the sale of the Painting. *See* Peck Aff. ¶ 7. It was these threats that motivated Respondents to enter into the Settlement Agreement, even though they vehemently dispute Claimants' assertions. *See* Peck Aff. ¶ 8.

Respondents dispute that they committed any allegedly criminal acts, let alone any tortious acts. *See id.* On the contrary, it is Greenberg that has committed criminal acts, including inducing

ACG to loan $1 million to Pinault, the proceeds of which were paid to Greenberg, based upon a fraudulent bank statement passed to Respondents by Greenberg himself. In any case, Greenberg's extortionate threats caused Respondents to enter into the Settlement Agreement, rendering it void and unenforceable.

### b)     Respondents' Claim of Extortion is Not Released by the Settlement Agreement

Claimants contend that ACG's counterclaim for extortion is barred by the release in the Settlement Agreement. But, as shown above, ACG's claim is that the Settlement Agreement itself is void on grounds that it was the product of extortion. Thus, the release in the Settlement Agreement cannot be a defense to Respondents' claim of extortion. *See Truman*, 434 F. Supp. 3d 100 at 114.

### 3.     Respondents Have Valid Counterclaims for Breach of Contract

Nor are Claimants entitled to summary disposition of Respondents' counterclaims for breach of contract.

### a)     Respondents Have Adduced Triable Issues of Fact Concerning Greenberg's Improper Contact with Christie's in Breach of the Settlement Agreement

Claimants mistakenly argue that the evidence at the hearing somehow contradicts Respondents' claim that Greenberg had improper contact with Glazer after January 20, 2021, in breach of the Settlement Agreement. But the opposite is true.

The evidence at the preliminary injunction hearing established that, prior to the handoff, Greenberg destroyed ACG's bargaining power with Christie's by telling Joshua Glazer that (1) Peck was a deadbeat, who defaulted on the payment of money, *see id.* at 131-32 &164-65; (2) the painting was a form of payment to Greenberg, *see id.*; (3) the painting needed to be sold quickly, *see id.* at 166 & 170-71; and (4) Greenberg "hoped" that the painting would sell "in the upper

24

several millions of dollars," *id.* at 130. Greenberg thus turned ACG's opportunity to realize a sales price in the multiple tens of millions of dollars, *see id.* at 163, into a distress sale.

Greenberg and Glazer each dubiously testified that they had no direct contact after January 31, 2021. But the effective date of the Settlement Agreement was ***eleven days earlier***—on January 20, 2021. At the hearing, Glazer admitted that he and Greenberg communicated orally and in writing on a number of occasions in the month of January, right "up until the point where he introduced me to Mr. Peck." *See* Hrg. Tr. at 169-70.

The single new email which Claimants provided in response to Respondents' discovery requests, dated January 4, 2021, reflects that Greenberg provided Christie's with highly confidential information concerning the terms of the Settlement Agreement—including the financial terms of the waterfall between Respondents and Claimants—which had an obviously negative impact upon Respondents' negotiating position with Christie's. *See* Press Dec., Exh. 4. Respondents have not had an opportunity to examine Glazer in a deposition, and thus have not had an opportunity to explore the contents of Glazer's admitted oral discussions with Greenberg, including discussions which occurred after January 20, 2021.

Thus, far from contradicting ACG's breach of contract claim, the evidence adduced establishes triable issues of fact precluding summary disposition.

> **b)** **Claimants Breached the Settlement Agreement by Refusing to Acknowledge Hall's Expert Advice to Adjourn the Auction**

Claimants also mistakenly contend that they are entitled to summary disposition of Respondent's claim that Greenberg breached § 1(a)(i) of the Settlement Agreement by not accepting the adjournment of the evaluation, consignment and sale deadlines based on the expert advice of Hall. As explained above, Claimants premise this argument on their bald assertion—supported by nothing in the contract itself—that the expert must communicate his or her opinion

to Greenberg in writing, and must do so before the earliest of the provisional deadlines set forth in the contract. But, as shown above, the contract does not bear Claimants' interpretation. Accordingly, Respondents have adduced triable issues of fact on their counterclaim that Claimants breached the contract by refusing to honor Hall's expert opinion.

## IV.    CONCLUSION

In view of the foregoing, Respondents respectfully request that Claimants' motion be denied.

DATED:    New York, New York
February 14, 2022

Respectfully submitted,

PRESS KORAL LLP

By: _Matthew J. Press_
Matthew J. Press
Lexington Avenue, 13th Floor
New York, NY 10022
Telephone: (212) 922-1111
Facsimile: (347) 342-3882
mpress@presskoral.com

_Attorneys for Respondents_