JAMS ARBITRATION

- - - - - - - - - - - - x

GARY GREENBERG, et       :

al,                      :

      Claimants,        :    JAMS Reference No.

  v.                     :    1425034873

IAN S. PECK, et al.,     :

     Respondents.       :

- - - - - - - - - - - - x


Taken Before:

Arbitrator Kenneth Kramer

New York, New York

Thursday, October 27, 2022

9:44 a.m.


Job No.:  6251237-001

Pages:  1 - 114

Reported By:  Leonora L. Walker, Court Reporter

Arbitrator Kenneth Kramer
October 27, 2022

Page 2

1    Proceeding held at the offices of:

2

3

4        JAMS

5        620 8th Avenue

6        New York, New York 10018

7

8

9

10

11    Pursuant to notice, before Leonora L. Walker,

12    Court Reporter, Notary Public in and for the State

13    of New York.

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1            C O N T E N T S

2    EXAMINATION        WITNESS            PAGE

3    DIRECT:

4    By Mr. Press        Dr. Robert Simon       5

5                        Ian Peck              83

6

7    CROSS:

8    By Mr. Nikas        Dr. Robert Simon      54

9                        Ian Peck              91

10

11    RE-DIRECT:

12    By Mr. Press        Dr. Robert Simon      80

13

14

15            E X H I B I T S

16    EXHIBIT            ADMITTED           PAGE

17    Respondent's        Report             6

18

19

20

21

22

23

24

25

Page 3

1            A P P E A R A N C E S

2    ON BEHALF OF CLAIMANTS:

3        LUKE NIKAS, ESQUIRE

4        PAUL MASLO, ESQUIRE

5        QUINN EMANUEL

6        51 Madison Avenue, 22nd Floor

7        New York, New York  10010

8        212.849.7000

9

10    ON BEHALF OF RESPONDENTS:

11        MATTHEW PRESS, ESQUIRE

12        PRESS KORAL LLP

13        641 Lexington Avenue, 13th Floor

14        New York, New York  10022

15        212.922.1111

16

17

18    ALSO PRESENT:

19    Dr. Timothy Hunter

20    Dr. Robert Simon

21    Ian Peck

22

23

24

25

Page 5

1            P R O C E E D I N G S

2    R O B E R T   B.   S I M O N, PhD, called as the

3        witness, having been duly sworn by a Notary

4        Public, was questioned and testified as

5        follows:

6        ARBITRATOR KRAMER:  State your full name

7    for the record, please.

8        THE WITNESS:  Robert Barry Simon.

9        ARBITRATOR KRAMER:  Good morning,

10    Mr. Simon.

11        THE WITNESS:  Good morning, sir.

12            DIRECT EXAMINATION

13    BY MR. PRESS:

14    Q  Dr. Simon, could you turn to -- I believe

15    it's Exhibit -- Tab 18 in the claimant's exhibit

16    binder?

17    A  Okay.

18    Q  Do you have that in front of you?

19    A  I do.

20    Q  And I believe that this document -- well,

21    what is this document?

22    A  This is the report that I prepared

23    regarding the issues in this case.

24    Q  Okay.

25    A  Attached I think is my CV, yes.

Arbitrator Kenneth Kramer
October 27, 2022

Page 6

1    MR. PRESS:  And I know that we looked at
2  this before yesterday.  Was this admitted -- did
3  you submit this as an exhibit?
4    MR. NIKAS:  No.  Our view, just to put it
5  simply, of course we don't -- we're going to have
6  his testimony, but our position is that this is
7  inadmissible because it only does one thing, that
8  is challenge assumptions that Mr. Hunter makes,
9  and those assumptions in our view are required by
10  the governing law in a contract case involving
11  damages.  He provides no valuation, no opinions
12  about anything that are actually at issue in this
13  case, and so we'd object to it as irrelevant.  And
14  of course we'll hear the testimony and do the
15  cross and we'll brief those issues, but we would
16  object to the admissibility of those documents.
17    ARBITRATOR KRAMER:  You're objecting now?
18    MR. NIKAS:  Yes.
19    ARBITRATOR KRAMER:  That's overruled then.
20    MR. PRESS:  Okay.  I'd like just right now
21  to have -- I'd move that the report be admitted in
22  this proceeding.
23    ARBITRATOR KRAMER:  Yes, it's received.
24    (Whereupon, the report was admitted and
25  received.)

Page 7

1  BY MR. PRESS:
2    Q  So, Mr. Simon, could you turn to your CV,
3  which is at the back of the Exhibit 18.
4    And is this CV a fair and accurate
5  representation of your education and career?
6    A  Yes.  I prepared it.
7    Q  And where did you receive your education?
8    A  My education was primarily Columbia
9  College and Columbia University where I have
10  received master's -- bachelor's, master's, MPhil,
11  and doctorate degrees, PhD.
12    Q  And what were the areas of specialization
13  in those degrees?
14    A  In the graduate degree, it's in
15  Renaissance painting.  And my doctoral thesis was
16  on the Florentine artist Bronzino.
17    Q  And when did you graduate undergrad from
18  Columbia?
19    A  1973.
20    Q  And in what year did you get a master's
21  degree in art history in --
22    A  That was 1975.
23    Q  And then you got an MPhil.
24    What is that?
25    A  That's the next stage; that's sort of

Page 8

1  completing the doctoral work without completing --
2  not having completed the thesis.
3    Q  Okay.  And what area was that in?
4    A  In the same area, same.
5    Q  And that was art history and archeology?
6    A  Art history.
7    Q  And was that also involving medieval and
8  Renaissance paintings?
9    A  Yes, primarily.
10    Q  And did you get -- did there come a time
11  when you got a PhD from Columbia?
12    A  Yes, that was in '82, 1982.
13    Q  And what was subject matter of the PhD?
14    A  The thesis was on the portraits of
15  Cosimo I de' Medici, the Duke of Florence by
16  Bronzino.
17    Q  Okay.  And did you -- following -- or
18  during the time of your education, did you perform
19  any consulting or other services in the art
20  business?
21    A  Yes.  Actually, I think I wrote my first
22  appraisal when I was an undergraduate but did
23  start to do some very casual consulting work when
24  I was in graduate school and then more seriously
25  afterward.

Page 9

1    Q  Directing your attention to the
2  professional experience portion of your CV, and I
3  guess going in reverse order -- chronological
4  order from the bottom, can you describe the kind
5  of work you were doing between, I guess 1974 and
6  1982 when you got your PhD?
7    A  Yes.  I had been engaged by a private
8  Irish collector to advise on the creation of the
9  collection of Old Master paintings.  I had worked
10  as a consultant to the Uffizi Gallery, in Florence
11  on their cataloging.  And I'm trying to remember
12  even the other private collector that would
13  occasionally -- you know, I would work with.  The
14  Irish collector was one for a number of years on a
15  regular basis.
16    Q  And the work you did for the Irish
17  collector was in connection with Old Master
18  paintings?
19    A  Old Master paintings, yes.
20    Q  Okay.  And in your professional experience
21  description in your CV, it notes -- it appears to
22  note some kind of relationship with the
23  Metropolitan Museum of Art in New York?
24    A  I was a research fellow in the European
25  Paintings department for two years.  And before

Arbitrator Kenneth Kramer
October 27, 2022

Page 10

1  that, a summer assistant in the department.
2      Q  Okay.  And was that in connection with Old
3  Masters paintings?
4      A  Yes, that's the department that includes
5  Old Master paintings.
6      Q  Okay.  And you mentioned you were an
7  author and researcher for the Uffizi Gallery, in
8  Florence?
9      A  Yes.
10     Q  And was that work in connection with Old
11  Master paintings?
12     A  Yes.
13     Q  And did that involve some of the same
14  kinds of artists that have been discussed in the
15  comparables in this proceeding?
16     A  My work there was mostly on the minor --
17  more minor artists.  The major ones they kept for
18  themselves, yes.
19     Q  And in -- since your PhD, what have your
20  professional activities been?
21     A  Well, I've been an appraiser and a
22  consultant both for myself for an appraisal
23  company that's called Crosson Dannis.  I don't
24  think they exist anymore as a real estate company,
25  that had a fine art division that I directed.  And

Page 11

1  then for an art fund, which is listed on the CV,
2  and then for two dealers in Old Master paintings,
3  eventually going out on my own as a dealer, as
4  well as a consultant appraiser.
5      Q  Okay.  And what sort of percentage of the
6  work you did during that period since 1982 has
7  involved Old Masters paintings?
8      A  Ninety percent.
9      Q  And in your -- according to your CV, since
10  1990 you've had -- you've been an art dealer,
11  appraiser, and consultant, and president of Robert
12  Simon Fine Art?
13     A  Correct.
14     Q  Okay.  And what kind of work do you do at
15  Robert Simon Fine Art?
16     A  I have a gallery here in Manhattan
17  focusing on Renaissance and Baroque painting, Old
18  Master painting, European painting, occasionally
19  some American paintings, but not contemporary
20  works.  Really old historical artists that would
21  be categorized today.
22     Q  Okay.  And have you published work or
23  writings concerning Old Master paintings?
24     A  Yes, many.
25     Q  And are some of those publications

Page 12

1  reflected on your CV?
2      A  Yes, they are.
3      Q  Okay.  And are these all your publications
4  or are these just some of the many publications --
5      A  I think they all except for really, you
6  know, self-published kind of catalog entries and
7  the like.  These are those that you could go out
8  and buy basically.
9      Q  Okay.  And have your publications
10  generally been on the topic of Old Masters works?
11     A  Generally speaking.
12     Q  And then have you also provided lectures
13  and taught courses?
14     A  Yes.
15     Q  And are those reflected in your CV as
16  well?
17     A  Yes.
18     Q  And let's see, looking at them, it looks
19  as though they go back to 1973?
20     A  Yes.  I talked a lot.
21     Q  And what kind of institutions have you
22  lectured on concerning Old Master paintings?
23     A  You mean where?
24     Q  Yes.
25     A  At appraisal organizations, museums,

Page 13

1  conferences, independent scholarly conferences,
2  auction houses.  Just looking down here, the
3  Center For Art Law is a recent one.  Two weeks
4  ago, I spoke at the Reading Public Museum, in
5  Pennsylvania.  So it's a variety of places.  A
6  couple of legal ones I see looking back now as
7  well.
8      Q  Now, in connection with your work at
9  Robert Simon Fine Art, you conduct art appraisals
10  from time to time?
11     A  I do.
12     Q  And, in fact, have you had a role at the
13  Appraisers Association of America, in New York
14  City?
15     A  Yes, I've been a member for many years and
16  served on their board in various titled roles,
17  secretary/treasurer, that kind of thing, and then
18  eventually as the president.
19     Q  So you were the president of the
20  Appraisers Association of America, in New York?
21     A  Yes, I was.
22     Q  And during what years were those?
23     A  Let's take a look.  I was president in
24  1998 to 2000.
25     Q  Okay.  And --

Arbitrator Kenneth Kramer
October 27, 2022

Page 14

1      A  It's a two-year revolving.  It's not that
2  I got thrown out.
3      Q  Did you -- now, have you provided
4  appraisals of art in connection with legal
5  proceedings before?
6      A  Yes.
7      Q  Okay.  And have you provided testimony as
8  an expert witness in legal proceedings before?
9      A  Yes, I have.
10      Q  And have you been accredited by a court as
11  an expert witness before?
12      A  Yes.
13      Q  And were you accredited as an expert
14  witness in connection with valuation of Old
15  Masters paintings?
16      A  Yes.
17      MR. PRESS:  Okay.  At this time I'd move
18  that Mr. Simon be accepted as an expert in Old
19  Master paintings.
20      MR. NIKAS:  I have no objection to his
21  qualifications; only the scope of the report,
22  which I'll raise at the appropriate time.
23      ARBITRATOR KRAMER:  Okay.  Dr. Simon is
24  accepted as an expert.
25  BY MR. PRESS:

Page 15

1      Q  So, Dr. Simon, what are some factors that
2  go into the valuation of an Old Masters painting?
3      A  Well, primarily the two major ones are
4  attribution and the degree of acceptance of the
5  attribution and the condition of the painting.
6      Q  Okay.  And --
7      A  Other ones, I should say, have to do with
8  provenance, the dating of the picture, the size of
9  the painting of course is critical as well, and
10  where it is in the artists's career.  There a lot
11  of other secondary value considerations.
12      Q  Is the condition of the painting among the
13  more important factors that go into the valuation?
14      A  Yes.
15      Q  Now, were you consulted by Ian Peck and
16  Gary Greenberg concerning the painting that's the
17  subject matter of this dispute?
18      A  Yes.
19      Q  Okay.  And around what year was that, to
20  your recollection?
21      A  It was in the summer of 2019.
22      Q  And do you recall in connection with that,
23  did you communicate with both Mr. Peck and from
24  Greenberg from time to time?
25      A  Yes.

Page 16

1      Q  And in connection with the engagement, did
2  you personally inspect the painting?
3      A  Yes.
4      Q  Okay.  And how about how many times?
5      A  Twice.
6      Q  Okay.
7      A  Once in October of 2019 and once in the
8  November of 2019.
9      Q  Okay.  And where was the painting located?
10      A  It was house of Virginia Bonito in the
11  Bronx.
12      Q  And who is Virginia Bonito?
13      A  She is an art historian, someone I first
14  met when I was in graduate school at Columbia, and
15  although I hadn't really kept up with her and so I
16  don't -- I mean, I knew of her activities back at
17  the time when I was in graduate school, but she is
18  purportedly or evidently the owner of the Andrea
19  del Sarto painting we are talking about.
20      ARBITRATOR KRAMER:  Where does Dr. Bonito
21  teach?
22      THE WITNESS:  I don't think she teaches.
23  BY MR. PRESS:
24      Q  Okay.  And so your understanding is that
25  she was an owner of the painting?

Page 17

1      A  Yes.
2      Q  And did she prepare her own description of
3  the painting, the condition report?
4      A  Yes.  After I had been engaged by Gary and
5  Ian, I was put in contact with her and she sent me
6  a dossier of material with a confidentiality
7  agreement, non disclosure agreement about all the
8  material included.
9      Q  Okay.  And was she the author of the
10  materials herself, to your knowledge?
11      A  A good part of them.  There were also some
12  external documents in there, but -- the --
13  something that was called an executive description
14  and the conservation agreement and history of the
15  provenance, the sort of -- and an essay about the
16  identity of the sitter, these were all authored by
17  her.
18      Q  And these are among -- strike that.
19      Did you provide these materials to
20  Mr. Peck and Mr. Greenberg?
21      A  I did.
22      Q  Okay.  And did you find Ms. Bonito to be a
23  reliable source concerning the painting where she
24  was an owner?
25      MR. NIKAS:  Objection.

Page 18

1    ARBITRATOR KRAMER:  Overruled.
2        THE WITNESS:  When I -- I mean, I took her
3    written material as accurate when I received it.
4    But then when I saw the painting and when she
5    started to speak about it and responded to my
6    questions, I began to doubt many of the details
7    and, I think, salient points that she was
8    expressing about her conclusions.
9    BY MR. PRESS:
10       **Q   And describe -- so what about was the**
11   **first time that you saw the painting and met with**
12   **Ms. Bonito?**
13       A   I think it was October 15, 2019.
14       **Q   And who was in attendance?**
15       A   Myself and Ian Peck.
16       **Q   And did you observe the condition of the**
17   **painting at that time?**
18       A   Yes.
19       **Q   And what were your observations?**
20       A   Well, first of all, the painting was shown
21   in the afternoon, in a not terribly well-lighted
22   living room, so it wasn't -- although she did
23   bring out a -- you know, a strong light, it still
24   was not an ideal place to see them but -- to see
25   the picture.  But I was confused by what I saw.  I

Page 19

1    have extensive experience not as a conservator but
2    in looking at pictures with conservators in a
3    museum context in what the critical issues are and
4    condition, that's partly what I do in my own
5    business and studying paintings for possible
6    acquisition and giving advice.  And I was -- I
7    should say I was at first disappointed with the
8    look of the painting.  But then as Dr. Bonito
9    started to rehash the kind of conservation
10   treatment of the picture, there were certain
11   details that did not really correspond to what I
12   was seeing.  It gave me pause that what I was
13   witnessing was not -- what I was studying was
14   really not as it was purported to be.
15       **Q   Okay.  Did you decide to engage a**
16   **conservator to assess the painting?**
17       A   No.  Actually, after leaving it and
18   speaking with -- and Ian asked me what I thought
19   of the condition of the painting, and I thought I
20   couldn't really come to a good conclusion.  It was
21   not -- among other things, there were aspects of
22   it that were so problematic that I thought it
23   really needed the point of view of an independent
24   trained conservator, someone really familiar with
25   Renaissance paintings because it was beyond, I

Page 20

1    thought, my level of expertise.  It was certainly
2    enough to raise a red flag.
3        **Q   And did you communicate that conclusion to**
4    **Mr. Greenberg?**
5        A   I believe I did, yes.
6        **Q   And did you return to view the painting a**
7    **second time?**
8        A   I did.
9        **Q   And who was in attendance at that time?**
10       A   So at that point I had asked Diane
11   Modestini, who is a professor of paintings
12   conservation at the Conservation Center of the
13   Institute of Fine Arts, and a world-renown
14   authority in the field, conservator of the Kress
15   Collection across America National Gallery, in
16   Washington, and I asked her whether she would come
17   with me because I valued her opinion.
18       **Q   Okay.  And did Ms. Modestini view the**
19   **painting with you?**
20       A   She did.  And Ian was in attendance as
21   well.
22       **Q   Okay.  And what did -- what else occurred**
23   **at that viewing?**
24       A   Well, again, at that point then and
25   possibly the first time, Dr. Bonito presented a

Page 21

1    color transparency of the painting which she
2    suggested was a clean state or stripped state
3    photograph of the painting; that is to say, a
4    photograph of the painting after the -- after old
5    restoration had been removed and witnessing was
6    only the original painting before subsequent
7    in-painting had been done.
8        And I think that was one of the critical
9    points where I came to believe that the
10   presentation was not accurate.  I conferred with
11   Diane Modestini afterwards, and we kind of
12   compared notes, even just driving back into
13   Manhattan from the Bronx.  And the very real
14   possibility that I felt and that Diane felt as
15   well was that the image that we had seen of a
16   so-called clean state was actually photographed
17   after a considerable amount of restoration had
18   already been done.  It was kind of selective in
19   that regard.
20       **Q   And did you communicate the facts**
21   **concerning that visit to Mr. Greenberg?**
22       A   I did.
23       **Q   Okay.**
24       ARBITRATOR KRAMER:  I didn't hear that.
25       MR. PRESS:  I asked him if he communicated

Arbitrator Kenneth Kramer
October 27, 2022

Page 22

1    the facts concerning that meeting that he just
2    described to Mr. Greenberg.
3         THE WITNESS: Yes, I did. I mean,
4    basically the result of that meeting was that I
5    felt it important, and also Diane Modestini did as
6    well, that the painting be examined in a clinical
7    setting in order to evaluate whether my suspicions
8    were correct or whether -- you know, or they
9    weren't and just to be able to see it under proper
10   lighting and with also the diagnostic tools that
11   are available in the painting conservation
12   laboratory.
13        ARBITRATOR KRAMER: In October and
14   November 2019, who was your principal? Did you
15   have an engagement agreement?
16        THE WITNESS: I did. It was with
17   Mr. Greenberg and Mr. Peck.
18        ARBITRATOR KRAMER: Is it a written
19   agreement, condition agreement?
20        THE WITNESS: Yes.
21   BY MR. PRESS:
22        **Q  Now, did you -- strike that.**
23        **So following that second viewing that you**
24   **described, did you seek to have the painting**
25   **brought to a conservation laboratory for**

Page 23

1    **inspection?**
2         A  Yes, it did. Going, in fact, as far as
3    getting proper forms from New York University
4    which requires any outside property to be insured
5    and properly acknowledged. And I believe we had a
6    couple of dates proposed for the delivery of the
7    painting.
8         **Q  And at some point, did you -- nobody**
9    **called you any more about following through on**
10   **that work?**
11        A  Yeah. I mean, there were certainly
12   e-mails. I wrote to Ian about when is the
13   painting coming and that sort of thing. And then
14   in December or so, I think it sort of died out,
15   and I never heard more from anybody.
16        **Q  Okay. In your discussions with Mr. Peck**
17   **and Mr. Greenberg concerning -- you obviously**
18   **hadn't appraised the painting, but did you give a**
19   **range of potential values that you thought**
20   **depending on the condition it could be?**
21        MR. NIKAS: Objection; there's nothing
22   about this in the report --
23        MR. PRESS: Yes, there is.
24        MR. NIKAS: -- and this report doesn't
25   reach any conclusion about value.

Page 24

1         ARBITRATOR KRAMER: Overruled.
2         THE WITNESS: I definitely did not reach
3    an -- an appraisal is a specific number. I was
4    not prepared to write an -- I wasn't engaged to
5    write an appraisal specifically but to advise on
6    the value. And I realized that the range of value
7    was so great from -- I think I characterized it as
8    being anywhere in the six figures, that is under a
9    million, to several millions dollar depending on
10   what the condition that the painting might turn
11   out to be.
12        ARBITRATOR KRAMER: Who did you tell that
13   to?
14        THE WITNESS: I told that to Mr. Peck and
15   Mr. Greenberg.
16   BY MR. PRESS:
17        **Q  Okay. So you told Mr. Greenberg that the**
18   **painting could be worth as little as under a**
19   **million dollars?**
20        A  Yes.
21        ARBITRATOR KRAMER: You misspoke. Under a
22   million dollars.
23        THE WITNESS: Under a million, yeah.
24   BY MR. PRESS:
25        **Q  As little as under a million dollars, yes.**

Page 25

1         **Now, have you reviewed the appraisal**
2    **report prepared by Dr. Hunter in this matter?**
3         A  I have.
4         **Q  Okay. And do you know whether Dr. Hunter**
5    **physically examined the condition of the painting?**
6         A  He states that he had not.
7         **Q  Okay. Do you know whether he retained a**
8    **conservator to examine the painting?**
9         A  Again, in his report, it did not indicate
10   that.
11        **Q  Now, in your professional opinion, is it**
12   **possible to render an accurate opinion of the fair**
13   **market value of an Old Masters painting without an**
14   **evaluation of the condition of the painting?**
15        A  It's possible to render a value. Whether
16   it's accurate or not is the question. I mean, the
17   condition is a -- either directly observing it or
18   ideally having a professional conservator see it
19   and make a report on it, these are preferable
20   conditions.
21        **Q  Okay. And in your opinion, would not**
22   **having that kind of firsthand information impact**
23   **the validity of the appraisal?**
24        A  The accuracy of the appraisal, yeah. The
25   appraisal will be valid with whatever caveats are

Arbitrator Kenneth Kramer
October 27, 2022

Page 26

```
 1   put into it.
 2       Q  Now, did Dr. Hunter assume that for his
 3   report that the painting was in good condition?
 4       A  Yes, he did.
 5       Q  Okay.  And did you see that that was
 6   described as an extraordinary assumption?
 7       A  I did.
 8       Q  Now, under USPAP rules, can an appraiser
 9   make an extraordinary assumption that's contrary
10   to known fact?
11       A  That would usually come under the rubric
12   of a hypothetical condition.  Often -- for
13   example, if you're appraising a painting that had
14   been destroyed in a fire and there's really no
15   record of what the painting -- what the condition
16   of the painting was -- and I think that's here
17   without any confirmation of the condition by an
18   independent source or firsthand, that I think
19   would be more appropriate.
20       Q  Okay.  Now, did Dr. Hunter also assume the
21   work was correctly attributed to Andrea del Sarto?
22       A  He did.
23       Q  Okay.  And did he rely on the letter by
24   Sydney Freedberg that was inside his report?
25       A  He did.
```

Page 27

```
 1       Q  Okay.  And did -- was there any other
 2   basis besides the Freedberg letter that he relied
 3   on in his report to your recollection?
 4       A  I imagine his own judgment as a
 5   specialist.
 6       Q  Okay.  And in your opinion, did Sydney
 7   Friedberg establish the work was by del Sarto?
 8       A  His is a very important opinion.
 9   Definitely as a kind of term that really
10   especially today requires consensus of scholarly
11   opinion, and so even though -- I mean, I certainly
12   fully believe it to be Andrea del Sarto.  I think
13   in the marketplace, more contemporary
14   scholarships -- scholar should have been
15   consulted.
16       Q  Was Dr. Friedberg's letter published?
17       A  No.
18       Q  And has there been subsequent
19   scholarships -- strike that.
20          When did Dr. Freedberg write the letter
21   that has been used to authenticate the painting?
22       A  When?
23       Q  Yeah, what timeframe, if you recall?
24       A  I'd have to check.  I think it was in the
25   1990s.
```

Page 28

```
 1       Q  Okay.  Has there been subsequent research
 2   in scholarships on del Sarto since then?
 3       A  Extensive scholarship, yes.
 4       Q  And to your knowledge, did Dr. Hunter look
 5   into any of the subsequent scholarship in his
 6   report?
 7       A  I assume he looked at Andrea del Sarto's
 8   scholarship, but the painting, to my knowledge,
 9   has never been published or -- or studied by any
10   other scholars so...
11       Q  Now, let's take a look at Exhibit 17 in
12   the binder.
13          Okay.  Do you recognize -- do you know
14   what this document is?
15       A  Yes.  This is Dr. Hunter's appraisal.
16       Q  Now, directing your attention to page 9 of
17   this document...
18       A  Yes.
19       Q  Are you there?
20       A  I am, yes.
21       Q  In the section entitled "authenticity," do
22   you see that?
23       A  I do.
24       Q  Is this based on scholarship other than
25   the scholarship of Dr. Freedberg?
```

Page 29

```
 1       A  No.  I think this is basically a
 2   repetition of the material that Dr. Bonito
 3   furnished myself and also Ian Peck and Gary
 4   Greenberg that was then repeated in the appraisal.
 5   But it's -- you know, it's set in quotations, and
 6   I think that's actually the text of Dr. Bonito.
 7   But there's no further scholarship indicated or
 8   opinions.
 9       Q  Now, directing you to page 13 of the
10   report, it says Appendix A, information provided
11   by client; do you see that?
12       A  I do.
13       Q  Okay.  If you turn to page -- let's turn
14   to the summary fact sheet that was included here.
15          Is summary fact -- is this something that
16   was prepared by Dr. Bonito?
17       A  Well, I see the redactions, but they --
18   yes, this is -- this was -- my copy of it included
19   Dr. Bonito's indication of her authorship.
20       Q  The material in here was the material that
21   was prepared by her?
22       A  Yes.
23       Q  And then turning to the next page is a
24   picture and a quote of de Sarri.
25          Is that also material from Ms. Bonito?
```

Page 30

1    A   Yes.
2    Q   And then I'm turning to the next page, is
3    the introductory remarks on page 16.  That's also
4    from Ms. Bonito?
5    A   Yes.
6    Q   And next page, page 17?
7    A   Yes.  I think the redacted part at the
8    bottom is her -- basically her signature and date
9    on it.  It types it, indication of authorship.
10   Q   And page 18, that's the Freedberg letter?
11   A   Yes.
12   Q   And that was provided to you by
13   Ms. Bonito?
14   A   Yes.
15   Q   Okay.  And on pages 20 and 21, there's
16   some pictures, some images?
17   A   So these are the images of -- the first
18   one on page 20 of the painting as restored.  And
19   page 21 of the so-called clean state image of the
20   painting.
21   Q   Okay.  And so that's the picture that you
22   testified about earlier?
23   A   That is a print of the -- from this color
24   transparency that was shown, yes.
25   Q   And that was the one that you thought

Page 31

1    might not have been actually strip state?
2    A   Correct.
3    Q   And then turning the page to 23, there's
4    a -- is this -- it says condition; do you see
5    that?
6    A   Yes.
7    Q   Okay.  And was this also something
8    prepared by Virginia Bonito?
9    A   I believe it is.  When looking through my
10   material, I couldn't find this exact image, so --
11   but I believe that is -- it was not, as far as I
12   know, any kind of independent condition report.
13   Q   Okay.  Now, have you reviewed the
14   comparables that Dr. Hunter used in his report?
15   A   Yes, I have.
16   Q   And I'm directing you to page 20 of the
17   report.  Okay.  Now, in reviewing the comparables,
18   what did you note about them?
19   A   Well, those that are -- I think some are
20   not particularly relevant.  I mean, I could one by
21   one through them, but they seem more chosen to get
22   to the desired goal.
23         MR. NIKAS:  If I could object here?
24         ARBITRATOR KRAMER:  Yes.
25         MR. NIKAS:  The comparable section of his

Page 32

1    report does not give any of those opinions that he
2    just started to describe.  He gives two opinions.
3    He says there are two works that seem to be in
4    different condition.  This work is not necessarily
5    in good condition; it's not clear, and that's it.
6         ARBITRATOR KRAMER:  That's good
7    cross-examination.
8         MR. NIKAS:  But, sir, he shouldn't be able
9    to offer an opinion now that he hasn't offered in
10   this report.  It's highly prejudicial.  If he's
11   going to talk one by one about the actual
12   comparable --
13         MR. PRESS:  I believe you should hear it;
14   you should let him --
15         ARBITRATOR KRAMER:  What's the question,
16   please.
17         MR. PRESS:  I'm going to ask him about
18   these comparables and whether he thinks they're
19   comparable.
20         ARBITRATOR KRAMER:  And what's your
21   objection?
22         MR. NIKAS:  My objection is he does not
23   give that opinion in his report.  He says two
24   things in his report.  There are two works, the
25   Botticelli and the Bronzino, that were in good

Page 33

1    condition.  And the condition of this work is not
2    clear, period.  He doesn't say any of the other
3    comparables are good comparables, bad comparables,
4    reflect value, don't reflect value.  He just
5    started to say I think these were used to get to a
6    value and they're not necessarily comparable,
7    that's not in his report.
8         For him to give that kind of opinion, to
9    walk through work by work and say why they're
10   comparable or not is outside the scope of this
11   report, it's highly prejudicial for him --
12         ARBITRATOR KRAMER:  Why is this
13   prejudicial?
14         MR. NIKAS:  Because he doesn't include it
15   in his expert report.  And so when you offer an
16   expert report that says I have one opinion and you
17   show up at trial and you say I have five opinions
18   that I didn't disclose to you in the timeline,
19   that's highly prejudicial to us.
20         He didn't offer the opinion.  How can he
21   now stand up and offer the opinion?  If he had
22   offered that opinion, then we would have prepared
23   to cross-examine him on an opinion that he
24   offered, but he hasn't.
25         ARBITRATOR KRAMER:  I'll sustain that

Arbitrator Kenneth Kramer
October 27, 2022

Page 34

1  objection.
2  BY MR. PRESS:
3    Q  Okay.  So, Dr. Simon, the Botticelli at
4  the top, what's your observation about the
5  Botticelli painting?
6    A  In terms of its condition?
7    Q  Yes.
8    A  It was in almost as perfect as a condition
9  of a Renaissance painting that one can find.  So
10  it's a -- part of its appeal besides its beauty
11  and the fact that it's painted by one of the most
12  famous artists of the Renaissance is that it was
13  in exceptional condition, exceptionally fine
14  condition.
15    Q  And was that in your mind an appropriate
16  comparable for this work?
17      MR. NIKAS:  Objection; he doesn't offer
18  that opinion.  All he says in the report is it's
19  in a potentially different condition.
20      ARBITRATOR KRAMER:  I'll overrule that
21  one.
22      THE WITNESS:  Well, Dr. Hunter, I mean, he
23  just places it as something to show how high a
24  Renaissance portrait -- you know, that the market
25  has an interest in Renaissance portraits.  In all

Page 35

1  fairness to him, he's not really using it as a
2  close comparable to the work, but it's kind of --
3  you know, it's like looking at, you know, a
4  one-story building and pointing to the Empire
5  State Building and say, well, buildings can go
6  that high.
7      So I don't think he's intending -- I'm
8  sorry to be interpreting what someone else's --
9  Dr. Hunter's appraisal is, but I don't find it to
10  be a useful comparable in that's it's really
11  something of a different moment, of a, you know,
12  artist of a different caliber and one in a very
13  different condition.
14  BY MR. PRESS:
15    Q  Okay.  And turning to the Bronzino, did
16  you mention earlier that you did some scholarship
17  yourself on Bronzino?
18    A  Yes, I wrote my doctoral thesis on
19  Bronzino, and I'm one of the world specialists on
20  the artist, I'd say.
21    Q  Oh, another thing, the Botticelli, was
22  that on canvas or was that on wood?
23    A  It's on a wood panel, yes.
24    Q  And is -- in general, are wood panels --
25  what different valuation would you expect in

Page 36

1  general, all things being equal, as between
2  wood -- paintings on wood -- Renaissance paintings
3  on wood and on canvas?
4    A  It really depends on the artist and the
5  time.  This is a moment when panel painting --
6  paintings on wood panel are sort of transitioning
7  to paintings on canvas.
8      Dr. Hunter had mentioned the example of
9  Titian in Venus where it's a very humid climate
10  where panels react to the humidity very much.
11  Canvas came in much earlier.
12      In Florence where Botticelli, Bronzino,
13  and Andrea del Sarto worked, it was more into the
14  16 Century that you would -- and later in the
15  16th Century that you would find canvas being used
16  more.  At this point, the time of Andrea del
17  Sarto, the only paintings that would really be
18  often painted on canvas directly would be things
19  that were that being sent a great distance or that
20  were being used in temporary festivals and the
21  like.
22      But, generally speaking, for portraits,
23  panel -- I'm talking about the practice of it, not
24  the value of it today, but, you know, panels were
25  certainly the preferred support.

Page 37

1    Q  And in terms of value today for works on
2  panel versus canvas, can you in general state any
3  general conclusion to turn the value of works on
4  wood versus works on canvas?
5    A  Well, generally speaking, panels are
6  prized more in the art market.  They're less
7  susceptible -- assuming that the panel is
8  structurally sound, less susceptible to the damage
9  that occurs from lining of canvases and the
10  flattening of them, as well as the implication,
11  which is often the case, that a panel painting has
12  been transferred to canvas which often results in
13  the loss of not only vitality but actually
14  physical components of the painting.
15      So, for example, the impasto, which is
16  sort of the raised three-dimensional quality of
17  the painting, is often lost over the years on a
18  canvas painting.  If you think of canvas like --
19  you know, it's cotton normally.  It's like what a
20  T-shirt would look like with paint on it after
21  500 years; it has to be relined and treated, so it
22  loses quite a lot; whereas a wood panel, assuming
23  it hasn't been greatly damaged from changes in
24  humidity and the like, often preserves a paint
25  surface more regularly.

Arbitrator Kenneth Kramer
October 27, 2022

Page 38

1  Q  Okay.  And so as to the Bronzino, in
2  Dr. Hunter's list of comparables, what do you know
3  about the condition of that painting?
4  A  Well, I examined it on more than one
5  occasion; certainly at its sale at Christie's but
6  also privately before the sale in the presence of
7  its former owner, and both to determine its
8  attribution to Bronzino and on behalf of a
9  potential client, so I looked at it extremely
10  carefully.  It's in truly an exceptional
11  condition.  I know Dr. Hunter mentioned it had a
12  crack in it.  It's a very, very fine seam where
13  the two pieces of the wood panel had been joined,
14  and there is some restoration on it, but really
15  quite minor.  It was in really superb condition.
16  And I've seen it subsequently.
17  Q  And the Raphael painting that's at the
18  bottom of this page on page 28 is in -- how does
19  Raphael as an artist compare to Andrea del Sarto
20  in its reception by the art world?
21  A  Well, Raphael is one of the giants of the
22  Renaissance.  Leonardo, Raphael, Michelangelo,
23  these are the three great artists that are the
24  focus of the High Renaissance and of art history,
25  so it's -- he's -- work by him is in a different

Page 39

1  league.
2  Q  A different league than del Sarto?
3  A  Than del Sarto.
4  Q  Okay.  And do you think that was an
5  appropriate comp for a del Sarto painting at issue
6  in this suit?
7  A  Again, I think it's put in the context of
8  saying this is what a Renaissance portrait can
9  achieve, especially one that's on canvas.  And the
10  Raphael painting as far as we know is painted on
11  canvas because it was being sent over some
12  distance.  I mean, it's just not -- I don't find
13  it appropriate because it's by so much of a more
14  important artist.
15  Q  And as to the Bronzino, do you think that
16  is an appropriate comp for the del Sarto painting
17  at issue in this case?
18  A  Well, I think --
19      MR. NIKAS:  Objection; he doesn't call for
20  that opinion in his report.
21      ARBITRATOR KRAMER:  I'll overrule that.
22  Let's move on.
23      THE WITNESS:  I think choosing a Bronzino
24  painting can be appropriate.  Just this painting
25  was in such exceptionally fine condition, whereas

Page 40

1  the subject painting as far as, you know, my
2  determination was not, so...
3  BY MR. PRESS:
4  Q  Okay.  And the Fra Bartolomeo painting
5  that's in the comps here, was that oil or was that
6  on canvas?
7      MR. NIKAS:  Objection.
8      ARBITRATOR KRAMER:  That's sustained.
9      MR. PRESS:  I'm not going to ask him
10  anything more.  I'm just asking --
11      ARBITRATOR KRAMER:  It's not in his
12  report.
13      MR. PRESS:  Okay.  That's fine.  I can
14  point it out, too.
15      ARBITRATOR KRAMER:  Is it in his report?
16      MR. PRESS:  It's not in his report, but
17  it's here, it's written here.  That's fine, I can
18  say it myself in argument.
19      ARBITRATOR KRAMER:  Okay.
20  BY MR. PRESS:
21  Q  Okay.  Now, I want you to turn to -- can
22  you turn to Tab 3 in the binder in front of you?
23  A  All right.
24  Q  Okay.  Do you know who Anne Frances Moore
25  is?

Page 41

1  A  Yes.
2  Q  Who is that?
3  A  She is an appraiser and someone that I
4  know personally for some years and former museum
5  director, a specialist in mostly American
6  portraits.
7  Q  Is she -- was she a specialist in Old
8  Masters paintings, to your knowledge?
9  A  Not to my knowledge.
10  Q  And what -- do you know of any connection
11  between her and Virginia Bonito?
12  A  I believe they're friends of longstanding.
13  Virginia received her doctorate I believe from the
14  Institute of Fine Arts and was a classmate of a
15  man named Michael Mezzatesta.  And they were both
16  fellows at the American Academy in Rome.  Michael
17  Mezzatesta is the former husband of Anne Moore,
18  and I believe they've been friends for over
19  30 years or more or 40 years.
20  Q  And does -- looking at the title of this
21  report, it says retail replacement value of
22  appraisal report for insurance inventory purposes.
23      Do you see that?
24  A  I do.
25  Q  Okay.  And what is the nature of an

Page 42

1    appraisal for insurance inventory purposes?
2         MR. NIKAS:  I object to this testimony.
3    He hasn't offered an opinion that he's trying to
4    elicit here.  There's literally nothing about it.
5         ARBITRATOR KRAMER:  It's not in his
6    report.  Why should he testify to things that
7    weren't in his report?
8         MR. PRESS:  Okay.  I mean, it was
9    something that was presented and I think he can
10   comment on it.
11        ARBITRATOR KRAMER:  Presented by whom and
12   to where?
13        MR. PRESS:  I don't believe that this --
14   this report that the -- Anne Frances Moore report
15   wasn't in the -- it wasn't in the other reports
16   either, but we heard about it, so I think that's
17   something that we can comment on.
18        ARBITRATOR KRAMER:  It wasn't in what
19   other reports?
20        MR. PRESS:  It certainly wasn't in
21   Dr. Hunter's report.
22        MR. NIKAS:  The reason I presented it to
23   Dr. Hunter is because they used that report to
24   criticize the opinions that he reached, so I asked
25   him if the respondent's argument that this report

Page 43

1    there undermined his or related to his were
2    accurate or not.
3         ARBITRATOR KRAMER:  And that was in the
4    briefing?
5         MR. NIKAS:  Exactly.  They used that
6    report, 1.5 report, which wasn't -- our expert
7    wasn't part of our report -- to challenge
8    Dr. Hunter, and so we picked directly up on their
9    argument and said are their arguments correct, and
10   he testified that their arguments were not
11   correct.
12        But Dr. Simon gave absolutely no opinion
13   whatsoever related to any of those methods, not
14   the 1.5, not the 30 million, not Anne Moore,
15   nothing.
16        MR. PRESS:  And I'd like to correct that.
17   Dr. Hunter doesn't mention this report in any way
18   in his --
19        ARBITRATOR KRAMER:  The Anne Moore report?
20        MR. PRESS:  "This" being the Anne Moore
21   report, but he mentioned that he found it, and he
22   said it's 30 million, and they brought it and they
23   presented it.  So I think it's something that
24   needs to be addressed here.  It's not within the
25   scope of either of these experts' reports.  I'm

Page 44

1    happy to have it, you know, not considered at all,
2    that's fine with me.
3         But since it's been raised and there was
4    some testimony about it, I think that I should be
5    able to have my witness comment on it.
6         ARBITRATOR KRAMER:  Okay.  Overruled for
7    the time being.  Let's move on.
8    BY MR. PRESS:
9         Q  I just want to ask about what -- the
10   question was what is an appraisal for insurance
11   inventory purposes?
12        THE WITNESS:  I'm not quite sure what the
13   inventory part means.  Insurance purposes
14   basically presupposes that one is going to obtain
15   insurance on a property and one will then get
16   what's called a retail replacement value
17   appraisal, which is the idea that if you had to go
18   out to tomorrow to buy that item, what it would
19   cost.
20   BY MR. PRESS:
21        Q  Okay.  And is there a distinction between
22   a retail replacement value appraisal and a fair
23   market value appraisal under USPAP guidelines?
24        MR. NIKAS:  Same objection; it's not
25   offered in this report.

Page 45

1         ARBITRATOR KRAMER:  Overruled.
2         THE WITNESS:  It's a huge difference.  I
3    mean, retail replacement value appraisal is
4    usually -- do not require the level of
5    documentation, and they also rarely come under any
6    scrutiny.  It's -- the only factor really is how
7    much someone would want to be paying for a premium
8    for insurance.  And often enough -- such --
9    appraisals are done more as sales tools to show
10   that something has been appraised for a certain
11   amount of money.
12   BY MR. PRESS:
13        Q  And did you -- did you come to learn that
14   Winston Art Group had performed an earlier
15   appraisal prior to Dr. Hunter?
16        MR. NIKAS:  I object to this as well.
17   This is not in his report that he cross-examined
18   Dr. Hunter, and so having an expert testify about
19   another report that in no way is addressed in his
20   expert opinion is a trial by ambush.
21        MR. PRESS:  Absolutely not.  We only got
22   this report after Dr. Simon did his report.  As
23   you may recall, Mr. Arbitrator, we had to seek and
24   demand it and get a copy of it and after Mr. Simon
25   already issued his report.  It's central

Page 46

1   importance to this arbitrate.
2         MR. NIKAS:  And if I may, sir, they never
3   sought to supplement his expert report with a
4   comment or any opinion on it, and to show up today
5   at trial and say it's of central importance for
6   their expert to testify about something he never
7   offered in his and they didn't seek need to
8   supplement his report to address is highly
9   inappropriate.
10        ARBITRATOR KRAMER:  I think that's right.
11  You could have.  I take it that the testimony is
12  going -- you're going to ask him as a former
13  president of the organization whether the various
14  violations of the rules that you suggested are
15  important, and you could have -- that could have
16  been in a written opinion after you had that
17  report.  So I think Mr. Nikas is right that you
18  should have supplemented the report.  You can't
19  come in here today and give opinions that
20  Mr. Nikas has not had a chance to prepare for.
21        MR. PRESS:  Okay.  I mean, I think it's
22  clearly fair game giving the -- that this
23  appraisal, in fact, I don't think we need to
24  submit a supplemental report.  I think it's
25  ultimately --

Page 47

1         ARBITRATOR KRAMER:  It's not the basis of
2   what you purposed to be his expert testimony.  It
3   could have been.
4         MR. PRESS:  Well, no, no, no.  We
5   proposed -- we put in a rebuttal report after we
6   received Dr. Hunter's report, but we didn't have
7   this at the time, and you're saying that we could
8   have submitted a supplemental report, but I
9   also -- I thought it was certainly fair game to
10  come here and talk about this document that we
11  looked at extensively yesterday.
12        ARBITRATOR KRAMER:  But not have an expert
13  testify about it.  You made your points about it
14  in the cross-examination of Dr. Hunter.
15        MR. PRESS:  That's true.  I think there
16  are a few things that --
17        ARBITRATOR KRAMER:  And it's not helpful
18  to me to have Dr. Simon testify about things that
19  can't be properly cross-examined.
20        MR. PRESS:  I only wanted to ask him if he
21  agreed with the statement in the report.
22        ARBITRATOR KRAMER:  What statement in the
23  report?
24        MR. PRESS:  In Geza von Habsburg's report.
25        ARBITRATOR KRAMER:  That's not helpful to

Page 48

1   me.
2         MR. PRESS:  It's not helpful to you, okay.
3         Now, what I would like to ask him about is
4   Dr. Hunter's testimony yesterday, which I didn't
5   know about before, okay.  We didn't have any prior
6   discussion about it concerning his contribution to
7   this report, a phone call.  I'd like to ask his
8   impression of that.
9         ARBITRATOR KRAMER:  Which contribution?
10        MR. PRESS:  So yesterday for the first
11  time, we heard testimony from Dr. Hunter that he
12  had a phone call with Geza von Habsburg and that
13  he says was his contribution to this report, and
14  the contribution is noted in the report, okay.
15  That's new information.  I wouldn't have had time
16  to prepare an expert report about that.  That's a
17  new piece of information I learned yesterday.
18        MR. NIKAS:  If may, sir, number one, the
19  report that they had he could have supplemented
20  Dr. Simon's report with.  The Geza von Habsburg
21  report references Mr. Hunter's involvement with
22  that report, so they had the opportunity to
23  address that.
24        Number two, Mr. Press had the opportunity
25  to take Dr. Hunter's deposition, and he would have

Page 49

1   testified what that involvement was that was
2   stated on the face of the Geza von Habsburg
3   report, but he failed to depose Dr. Hunter.  So
4   for him to show up today and say this is new
5   information that he could have gotten in a
6   deposition, that he could have learned about
7   beforehand, and now get an expert to testify,
8   because he's not say anything about in his
9   report, presents the same exact trial by ambush
10  problem.  It's highly prejudicial.  We didn't come
11  prepared to cross-examine the expert on things
12  that he didn't put in his report.
13        ARBITRATOR KRAMER:  And I'll sustain that
14  objection.  It's not helpful to me.  I think
15  you've cross-examined Dr. Hunter as I excepted you
16  to, and we talked about that in the conference.
17        MR. PRESS:  Okay.
18        ARBITRATOR KRAMER:  So let's move on.
19        MR. PRESS:  Okay.
20  BY MR. PRESS:
21     Q  Dr. Simon, are you aware that the painting
22  in question was sold in Sotheby's Old Masters
23  auction in January 27, 2022?
24     A  Yes, I am.
25     Q  Okay.  And did you view that auction

Arbitrator Kenneth Kramer
October 27, 2022

Page 50

1  yourself?
2      A  I was in the attendance, and I viewed the
3  exhibition beforehand.
4      Q  Okay.  And did you see the painting
5  exhibited by Sotheby's prior to the auction?
6      A  Yes.
7      Q  And what were your observations at that
8  time about the painting?
9      A  It was --
10         MR. NIKAS:  Objection to the testimony as
11  well, sir.  This is not in the report at all, and
12  for him to comment on the Sotheby's auction is,
13  again, highly inappropriate and prejudicial.  We
14  weren't prepared to cross-examine him on an
15  opinion about the Sotheby's auction that he didn't
16  put in his report.  And again, if Mr. Press wanted
17  to supplement the report with commentary if he
18  knew about it, he could have asked me to do so, he
19  didn't.
20         MR. PRESS:  This is a factual thing.  He
21  went and he saw it.
22         ARBITRATOR KRAMER:  But he's here to
23  testify as an expert and give me his opinions and
24  help me determine what the damages are to be or
25  not to be.

Page 51

1         MR. PRESS:  Okay.
2         ARBITRATOR KRAMER:  So I'll think we'll
3  move on.
4         MR. PRESS:  Okay.  I mean -- all right.
5         ARBITRATOR KRAMER:  If he was going to
6  testify about the condition of a painting based on
7  having seen it at Sotheby's, that's something that
8  could have in an opinion.
9         MR. PRESS:  Well --
10         ARBITRATOR KRAMER:  He's here as an
11  expert, not as a fact witness.
12         MR. PRESS:  It just so happens that he had
13  some factual information that he obtained because
14  he was in attendance.
15         ARBITRATOR KRAMER:  I suspect if that had
16  been in a report, he would have been deposed about
17  it, so let's move on.
18         MR. PRESS:  No, no.  The reports were
19  issued long before this happened.  This is a more
20  recent occurrence.
21         ARBITRATOR KRAMER:  It could have been in
22  a supplemental report.
23         MR. PRESS:  Okay.  All right.
24  BY MR. PRESS:
25      Q  Are you aware of what the hammer price was

Page 52

1  the sale of the painting?
2      A  Yes.
3      Q  And what was that?
4      A  $1,800,000.
5      Q  Okay.  And at the time of the auction,
6  were you aware of any litigation concerning the
7  painting?
8         MR. NIKAS:  Objection.
9         ARBITRATOR KRAMER:  Let him answer that.
10         Were you aware of any litigation?
11         THE WITNESS:  No.
12  BY MR. PRESS:
13      Q  Okay.  As between an appraisal and a
14  public sale by auction, which is a better
15  indication of the fair market value of the
16  painting?
17         MR. NIKAS:  Objection.
18         ARBITRATOR KRAMER:  Overruled.
19         THE WITNESS:  An actual sale is much more
20  appropriate for values.  It is essentially the
21  definition of fair market values, what someone is
22  willing to pay and it's without any constraint.
23  BY MR. PRESS:
24      Q  In your opinion, did the Sotheby's sale
25  establish the fair market value of the painting?

Page 53

1         MR. NIKAS:  Objection.  He didn't offer
2  that opinion.
3         ARBITRATOR KRAMER:  Sustained.
4         MR. PRESS:  Okay.  Then I have no further
5  questions.  Thank you.
6         ARBITRATOR KRAMER:  Dr. Simon --
7         THE WITNESS:  Yes, sir.
8         ARBITRATOR KRAMER:  -- would the filing of
9  a lawsuit challenging the authenticity and the
10  ownership of a painting three days before a
11  Sotheby's auction affect the value of a painting?
12         THE WITNESS:  I think if it were
13  publicized, absolutely.  But in my sense, it's
14  like the tree falling in the forest.
15         ARBITRATOR KRAMER:  You don't know if it
16  was publicized or not, right?
17         THE WITNESS:  Well, to the extent that I'm
18  aware of the art market and the sale and all that,
19  I would have heard about it.  It's a gossip-filled
20  world.
21         ARBITRATOR KRAMER:  Okay.  All right.
22         Cross-examination?
23         MR. NIKAS:  Yes.  If I can just take five
24  minutes to run to the bathroom.
25         ARBITRATOR KRAMER:  Why don't we take a

Page 54

1   ten-minute break.
2          (Whereupon, a break was taken.)
3          ARBITRATOR KRAMER:  Are we ready to
4   proceed?
5          MR. NIKAS:  Ready.
6          C R O S S - E X A M I N A T I O N
7   BY MR. NIKAS:
8      Q  Good morning, Dr. Simon.
9      A  Good morning.
10     Q  Now, you testified a bit about the
11  background of this case leading up to the
12  settlement agreement; do you recall that?
13     A  The -- my experience in dealing with the
14  painting.
15     Q  And with Mr. Peck and Mr. Greenberg?
16     A  The settlement agreement I have, you know,
17  until today I had no cognizance of, so...
18     Q  So I'm want to explore what you understand
19  this case to be about and your engagement.
20        Are you aware from your engagement with
21  Mr. Peck and Mr. Greenberg that this case arose
22  out of my client, the claimants, threatening to
23  sue Mr. Peck for engaging in an art finance ponzi
24  scheme?
25     A  No.

Page 55

1      Q  Are you aware that following that
2   discussion and that threat, the parties settle
3   case in settlement agreement under which the
4   respondents were required to sell the del Sarto at
5   issue here and use the proceeds to pay the
6   settlement to my clients?
7      A  I'm aware that there was a settlement
8   agreement.  I haven't looked at it and the details
9   of their dispute, the financial issues, is
10  something beyond my cognizance.
11     Q  And are you aware that the arbitrator in
12  this case has already found that the respondents
13  breached their agreements and therefore this is
14  just a trial about damages?
15     A  I know that the arbitrator reached a
16  decision, but the details are -- no, I'm not aware
17  of these -- to me finer points, but I guess
18  they're crucial for what they're dealing with.
19     Q  Now, following your engagement by Mr. Peck
20  and the experience you had with the work, you were
21  engaged in this case, this actual litigation,
22  right?
23     A  Well, I was engaged by Mr. Peck and
24  Mr. Greenberg initially, and then engaged to
25  write -- to prepare this statement that I did by

Page 56

1   Mr. Peck.
2      Q  And were you aware when you were engaged
3   by Mr. Peck in this case that you would be giving
4   testimony against a former client of yours,
5   Mr. Greenberg?
6      A  No.
7      Q  You weren't told that?
8      A  No, I was -- it's mentioned right here
9   that there was a case, obviously, in that regard.
10  The details of what this dispute is, is something
11  beyond where I -- you know, my knowledge.
12     Q  So now knowing that, do you perceive it to
13  be a conflict to give testimony against a former
14  client related to the very subject matter of your
15  engagement with that client?
16     A  No, not at all.  I'm -- part of my report
17  had to do with my -- facts -- factual issues.  The
18  other part had to do with Dr. Hunter's appraisal.
19  I don't see it -- I don't see it in any way a
20  conflict.
21     Q  You don't see giving testimony against
22  your former client in a case about the work you
23  advised that client on as a conflict?
24        MR. PRESS:  Objection; asked and answered.
25        ARBITRATOR KRAMER:  Overruled.

Page 57

1         THE WITNESS:  No.
2   BY MR. NIKAS:
3      Q  Now, in your report, that's at Tab 18, you
4   don't identify any comparables for this work,
5   correct?
6      A  I didn't prepare an appraisal on the
7   painting.
8      Q  Okay.  And you heard Dr. Hunter testify at
9   great length about the comparables that he put in
10  his report, right?
11     A  I did.
12     Q  And you heard him describe the reasons he
13  used those several comparables to reach a value
14  about the painting, correct?
15     A  I do.
16     Q  And you didn't provide any opinion about
17  the issues or the reasons these comparables were
18  good comparables or bad comparables to rebut
19  Dr. Hunter's testimony, correct?
20     A  I think -- I remember we just spoke about
21  the issue of the condition of the painting which
22  is relevant, but no, I would say that in terms of
23  Dr. Hunter's appraisal I think it was properly
24  prepared, but basically faulted on the fact that
25  the condition is such a crucial issue and it was

Arbitrator Kenneth Kramer
October 27, 2022

Page 58

1  disregarded it was assumed to be in fine
2  condition.  What he did, you know -- given that, I
3  think, very crucial caveat or issue, he prepared a
4  fine appraisal.
5      Q  So with the exception of the caveat of the
6  condition of the del Sarto, which we'll get to in
7  a little bit, you think Dr. Hunter prepared a fine
8  appraisal; is that what you just said?
9      A  Yes.
10     Q  Now, you heard him, Dr. Hunter, describe
11  how he reached that $15 million fair market value
12  for the work, correct?
13     A  Correct.
14     Q  Your report offers no competing valuation,
15  correct?
16     A  Correct.
17     Q  The report that you issued doesn't offer
18  an opinion about the actual condition of the work,
19  correct, the del Sarto?
20     A  That's correct.
21     Q  You say it's not clear, right?
22     A  Correct.
23     Q  You say that it's quite possible
24  restoration is required, but ultimately you don't
25  have an opinion one way or the other offered in

Page 59

1  your report, right?
2      A  What's in my report is in my report.
3      Q  Okay.  And in your report you don't offer
4  an opinion as to whether the work is, in fact,
5  authentic or not, correct?
6      A  I think I did.  I do believe the painting
7  is authentic.
8      Q  You do believe it's authentic?
9      A  Absolutely.
10     Q  Okay.
11     A  I mean, one thing that I think I indicated
12  though is that in terms of how the market
13  perceives the authenticity issue more work needed
14  to be done for the consultation with other
15  contemporary scholars was required in order for
16  the painting to achieve its proper value.
17     Q  And ultimately --
18     A  Ultimately.
19     Q  -- altho9ugh you talk about that you don't
20  offer a definitive opinion in your report, you do
21  note those facts, however, correct?
22     A  Yes.  I'm not a definitive Andrea del
23  Sarto scholar.  It's -- my opinion is, you know,
24  I've gone through my credentials, whatever, as a
25  specialist in the field from the beginning and

Page 60

1  every time I saw the picture until it was sold at
2  Sotheby's, I believe it's by Andrea del Sarto.
3  It's just a question of what -- how the market --
4  the market requires further confirmation in my
5  opinion.
6      Q  Now, you don't offer a definitive opinion
7  about who the sitter is in the painting, correct?
8      A  That's correct.
9      Q  And you don't offer in your opinion, or in
10  your report, any opinions about other appraisals
11  of the work, correct?
12     A  That's correct.  I mean, I think in the
13  opinion -- I mean, as for the sitter, I'm not
14  quite sure whether I stated it overtly, but
15  it's -- I do mention it.  It's speculative.  The
16  opinion -- that it's Ottaviano de' Medici.  That's
17  one of the statements of Virginia Bonito that I
18  did not find persuasive.
19     Q  Well, we'll get to that in a minute, too.
20        With respect to Dr. Hunter's appraisal,
21  that's the only appraisal that you address in your
22  report, correct?
23     A  Correct.
24     Q  Now, with respect to Dr. Hunter's
25  appraisal, you give four opinions, right?

Page 61

1      A  I do.  Okay.  Let's take a look.
2        Yes.
3      Q  Okay.  Now, let's start with the
4  authorship and attribution.  You say under that
5  section that more work needs to be done and needs
6  to be done to fully confirm the work, correct?
7      A  Correct.
8      Q  And that Dr. Hunter's appraisal overlooks
9  that fact; is that right?
10     A  Correct.
11     Q  And makes an assumption about authenticity
12  without acknowledging that fact?
13     A  Yes.
14     Q  That's number one.  Number two, with
15  respect to the sitter on next the page of your
16  report you say that the identification of the
17  sitter is speculative?
18     A  Correct.
19     Q  And that Dr. Hunter's assumption that the
20  sitter is identified as accurate doesn't
21  acknowledge the dearth of information proving it
22  to be so; is that accurate?
23     A  Yes.
24     Q  Now, we talked a moment ago about the fact
25  that the parties had a settlement agreement,

Page 62

1    correct?
2        A  Yes.
3        Q  And you never reviewed that settlement
4    agreement before?
5        A  Correct.
6        Q  Let's turn to Tab 1 in your binder,
7    please.  The first page of the document says
8    "settlement agreement;" do you see that?
9        A  Correct.
10       Q  So if you could, please, turn with me to
11   page 4, section 6.  Bottom of the page it says,
12   representations by ACG, and that's Mr. Peck.  ACG
13   represents the following facts to be true.  "E,"
14   on the next page, the work is an authentic work of
15   art by Andrea del Sarto as described above in
16   section 1A.
17       Do you see that?
18       A  I do.
19       Q  And if you turn back to Section 1A, which
20   is the top of the page 2, it says, Andrea del
21   Sarto, Ottaviano de' Medici, and so forth; do you
22   see that?
23       A  I do.
24       Q  And Ottaviano de' Medici, the title, and
25   that's supposed to be sitter according to this

Page 63

1    representation, right?
2        A  Right.
3        Q  Now, when you issued your expert report,
4    were you told by Mr. Peck that he had promised or
5    represented the authenticity and accurate
6    description of this painting?
7        A  No.
8        Q  Were you informed that, in fact, the basis
9    for Dr. Hunter's assumption of authenticity and
10   accuracy of the sitter was the fact that Mr. Peck
11   represented those facts to be true?
12       MR. PRESS:  Objection; argumentative.
13       ARBITRATOR KRAMER:  Overrule.
14       THE WITNESS:  I was not aware of this
15   consignment agreement and the statement of
16   authorship.  As I said, I agree with the
17   authorship of the painting.  I don't think that's
18   really an issue.  It's really a market perception
19   that I'm proposing.  The same as Dr. Hunter
20   testified that the identification of the sitter as
21   Ottaviano de Medici would be a value added thing,
22   not something -- the question mark about it is not
23   something that would take away its -- lower the
24   value.
25       ARBITRATOR KRAMER:  On the top of page two

Page 64

1    of the settlement agreement, your name appears.
2    Were you consulted about having your name included
3    in the agreement?
4        THE WITNESS:  No, No, I didn't know there
5    was a settlement agreement, so...
6        ARBITRATOR KRAMER:  Okay.
7    BY MR. NIKAS:
8        Q  Now, so you didn't understand when
9    criticizing Dr. Hunter's assumptions regarding
10   authenticity and sitter that those assumptions
11   came from the contractually binding representation
12   in this agreement?
13       MR. PRESS:  Objection.
14       THE WITNESS:  That's correct.
15       MR. PRESS:  Objection; argumentative.
16       ARBITRATOR KRAMER:  Overruled.
17       MR. PRESS:  It's a different point.
18   BY MR. NIKAS:
19       Q  Now, in your profession, are you aware of
20   an appraiser rule that says if an individual
21   breaches his contractual obligations with respect
22   to authenticity and the identity of the sitter,
23   you're allowed disregard when preparing an
24   appraisal in a litigation about damages?
25       A  Can you repeat that question?

Page 65

1        Q  Sure.
2        Now, there's no appraiser rule, is there,
3    that would require Dr. Hunter to disregard these
4    representations when preparing an appraisal report
5    for a litigation, correct?
6        A  Well, first, I don't know that there's a
7    separate -- any kind of rule specifying appraisals
8    for litigation as different from any other
9    appraisals.  So -- and the idea that one would
10   disregard information, I don't think this ever
11   gets discussed really.
12       Q  Sure.  I just want to understand the rules
13   that govern appraisals because Dr. Hunter prepared
14   a report for this litigation.
15       You're aware of that, yes?
16       MR. PRESS:  I'm going to have to object to
17   this.  He didn't want my witness to talk about
18   rules of appraisal and now he's asking about rules
19   of appraisal.
20       ARBITRATOR KRAMER:  Overruled.  This is
21   cross-examination.
22   BY MR. NIKAS:
23       Q  Now, when you criticized Dr. Hunter for
24   making the assumption of authenticity and the
25   identity of the sitter, you were basing that on

Page 66

1   the appraiser rule that governs the profession,
2   correct?
3       A  This is not specific, those specific
4   things that I singled out.  Really the salient
5   issue had to do with the condition.  The
6   authorship, the identity of the sitter in my mind
7   makes very little difference in terms of what the
8   value of the painting is.  The -- to me the
9   identification of Ottaviano de' Medici was kind of
10  something that is part of the misrepresentations
11  by Dr. Bonito to say that was carried forward in
12  all these documents.  Really, the crucial issue in
13  terms of the criteria for the value that's assumed
14  that I think is at fault here is really the
15  question of condition.
16      Q  Okay.  So we'll get to condition.  So what
17  I wanted to understand is we can then disregard
18  your commentary about Dr. Hunter's assumptions
19  regarding authenticity?
20      A  I don't think that's an issue.
21      Q  And can we disregard your opinion about
22  the comparables with respect to valuation?
23      A  You see, the valuation, we're talking
24  about something in terms of what the value is in
25  the marketplace, and the -- my opinion that it's

Page 67

1   by Andrea del Sarto and whatever is written in the
2   agreement is one thing, but in terms of what's
3   required in terms of the market perception and
4   what people would demand in terms of what a
5   painting is worth, that I found to be
6   insufficient.
7       So if -- and this is a question for you
8   two lawyers to figure out if this document and
9   this statement of it is more important than these
10  other questions, so be it.  It's not my purview to
11  comment on it.
12      Q  Let me just put a finer point on that.  If
13  the law requires us to accept the representations
14  in this document as true and accurate, that it's
15  an Andrea del Sarto and that's the sitter as
16  identified here, there's no appraisal rule that
17  says you're supposed to disregard the --
18      A  No, we follow the law.
19      Q  There we go.  Thank you very much.
20      Now, so we're setting your -- we're
21  disregarding your comment on authenticity and
22  sitter.  I want to focus for a minute on the
23  comparables section that you identified.
24      MR. PRESS:  Objection to form.
25      ARBITRATOR KRAMER:  What's the nature of

Page 68

1   your objection?
2       MR. PRESS:  Because he said a bunch of
3   things about disregarding and now he's moving --
4   it's speech that he made, so I'm objecting to
5   that.
6       ARBITRATOR KRAMER:  Can you rephrase the
7   question, please.
8       MR. NIKAS:  Sure.
9   BY MR. NIKAS:
10      Q  I want to talk now about comparables since
11  you've already told us about authenticity and the
12  sitter.  Understood?
13      A  Yes.
14      Q  Great.  Now, in that section of your
15  report you say it's not clear what Dr. Hunter knew
16  about the condition of the works he identified as
17  comparable, correct?
18      A  That's true.
19      Q  And, first of all, his report was prepared
20  as an appraisal under USPAP standards, correct?
21      A  Yes.
22      Q  You didn't prepare a competing appraisal?
23      A  Correct.
24      Q  Your report doesn't purport to comply with
25  USPAP, correct?

Page 69

1       A  It's not an appraisal.
2       Q  And, therefore, doesn't even purport
3   comply with USPAP because it doesn't need to?
4       A  Correct.
5       Q  Now, you heard Dr. Hunter testify about
6   all of the comparables at length, correct?
7       A  I did.
8       Q  And you, in your report, offer no opinion
9   about those matters, correct?
10      A  Correct.
11      Q  Now, you also heard him describe how he
12  used his judgment to assess that group of
13  comparables to provide ultimately an opinion that
14  the work was worth $15 million.  You heard him
15  talk about that, right?
16      A  Yes.
17      Q  And your report doesn't address or offer
18  an opinion that addresses those direct issues,
19  correct?
20      A  Correct.
21      Q  Now, fourth, and finally, let's talk about
22  the condition of the work in your opinion in that
23  respect, all right?
24      A  Yes.
25      Q  Great.  Now, are you aware -- let's get

Page 70

1  your opinion out there for just a minute.  You say
2  Dr. Hunter's report assumes good condition when,
3  in fact, that's a hypothetical assumption,
4  correct?
5      A  Correct.
6      Q  And from the report, your -- the report
7  you drafted, your opinion is the condition is not
8  clear, correct?
9      A  I mean, I stated that it was not clear to
10  me and that further information was needed.  In
11  my -- that was my advice to Mr. Peck and
12  Mr. Greenberg that more attention needed to made.
13      My own opinion is that it was a -- the
14  reason that prompted that inquiry was that I was
15  not satisfied with the opinion.  I did not think
16  it was in good condition.
17      Q  You say in your report that the condition
18  of the del Sarto is not clear, correct?
19      A  Correct.
20      Q  And you say --
21      A  No, excuse me.  Where --
22      Q  Under the comparable section, you say,
23  Raphael -- four lines up from the bottom, a far
24  more celebrated artist than Andrea del Sarto on
25  panel.  As indicated above, the actual condition

Page 71

1  of the subject property is not clear.
2      A  Right.
3      Q  Correct.
4      And then you say under the condition
5  section that it's quite possible that the work
6  needs restoration, correct?
7      A  I'm sorry.  Where are you under?
8      Q  Excuse me.  Under the conclusion section.
9  You say in the final paragraph, the painting would
10  have to be carefully examined, its actual
11  condition determined, and quite possibly for the
12  need for further conservation, correct?
13      A  Yes.
14      Q  So you don't offer an opinion about the
15  actual condition in this report, correct?
16      A  I think I stated clearly that it was not
17  definitely determinable without being properly
18  examined.
19      Q  Precisely.  You need to --
20      A  However, that -- saying that indicates
21  that the picture is not in excellent condition,
22  you know, it needs to be studied and possibly
23  treated.  The possibility of the treatment really
24  had more to do with whether a treatment would
25  benefit the -- it could improve the condition of

Page 72

1  the picture in the marketplace or whether it's
2  kind of a hopeless situation, which is -- that's
3  really the issue whether it could be improved, or
4  whether what it is, is what you get and it's
5  permanently kind of compromised.
6      Q  And you have no idea what the answers to
7  these questions are because you haven't seen it?
8      A  No, these needed to be, and I'm sure
9  whoever brought the picture is dealing with that
10  right now.
11      ARBITRATOR KRAMER:  Can I understand the
12  chronology of your involvement.  Back in 2019,
13  October or November, you went to see the painting?
14      THE WITNESS:  Correct.
15      ARBITRATOR KRAMER:  Dr. Modestini --
16      THE WITNESS:  She went on the second visit
17  in November.
18      ARBITRATOR KRAMER:  And then you had an
19  engagement letter with Mr. Peck and with
20  Mr. Greenberg.
21      THE WITNESS:  Prior to that.
22      ARBITRATOR KRAMER:  Prior to that.
23      What was your involvement -- did you tell
24  us that as of December 2019 you were no longer
25  involved?

Page 73

1      THE WITNESS:  I was no longer involved.  I
2  wrote to Mr. Peck, what's happening with the
3  picture.  Then the pandemic happened.  I wasn't
4  doing much of anything, but periodically I would
5  send a note and say what's going on, and I
6  basically got no answer.
7      ARBITRATOR KRAMER:  And when were you
8  retained to give the expert opinion?
9      THE WITNESS:  Oh, maybe just a day -- a
10  couple of days before I gave the opinion, and that
11  was 2021.
12      ARBITRATOR KRAMER:  I didn't see a date on
13  them.  Am I missing a date?
14      THE WITNESS:  It was November of 2021, I
15  think.  I guess I didn't date it.
16      ARBITRATOR KRAMER:  Dr. Hunter's report is
17  dated November 5, 2021.
18      THE WITNESS:  Well, it was later in that
19  month, I think.
20      ARBITRATOR KRAMER:  In November of 2021,
21  right.  In between November 2019 and November of
22  2021, did you see the painting?
23      THE WITNESS:  No.
24      ARBITRATOR KRAMER:  Thank you.
25  BY MR. NIKAS:

Arbitrator Kenneth Kramer
October 27, 2022

Page 74

1    Q  And you asked Mr. Peck to deliver the
2  painting to Ms. -- how do we say her name?
3    A  Modestini.
4    Q  -- Modestini, to her lab so she could
5  review it with you?
6    A  Correct.
7    Q  And he didn't do that, correct?
8    A  He didn't.  I believe it was Dr. Bonito
9  that was the -- who failed to deliver the picture,
10  yes.
11    Q  And you had asked Mr. Peck to deliver it,
12  and for whatever reason, whether it's him or
13  Ms. Bonito --
14    A  The painting never showed up, put it that
15  way.
16    Q  Now, are you aware that Mr. Peck had
17  agreed in the settlement agreement to deliver the
18  painting to Christie's for an evaluation of its
19  condition?
20    A  Having heard that only in this proceeding,
21  yes.
22    Q  And are you aware that Mr. Peck didn't
23  deliver the painting on that occasion for an
24  evaluation by Christie's?
25    A  I gather it's a similar situation.

Page 75

1    Q  Now, when you criticized Dr. Hunter for
2  assuming the condition of the work is good and not
3  evaluating it in person, are you aware that he was
4  unable to do so because the respondents had
5  breached their obligation to deliver it?
6    MR. PRESS:  Objection.
7    THE WITNESS:  The motivation -- all I know
8  is he did not have -- either didn't have access or
9  wasn't able for travel reasons, whatever it might
10  be, he did not examine the picture.
11    ARBITRATOR KRAMER:  And you know that
12  because of what you heard in this last day and a
13  half?
14    THE WITNESS:  Yes, exactly.
15  BY MR. NIKAS:
16    Q  Now, did you hear Mr. Greenberg testify
17  that Ian Peck had sent him the package of
18  documents in Appendix A that were part of
19  Dr. Hunter's report?
20    A  Yes.
21    Q  Do you have any reason to doubt the
22  accuracy of that testimony?
23    A  No.  I know that I had the -- that packet
24  had been delivered to me by Virginia Bonito and
25  that I shared the documents with Ian Peck, and Ian

Page 76

1  then forwarded it to probably the DropBox link
2  which I had them to Mr. Greenberg.
3    Q  And so you have no -- in fact, the
4  chronology was you got the documents, gave them to
5  Ian Peck, and the Ian Peck e-mailed them to Gary
6  Greenberg, correct?
7    A  I believe.  I mean, that part of it is, of
8  course, out of my knowledge, but I know that Ian
9  had requested a copy of them, and I provided the
10  DropBox link.
11    Q  To Ian Peck?
12    A  To Ian Peck.
13    Q  And so when Mr. Greenberg says Ian Peck
14  sent him those documents --
15    A  It sounds like a rational chain of events,
16  yes.
17    Q  Now, in Dr. Hunter's report, I just want
18  to be clear here.  If you could turn to Tab 17 or
19  Exhibit 17, please.
20    A  Yes.
21    Q  If you go to Appendix A, information
22  provided by claimants on page 13 of 51.
23    A  Yes.
24    Q  And if you could look at that appendix,
25  please.  Just page through it.  It has summary of

Page 77

1  fact sheet, we have the works with remarks, the
2  Freedberg letter, picture of another work.  Excuse
3  me, a picture of the del Sarto, a picture of
4  another work, condition of work, yes?
5    A  Yes.
6    Q  Are these the documents that --
7    A  Some of them.  In addition, there's a
8  sheet from David Franklin Mr. Greenberg mentioned
9  that he found on the Internet and added there were
10  other -- there was other material from Virginia
11  Bonito.  Most of it was pretty irrelevant to the
12  matter at all hand, so...
13    Q  The documents here, other than that David
14  Franklin --
15    A  And the redaction, of course, was in the
16  material that I had received from Virginia Bonito.
17    Q  And you provided the documents that we're
18  looking at right now to Ian Peck, correct, other
19  than the David Franklin letter?
20    A  I believe so.  Although I -- as I
21  mentioned, although the content seems to -- I
22  don't really recognize the item.  I have to go
23  through it of the sheet that says "work of art,"
24  but I believe that is Virginia Bonito's condition
25  statement or whatever.

Arbitrator Kenneth Kramer
October 27, 2022

Page 78

1    Q   That you sent to Ian Peck, that Ian Peck
2    then sent to Gary Greenberg?
3    A   Yes.
4    Q   Now, the Freedberg letter that you
5    received that ultimately Mr. Peck sent to
6    Mr. Greenberg said that the work is in fine and
7    stable condition, right?
8    A   Uh-huh.
9    Q   And then the -- the Friedberg letter also
10   that you received and forwarded to Ian which he
11   forwarded to Mr. Greenberg also mentioned that
12   Mr. Friedberg saw it in person, correct?
13   A   Yes.
14   Q   And that it was a high quality work?
15   A   Yes.
16   Q   Now, you offer the opinion in your report
17   that the condition is not clear, right?
18   A   I do.
19   Q   And so in order for someone to determine,
20   in fact, whether Dr. Freedberg's comments about
21   his inspection of the painting, the condition
22   report comment that it's in good and stable
23   condition were inaccurate.  You need to actually
24   see the work in person, correct?
25   A   Yes.

Page 79

1    Q   And then you need to hire someone like
2    Diane Modestini?
3    A   Well, if I were doing the appraisal -- if
4    I had done an appraisal, I would have been more
5    specific in my appreciation of the condition of
6    the painting.  I have the -- as a trained art
7    historian and observer of an appraiser, I could
8    certainly qualify it, you know, specify my
9    appreciation of the condition of the painting.
10   Q   And so when you qualify it, using that
11   example, you've got no access to the painting, but
12   a condition report that says it's in good
13   condition, a letter from a scholar significant as
14   Freedberg saying, saw it in person, and it's a
15   high quality work, in order to determine whether
16   those are accurate statements you'd need to see
17   the work in person, right?
18   A   Well, the fact that the painting is high
19   quality doesn't mean that it's in good condition.
20   That's one thing, but the other thing is when
21   you're dealing with a condition report that was
22   authored by the owner of the painting, it really
23   would want an independent condition report.  This
24   is -- the condition statements from Virginia
25   Bonito were not to be trusted, in my opinion, and

Page 80

1    should not have been taken as a fact.
2    Q   Now, you heard Mr. Greenberg testify that
3    the condition report that Mr. Peck sent to him had
4    the redactions in it, you heard that, right?
5    A   I did.
6    Q   You have no reason to doubt that
7    Mr. Greenberg was telling the truth?
8    A   I think he's an honest man.
9        MR. NIKAS:  Thank you very much, sir.  No
10   further questions.
11       R E D I R E C T - E X A M I N A T I O N
12   BY MR. PRESS:
13   Q   Dr. Simon, as counsel was going through
14   your rebuttal report with you, he
15   asked if the arbitrator can disregard portions of
16   the report.
17       Do you remember that testimony, that
18   question?
19   A   Disregard portions of my report?
20   Q   Yes.
21   A   I -- the question of the authorship and
22   identification of the sitter.
23   Q   Do you agree he asked you if you --
24   A   Yes.
25   Q   Are you agreeing that portions of your

Page 81

1    report can be disregarded for purposes of this
2    arbitration?
3    A   I think they're significant, but, I
4    mean --
5    Q   So you're not agreeing that they should be
6    disregarded?
7    A   Well, that has to do with the legal issue
8    that -- you know, in the settlement agreement
9    which is something that I don't have, you know, an
10   intelligent opinion about.
11   Q   So when you hear that testimony, you were
12   saying that the law will decide, but you're not
13   yourself saying that portions of your report
14   should be disregarded?
15   A   No.  Exactly.
16   Q   Okay.  And do you recall being asked about
17   sort of a sequence of events in which the
18   materials concerning the condition and the
19   attribution of the work that were prepared by
20   Virginia Bonito was sort of disseminated; do you
21   remember that testimony?
22   A   You mean about how Mr. Greenberg received
23   them?
24   Q   Correct.
25   A   Yes.

Arbitrator Kenneth Kramer
October 27, 2022

Page 82

1    Q  Now, after the time that these materials
2  were provided to Mr. Peck, and ultimately
3  Mr. Greenberg, in whatever order it occurred, you
4  had discussions with Mr. Greenberg concerning the
5  viewings you had of the painting, right?
6    A  I think the materials --
7       MR. NIKAS:  Objection; leading.
8       ARBITRATOR KRAMER:  Let me hear the
9  question again.
10      MR. PRESS:  I'm asking him if after the
11 time that the condition report materials, other
12 materials, were provided, if he had discussions
13 with Mr. Greenberg.
14      ARBITRATOR KRAMER:  That's okay.  Go
15 ahead.
16      THE WITNESS:  As I recall, I spoke with
17 Mr. Greenberg and Mr. Peck within pretty
18 contemporaneously with seeing the painting, and I
19 think the documents were sent subsequently, among
20 other things.
21      At the time that I saw the painting in
22 October or November of 2019, the owner of the
23 painting, the location of the painting, were kind
24 of privileged to Mr. Peck, you know, had not
25 wanted that to be disseminated to, let's just call

Page 83

1  it the owner, and it was after that, it may have
2  been actually in the new year, like in February of
3  2020, that the dossier of documents was shared by
4  me.  I mean, I think -- I'm pretty sure that Ian
5  had it before, but he just couldn't locate it, so
6  I sent my copy back to him.
7  BY MR. PRESS:
8    Q  But you had --
9    A  I don't know that I spoke with
10 Mr. Greenberg after that.
11 BY MR. PRESS:
12   Q  And when you spoke with Mr. Greenberg, you
13 communicated your concerns about the condition of
14 the painting?
15   A  Yes.
16      MR. PRESS:  Okay.  No further questions.
17      MR. NIKAS:  Nothing further for me.
18      ARBITRATOR KRAMER:  Thank you very much.
19 Let's start with Mr. Peck.
20      MR. PRESS:  I have a few questions for
21 Mr. Peck.  He had to step out.
22      D I R E C T   E X A M I N A T I O N
23               O F
24           I A N   P E C K
25           (Resumed.)

Page 84

1  BY MR. PRESS:
2    Q  Mr. Peck, you are the director of the
3  respondents in this case, right?
4    A  Yes.
5    Q  And you testified yesterday in the case of
6  the claimant, correct, you provided some prior
7  testimony?
8    A  Yes.
9    Q  Okay.  I only have a few questions for
10 you.
11      The -- we just heard some questions and
12 some testimony about materials that were provided
13 by Virginia Bonito concerning the painting.
14      Do you recall that testimony?
15   A  Yes.
16   Q  Okay.  And did you send over materials by
17 Ms. Bonito to Robert Simon and/or Gary Greenberg?
18   A  My recollection was that we sent some
19 documents via e-mail to Gary, and I thought that
20 Robert had sent some as well.
21   Q  Okay.  And did you inform Mr. Greenberg
22 the source of the documents that you provided?
23   A  I told him it was coming from the owner.
24   Q  And did you represent anything as to the
25 accuracy or truthfulness of the materials provided

Page 85

1  by the owner?
2    A  Not specifically, no.
3    Q  Okay.  And I want you to turn to Tab 1 in
4  the binder.
5      Now, I believe that when you were being
6  questioned before you were asked about section 6
7  in this document.  This is the settlement
8  agreement, correct?
9    A  Yes.
10   Q  Okay.  And in this document, just
11 directing your attention to page 5.
12   A  Yes.
13   Q  Now, you were shown section 6E of this
14 document.  Do you see that?  It says, this work is
15 authentic?
16   A  Yes.
17   Q  Did you make any other representation
18 concerning -- well, strike that.
19      Did you make a representation anywhere in
20 this document concerning the condition of the
21 work?
22   A  No.
23   Q  And directing your attention to page 8 of
24 this document, if you turn there, directing you to
25 Section 16.  Now, this says "entire agreement"; do

Page 86

1  you see that section?
2      A  Yes.
3      Q  Okay.  And you understand this to be an
4  integration clause?
5      A  Yes.
6      Q  Did you rely on this provision in
7  connection with entering into this agreement with
8  Mr. Greenberg and the claimants?
9      A  Yes.
10     Q  Now, there was some testimony from
11 yesterday about -- well, first I want to ask you
12 are you aware that the painting sold in Sotheby's
13 Old Masters auction in January 2022?
14     A  Yes.
15     Q  And did you -- did you watch that auction
16 in some form?
17     A  Yes.
18     Q  Okay.  And did you see it get bid on?
19     A  Yes.
20        ARBITRATOR KRAMER:  Did you watch it --
21 was it in person or --
22        THE WITNESS:  I was watching it on video,
23 live video.
24        ARBITRATOR KRAMER:  A live stream video?
25        THE WITNESS:  Yes.

Page 87

1        ARBITRATOR KRAMER:  Is that typically done
2  by Sotheby's?
3        THE WITNESS:  A lot of people, especially
4  with COVID, were doing that.  Evaluating in the
5  room, you know, with a bunch of people was not
6  good.
7  BY MR. PRESS:
8      Q  Okay.  And did you see what the hammer
9  price was for the work?
10     A  Yes.
11     Q  And what was that?
12     A  1.8 million.
13     Q  Okay.  And there's been some testimony
14 about litigation concerning the painting, you
15 know, prior to that time.
16        Do you recall that testimony?
17     A  Yes.
18     Q  Okay.  And did Virginia Bonito -- strike
19 that.
20        Was there a dispute between you and
21 Virginia Bonito concerning the reimbursement
22 amounts that you extended to her?
23        ARBITRATOR KRAMER:  I didn't hear the
24 question.
25        MR. PRESS:  Reimbursement amounts that you

Page 88

1  had extended to her.
2        THE WITNESS:  That was part of the
3  dispute, yes.
4  BY MR. PRESS:
5      Q  Okay.  And were there negotiations between
6  you and Ms. Bonito concerning the reimbursement of
7  the amounts that had been extended to her or
8  advanced by you in some other way?
9        MR. NIKAS:  Objection.  It's not relevant.
10       ARBITRATOR KRAMER:  Overruled.
11       THE WITNESS:  In the context of Sotheby's,
12 yes.
13 BY MR. PRESS:
14     Q  All right.  And we saw a complaint that
15 you filed in court, you know, a few days before
16 the auction; do you recall that?
17     A  Yes.
18     Q  And was that matter resolved?
19     A  Yes.
20     Q  Okay.  And in the caption in that
21 matter -- let's just look at it really quick here.
22 It's seven, tab seven.
23        Okay.  Let me know when you get there.
24     A  Okay.
25     Q  Okay.  Look at the caption.  Doe the

Page 89

1  caption in this lawsuit in any way mention the
2  painting?
3      A  No.
4        ARBITRATOR KRAMER:  Does it mention any
5  what?
6        MR. PRESS:  The painting.
7        ARBITRATOR KRAMER:  Okay.
8  BY MR. PRESS:
9      Q  Okay.  This has Empire Chesapeake Holdings
10 and Chelsea Art Holdings as plaintiffs?
11     A  Yes.
12     Q  And Virginia Anne Bonito and Bottom Line
13 Exchange Company as defendants, right?
14     A  Yeah.
15     Q  Okay.  And to your knowledge, is anyone
16 else other than the parties to this case and
17 Sotheby's aware of this litigation proceeding?
18     A  No, not to my knowledge.
19     Q  Okay.  And it was resolved prior to the
20 auction, correct?
21     A  Yes.
22     Q  Okay.  And in connection with the auction,
23 the auction by Sotheby's, does Sotheby's warrant
24 anything to a purchaser?
25     A  Yes.

Arbitrator Kenneth Kramer
October 27, 2022

Page 90

1      Q   And what is that?
2      A   Sotheby's guarantees authenticity, title,
3   and that's it, authenticity and title.
4      Q   And do you believe the litigation that was
5   filed just a few days before the auction had any
6   impact on the auction results?
7          MR. NIKAS:  Objection; no foundation.
8          THE WITNESS:  No, I do not.
9          MR. PRESS:  He can have an opinion about
10  that, and take it for what it is.
11         ARBITRATOR KRAMER:  He already answered.
12  So I won't strike his answer.
13         MR. PRESS:  All right.
14  BY MR. PRESS:
15     Q   Do you think that the auction established
16  the fair market value of the painting?
17     A   I think public auction is the most
18  accurate reflection of market value.
19     Q   And is there any reason in your mind to
20  believe that the painting could have sold for more
21  at a prior date such as in April 2021?
22     A   No.  If anything, I think it would have
23  sold for much less.
24     Q   Why do you think that?
25     A   Well, the January sale -- auction at

Page 91

1   Sotheby's is considered the main and most
2   important auction of the year for Old Masters and
3   have the best property in it.  Sotheby's has the
4   best marketing machine by far, and so I do think
5   it would have done better in Sotheby's sale than
6   rushed into an April sale -- a minor sale at
7   Christie's.
8      Q   Okay.  And you've been in the art business
9   for many decades; is that fair?
10     A   Thirty years.
11     Q   And have you presented appraisals to the
12  IRS from time to time?
13     A   I have worked as part of a team with
14  appraisers with the IRS for valuation purposes.
15     Q   And would the IRS accept an appraisal if
16  it didn't comply with USPAP rules in your
17  experience?
18     A   No, they would disregard it.
19         MR. PRESS:  I have no further questions.
20  Thank you.
21         MR. NIKAS:  I have a few questions, sir.
22         ARBITRATOR KRAMER:  Can I have the last
23  question and answer, please.
24         (Whereupon, the selected portion of the
25  transcript was read back.)

Page 92

1            C R O S S - E X A M I N A T I O N
2   BY MR. NIKAS:
3      Q   You just testified that the action you
4   filed against Sotheby's was resolved before the
5   sale; do you recall that?
6          MR. PRESS:  I have to object.  He said
7   against Sotheby's.  You have to look at the
8   caption, please.
9          THE WITNESS:  We didn't file an action
10  again Sotheby's.
11  BY MR. NIKAS:
12     Q   You filed a lawsuit against Virginia Anne
13  Bonito and the Bottom Line Exchange regarding a
14  work that Sotheby's was selling, correct?
15     A   We filed against those two parties as it
16  related to a painting that was being consigned to
17  Sotheby's for sale.
18     Q   And you sent a letter to Sotheby's
19  objecting -- we went over this -- objecting to
20  Sotheby's selling the work, correct?
21     A   We -- the purpose of the letter was to
22  notify them that we had an interest, yes.
23     Q   And you sent a letter objecting to the
24  sale, correct?
25     A   Well, objecting to the sale without our

Page 93

1   rights being protected, yes.
2      Q   And the complaint that you filed related
3   to the works Sotheby's was offering for sale was
4   filed on January 24, 2022, correct?
5      A   I don't recall the exact date, but it was
6   late January.
7      Q   And the sale was scheduled for three days
8   later, January 27, 2022, right?
9      A   It was very close to the sale, yes.
10     Q   In fact, the lawsuit that you filed
11  against Bonito and Bottom Line Exchange wasn't
12  dismissed until March 16th of 2022; isn't that
13  right?
14     A   That is correct.
15     Q   And was the stipulation signed on
16  March 1st, 2022, correct?
17     A   I don't recall the stipulation.
18     Q   But the lawsuit was dismissed in the
19  middle of March, a month and a half after the
20  sale, correct?
21     A   Yes.
22     Q   And on the docket of that case, you're not
23  aware of any public notices that the lawsuit had
24  been resolved in a matter of days, correct?
25     A   No.

Page 94

1    Q   And the only public notice was that it
2   resolved a month and a half later, right?
3    A   I assume that's what it says.
4    Q   Thank you.
5        Now, you heard Dr. Simon's testimony that
6   you had sent documents to him or Bonito did, he
7   sent them to you, and then you sent them to Gary
8   Greenberg, correct?
9        MR. PRESS:  The question is did you hear
10  the testimony or are you asking him is that what
11  happened?
12       MR. NIKAS:  If you have an objection, make
13  it.  I'm not sure --
14       MR. PRESS:  Object to form.
15       ARBITRATOR KRAMER:  Rephrase the question.
16       MR. NIKAS:  Sure.
17  BY MR. PRESS:
18   Q   Did you hear Dr. Simon's testimony that he
19  received documents from Bonito, he then sent those
20  documents to you, and then you sent those
21  documents to Gary Greenberg?
22   A   Yes.
23   Q   Is that accurate?
24   A   My recollection is that I sent certain
25  documents from that same file that Dr. Simon

Page 95

1   provided, and that he certain documents directly
2   to Greenberg.
3    Q   You have no actual knowledge of what
4   Dr. Simon actually sent to Mr. Greenberg, correct?
5    A   Not specifically.
6    Q   You only know what you sent to
7   Mr. Greenberg, right?
8    A   Generally, yes.
9    Q   And you sent Mr. Greenberg the condition
10  report, correct?
11   A   I don't recall the specific things we were
12  sending.  We were sending the entire file that was
13  being provided to us from Dr. Bonito to give him
14  everything that we were looking at -- that we were
15  looking at so that he had everything that we had.
16   Q   Maybe I can refresh your recollection.
17  I'm going to show you an e-mail that you sent to
18  Mr. Greenberg on February 16, 2020, attaching a
19  redacted condition report.  If you can tell me
20  whether that --
21       MR. PRESS:  I'm going to object.  Is this
22  an exhibit in the case?
23       MR. NIKAS:  I'm refreshing his
24  recollection.
25       ARBITRATOR KRAMER:  It's

Page 96

1   cross-examination.
2        MR. PRESS:  Okay.
3   BY MR. NIKAS:
4    Q   If you can take a look at that, please.
5        ARBITRATOR KRAMER:  Did you supply a copy
6   to Mr. Press?
7        MR. PRESS:  I haven't received this in
8   discovery.  I never received this in discovery.
9        MR. NIKAS:  It was a request for all
10  documents related to the work that Mr. Press made.
11  We objected to the breadth of that request
12  containing privilege, and otherwise we said we
13  would agree to confer in a good faith, and there
14  are the requests.  Mr. Press, he never followed
15  up, never moved to compel, and this is a document
16  his clients sent, so there's clearly no prejudice,
17  and we requested it from him as well, and we never
18  received it.
19       ARBITRATOR KRAMER:  Okay.
20  BY MR. NIKAS:
21   Q   Does your refresh your recollection that
22  you sent Mr. Greenberg the condition report in
23  redacted form?
24   A   It appears that I did, yes.
25   Q   And you also sent Mr. Greenberg the

Page 97

1   Freedberg letter, correct?
2    A   Yes.
3    Q   And you also sent him the images of the
4   work, correct?
5    A   There were two main images of the work
6   that we sent, yes.
7    Q   And when you e-mailed Mr. Greenberg the
8   image of the work, you said that that's the
9   painting, we had no restoration, repairs, or
10  vanish, so what you see, is all original, correct?
11   A   That's what I was told.
12   Q   And that's what you told Mr. Greenberg,
13  correct?
14   A   I don't recall specifically telling him
15  that.
16   Q   Let me see if I can refresh your
17  recollection.
18       Does that refresh your recollection that
19  you told Mr. Greenberg that the painting in this
20  image was the painting with no restoration,
21  repairs, or vanish, so what you see is all
22  original?
23   A   That was my opinion based on what I was
24  being told.
25   Q   Okay.  Now, you've heard Dr. -- let me

Page 98

1  just -- with respect to the Friedberg letter, you
2  sent that to Mr. Greenberg directly on
3  February 5th, 2020; do you recall that?
4      A  I don't specific recall.
5      Q  Let me see if I can refresh your
6  recollection.
7          MR. PRESS:  I'm going to object to all
8  these documents because they're all within the
9  scope of my request, and they said I'm not giving
10 you anything, and it's all directly relevant to
11 this proceeding, and I don't think we should --
12         ARBITRATOR KRAMER:  Overruled.
13 BY MR. NIKAS:
14     Q  Do you recall sending that e-mail, sir?
15     A  Not specifically, but I have no doubt that
16 I would have.
17     Q  Now, you heard Dr. Hunter testify that the
18 only additional information he'd need to make a
19 definitive conclusion about the condition of the
20 paint is to actually see it in person?
21         MR. PRESS:  I'm going to object to this as
22 it's beyond the scope of the direct examination.
23         MR. NIKAS:  He gave answers about the
24 condition of the work.
25         MR. PRESS:  It was only about his

Page 99

1  representations.
2          ARBITRATOR KRAMER:  I'll allow that.
3  Overruled.
4          THE WITNESS:  I'm sorry.
5  BY MR. NIKAS:
6      Q  You heard Dr. Hunter say the additional
7  information he'd need to determine the condition
8  definitively was to be able to see it in person,
9  correct?
10     A  I don't recall that specifically.
11     Q  Okay.  You heard Dr. Simon just say that
12 in order to determine definitively the condition
13 of the painting he would need to have it delivered
14 to Diane Modestini and see it in person in her
15 lab, correct?
16     A  Yes.
17     Q  And in the contract with Mr. Greenberg,
18 you promised to send the work to Christie's for an
19 inspection of its condition and an estimate,
20 correct?
21         MR. PRESS:  Now I'm going to objet.  Now,
22 this is definitely beyond the scope.  I mean, he
23 gave very limited testimony.  He could have asked
24 this yesterday when he called him direct.  He
25 rested, and I really think he has to be stuck with

Page 100

1  that.
2          If he's going to preclude things that I
3  would like to have my witness discuss, then I
4  think he has to respect the rule on staying within
5  the scope of the examination.
6          MR. NIKAS:  We went over the contractual
7  provisions.  He talked directly about the
8  conditions.  I'm asking him questions directly
9  related to the conditions as well as the expert
10 testimony that his own expert gave after my
11 case-in-chief.
12         ARBITRATOR KRAMER:  Overruled.
13         THE WITNESS:  Sorry.  Can you repeat the
14 question?
15 BY MR. NIKAS:
16     Q  Sure.  In the contract you entered into
17 with Mr. Greenberg and the respondents, you
18 promised that you would deliver the work to
19 Christie's for an inspection of the condition and
20 an estimate, correct?
21     A  That was the goal, yes.
22     Q  And you never delivered the work to
23 Christie's for that inspection, correct?
24     A  We were unable to.
25     Q  You never delivered the work to Christie's

Page 101

1  for that inspection, correct?
2          ARBITRATOR KRAMER:  We know that, yes.
3          MR. PRESS:  This has all been asked and
4  answered.
5  BY MR. NIKAS:
6      Q  And your aware the arbitrator found you
7  breached the contract --
8          MR. PRESS:  We've covered this.
9  BY MR. NIKAS:
10     Q  -- for failing to deliver, correct?
11     A  I understand that's the finding.  I don't
12 agree with it.
13     Q  And it is your testimony with respect to
14 the condition that you should be able to take
15 advantage of your failure to deliver it by
16 suppressing the value of the work in this case?
17         MR. PRESS:  Objection.
18         ARBITRATOR KRAMER:  Sustained.
19         MR. NIKAS:  I have no further questions.
20         MR. PRESS:  I have no further questions
21 for Mr. Peck.
22         ARBITRATOR KRAMER:  Let me ask a question.
23         In 2019, when Dr. Simon went to look at
24 the painting at Dr. Bonito's house, did he report
25 to you on his views of the condition?

Arbitrator Kenneth Kramer
October 27, 2022

Page 102

1    THE WITNESS: Yes.  He said that he had
2  questions and that he wanted to have this woman
3  follow up and do these exams.  Unfortunately, we
4  couldn't get the owner to agree to that, but, you
5  know, he certainly saw it.  Robert is being
6  modest.  He's an expert.  He's not a restorer, but
7  he's very expert in looking at Old Master
8  paintings.
9    ARBITRATOR KRAMER:  If there were
10  questions about the condition in 2019, why did you
11  send, in February of 2020, send a letter to
12  Mr. Greenberg -- forward the letter to
13  Mr. Greenberg which says the condition, the
14  painting is in a fine and stable condition?
15    THE WITNESS:  We were just forwarding what
16  we had as a condition report for the painting,
17  which was being provided by the owner.  Robert
18  Simon's job was to offer his own independent view.
19    ARBITRATOR KRAMER:  Okay.  Thank you.
20    MR. PRESS:  I have no further questions.
21    ARBITRATOR KRAMER:  Very well.  Thank you
22  very much, Mr. Peck.
23    Any further witnesses?
24    MR. NIKAS:  Not from the claimants, sir.
25    MR. PRESS:  And none from this side.

Page 103

1    ARBITRATOR KRAMER:  Okay.  Why don't we
2  excuse Dr. Hunter and Mr. Simon.  I want to talk
3  about briefing.
4    MR. PRESS:  I have one further statement
5  which is that I need to renew my request that we
6  keep the hearing open so that we can get the
7  testimony of Geza von Habsburg and Elizabeth von
8  Habsburg.
9    ARBITRATOR KRAMER:  Well, I've written
10  about it, and I'll write about it again in my next
11  decision.  The basic reason is I thought that it
12  would unduly extend the hearings, and you have
13  been given sufficient information to cross-examine
14  on the issues raised by the failure of the -- of
15  Dr. Hunter's report to acknowledge that the
16  Winston Art Group had done an appraisal of the
17  same work in 2019.  I'll write further about that
18  in my final decision.
19    MR. PRESS:  I would just like to make one
20  comment on that.  I understand your ruling, but
21  the comment I'd like to make is that because we
22  have not had discovery and haven't been able to
23  speak to either Geza or Elizabeth von Habsburg,
24  because of that, we -- the respondents have been
25  forced to accept what I believe to be a pretext

Page 104

1  rule explanation of what happened, and I don't
2  believe that story we heard is credible.  I think,
3  that it's easily verifiable from documents within
4  Winston Art Group and from the testimony of those
5  witnesses.  I think it's material to the
6  admissibility of Dr. Hunter's expert report.
7    So I'm just stating that I want to state
8  that on the record.  I understand your ruling.
9  I'm objecting to the ruling, and then we can move
10  on.  We can talk about it.
11    ARBITRATOR KRAMER:  When did you obtain
12  the appraisal report dated October 4, 2019, and
13  from whom?
14    MR. PRESS:  We -- so my client learned
15  about it, and so we made discovery requests asking
16  for that report and for material concerning that
17  report.  And I recall that we had a teleconference
18  in which you directed the claimants provide that
19  report.  I then had discovery requests, further
20  requests, for documents concerning the origin of
21  the two reports.  And also, I specifically
22  requested deposition's of Geza von Habsburg and
23  Elizabeth von Habsburg; you denied those requests.
24  I've been renewing them.  I understand your
25  decision.  I've been renewing them because I think

Page 105

1  at this point, I think perhaps you can see that
2  these are -- this is relevant information that's
3  being sought, and so I'm going to continue
4  renewing it and I'll continue objecting, but
5  there's a record of that, that we have been asking
6  for that since we found out about the report.
7    ARBITRATOR KRAMER:  Can you tell me bout
8  the chronological, please?
9    MR. NIKAS:  Sure.  So Mr. Hunter had no
10  idea the report had been prepared.  He didn't have
11  it in his files.
12    ARBITRATOR KRAMER:  I have heard his
13  testimony.
14    MR. NIKAS:  And nor was Winston aware of
15  it.  It didn't come up in the conflict check, so
16  we didn't know about it when he produced his
17  report.
18    When Mr. Press learned about it, he in
19  essence took the position that this is not
20  Dr. Hunter's report, it's not our expert in the
21  case, he's an independent consultant, and so it's
22  relevant.  You said produce the report, so we went
23  to the files, which was at Winston, found the
24  report, found the $30 million-report in the same
25  file and produced those reports to Mr. Press.  He

Arbitrator Kenneth Kramer
October 27, 2022

Page 106

1  did not make any efforts to depose Dr. Hunter
2  about those issues. We said Dr. Hunter can
3  testify about those issues. We prefer discovery
4  after that and we can discuss it. He failed to
5  take any depositions in the case at all, follow up
6  on any depositions at all. And then after expert
7  discovery was done, after summary judgment was
8  already in, he started pressing for discovery
9  directly of Winston around that time. We said
10 that's entirely irrelevant. You've got the
11 testimony of our expert, Dr. Hunter, and you said
12 you'd hear from Dr. Hunter because he's the one
13 prepared the report. It's his credibility on the
14 line, and Mr. Press was perfectly free to
15 cross-examine him on the issues, and then,
16 ultimately, if Mr. Hunter is not prepared to
17 testify about those matters, then you'd make a
18 discussion as to whether someone else was. He
19 came, he testified about those matters, he
20 testified truthfully that he wasn't aware of it,
21 that the conflict check happened in exactly the
22 way it did, and that we didn't know about it.
23 Mr. Greenberg said that he didn't know about that
24 report, and nor did I until after Mr. Press raised
25 it.

Page 107

1         With all of that evidence, there's
2  absolutely no reason to bring in other people who
3  were not hired, did not provide this report, and
4  are not going to be additive to what Dr. Hunter
5  already testified about.
6         You denied the request multiple times, and
7  Mr. Press could have taken Dr. Hunter's deposition
8  and heard that testimony and said, well, I think I
9  need more information, made an application to you,
10 but he didn't.
11       MR. PRESS: And that chronology leaves out
12 the fact that I issued document requests and
13 discovery requests, I had a subpoena to Winston
14 Art Group where I asked for an entire range of
15 documents that would allow me to explore these
16 issues, and I got no objection that, you know,
17 wholesale objection not providing documents.
18       I did raise this to you and you sustained
19 those objections, but I think at that time it may
20 not have been clear to you the significance of it,
21 and I do think that -- we heard some testimony
22 from Dr. Hunter yesterday that he -- that this
23 assignment came through Elizabeth von Habsburg in
24 the New York office, okay, and then she farmed it
25 out to Dr. Hunter. She's the managing director of

Page 108

1  the whole company. I just think that it doesn't
2  seem plausible to me that they made this mistake,
3  and while they presented it that way, you know,
4  the normal process in litigation is not to just
5  take their word for it, but to get documents. I
6  did seek the documents. I didn't take the
7  deposition of Dr. Hunter, that's true, but I did
8  seek to a subpoena and documents related to
9  exactly this issue. You denied the request, but
10 I'm renewing it now. I think the hearing could
11 remain open. We could obtain the discovery
12 quickly, and then if there's more testimony, we
13 could cover it.
14       ARBITRATOR KRAMER: Well, what Mr. Press
15 is suggesting is that there -- that Dr. Hunter
16 gave untruthful testimony and that could be shown
17 by examining one or both of the Habsburgs.
18       Are you content to leave the record the
19 way it is?
20       MR. NIKAS: I'm content to leave it
21 exactly as it is. He's had multiple opportunities
22 to depose -- he had a month to depose Dr. Hunter
23 to follow up on any evidence that he thought in
24 that testimony demonstrated he was not credible;
25 he failed to do that. There's absolutely zero

Page 109

1  evidence presented in Dr. Hunter's
2  cross-examination that he was not telling the
3  truth. His testimony was credible, we ran a
4  conflict check with Winston. They said they had
5  no record of any of the parties. Mr. Greenberg
6  testified that we have absolutely no idea.
7         This goes to credibility, and if you found
8  his testimony to be credible, and it is, then
9  fine. If you found his testimony not to be
10 credible, you'll make that judgment. You have
11 that $1.5 million report, we have his explanation
12 for it, there's absolutely no prejudice
13 whatsoever, they were able to cross-examine him on
14 the substance of the report. This is an effort to
15 keep the hearing open and delay when the record
16 speaks for itself in this claim.
17       MR. PRESS: Mr. Kramer, if I may respond
18 to that very quickly. I know you don't want to
19 keep the going over this, but you may recall the
20 testimony of Dr. Hunter was that that he
21 acknowledges providing substantial assistance in
22 Geza von Habsburg's 2019 appraisal. Because of a
23 single phone call, and in that single phone call
24 he said that there was a very serious issue with
25 title and that they should stay away from Virginia

Page 110

```
 1  Bonito, but if you look at that expert report, it
 2  doesn't say anything like that.  It doesn't
 3  mention a problem with title.  In fact, it assumes
 4  the title.  It doesn't say anything like that.
 5        So if we're being told that that was --
 6  that it was just a single phone call, he doesn't
 7  remember it at all, and it was about that, the
 8  report that was issued in 2019, doesn't reflect
 9  anything like that.  It seems implausible.  The
10  work file that Winston was required to keep, as a
11  matter of appraisal rules, would indicate the
12  actual work that Dr. Hunter did on that and it
13  could be used to impeach him.
14        It's very easy.  They have to keep a work
15  file.  They would give us the work file for both
16  of these appraisals, I think there could be some
17  e-mails, and then, sir, you can take it from
18  there.
19        MR. NIKAS:  With respect to the evidence,
20  Dr. Hunter searched his entire work file, searched
21  his e-mails.  There's not a single document, and
22  I'll put that on the ye record in terms of the
23  document collection and search we did.  Not a
24  single document in Dr. Hunter's files related to
25  valuation, research, or anything else.  No
```

Page 111

```
 1  e-mails, nothing, zero.
 2        ARBITRATOR KRAMER:  Related to 2019 --
 3        MR. NIKAS:  Related to the 2019 report.
 4  Sir, his testimony is that he had one, maybe two,
 5  phone calls and gave the information he gave, it's
 6  corroborated by the failure -- the absence of any
 7  documents whatsoever related to this.
 8        ARBITRATOR KRAMER:  Okay.
 9        MR. NIKAS:  We did that research.  So to
10  the extent he wants documents as to what
11  Dr. Hunter had in his files, what he relied upon,
12  what he considered, which is what's relevant when
13  you're talking about the opinions that an expert
14  gives, he has literally nothing related to that
15  2019 report in his files.
16        MR. PRESS:  You're speaking of his files.
17  Notice that Geza von Habsburg, I think there
18  should be one file, okay, but Geza von Habsburg
19  may have a file that talks about the contributions
20  that Mr. Hunter made.
21        I think what -- there's a sort of
22  sophistry going on here about the difference
23  between Dr. Hunter's files, but Dr. Hunter is
24  saying he's a consultant.  He's not actually part
25  of Winston, but Winston has a work file, and that
```

Page 112

```
 1  work file may well reflect the work that
 2  Dr. Hunter did.
 3        Now, what I hear counsel saying is that he
 4  checked Dr. Hunter's file.  Now, of course, it's
 5  just his say so, but I don't believe this has been
 6  run down fully, and I think that the outcome of
 7  this could be significant.
 8        ARBITRATOR KRAMER:  Okay.  I will maintain
 9  my ruling.  I think in litigations, and in
10  arbitrations as well, lawyers make choices along
11  the way about -- deadlines are established in
12  order to make choices along the way of what to
13  pursue and what not to pursue.  At the time
14  discovery had ended, according to our schedule,
15  you had not taken any depositions, and so I would
16  maintain my ruling that I will deny the request to
17  get documents or have testimony from either one of
18  the von Habsburgs, okay.
19        MR. NIKAS:  Thank you, sir.
20        ARBITRATOR KRAMER:  But if we can excuse
21  Dr. Hunter, I would like to talk about the
22  briefing.
23        When did you submit the briefs to me?
24        MR. PRESS:  We will get the transcript,
25  and then we're going to need a certain amount of
```

Page 113

```
 1  time to submit the briefs.
 2        ARBITRATOR KRAMER:  We can go off the
 3  record.
 4        (Whereupon, the proceedings concluded at
 5  12:30 p.m.)
 6                    --oo0oo--
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 114

```
1              C E R T I F I C A T E

2

3          I, Leonora L. Walker, a Notary Public, the

4   officer before whom the foregoing deposition was

5   taken, do hereby certify that the foregoing

6   transcript is a true and correct record of the

7   testimony given; that said testimony was taken by

8   me stenographically and thereafter reduced to

9   typewriting under my supervision; that reading and

10  signing was not requested; and that I am neither

11  counsel for or related to, nor employed by any of

12  the parties to this case and have no interest,

13  financial or otherwise, in its outcome.

14         IN WITNESS WHEREOF, I have hereunto set my

15  hand and affixed my notarial seal this 27th day of

16  October 2022.

17      My commission expires May 17, 2024.

18

19

20          NOTARY PUBLIC IN AND FOR THE

21          STATE OF NEW YORK

22          Notary Registration No. 01WA6109670

23

24

25
```