

# Fair Market Value Appraisal
# for Litigation Purposes

Client:

**Claimants Gary Greenberg et al. c/o Luke Nikas, Quinn Emanuel Urquhart & Sullivan LLP**

Job Number:

**16089.1**

Appraisal Effective Dates:

**April 30, May 31, and October 31, 2021**

Total Appraised Value:

**$15,000,000**

**Note:** The values included in this appraisal are Fair Market Values in accordance with IRS Publication 561 and the Technical Advisory Memorandum 9235005 (see definition in our Scope of Work) and include assumed fees such as Buyer's Premium. However, these values do not necessarily represent the net amount the owner would receive in a hypothetical sale as of the effective date of the appraisal.

WINSTON
ART GROUP

## Table of Contents

Signed Certification ................................................................................................................ 3-4

Scope of Work .................................................................................................................... 5-8

Narrative ............................................................................................................................ 9-11

Grand Total ....................................................................................................................... 12

Appendix A: Information provided by client ...................................................................... 13-26

Appendix B: Comparable Sales .......................................................................................... 27-30

Market Overviews .............................................................................................................. 31-32

Appraisal Definitions and Terminology ............................................................................. 33-41

Terms and Conditions ....................................................................................................... 42-45

Curriculum vitae ................................................................................................................ 46-51

WINSTON
ART GROUP

**SIGNED CERTIFICATION**

I, the undersigned, on behalf of Winston Art Group, Tax ID #27-2541263, being duly sworn, hereby depose and certify:

That to the best of the appraiser's knowledge and belief:

- the statements of fact contained in this report are true and correct.

- this appraisal represents the appraiser's best judgment and opinion as to the FAIR MARKET VALUE of the subject property.

- the reported analyses, opinions, and conclusions are limited only by the reported assumptions, disclaimers, and terms and limiting conditions outlined in this report, and these are the appraiser's personal, impartial and unbiased professional analyses, opinions, and conclusions.

- the appraiser has no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- the appraiser has not performed services as an appraiser or in any other capacity for the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- the appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- the appraiser's compensation for completing this assignment is based on an hourly rate ($395 per hour for appraisal research and, if requested, $500 per hour for expert witness testimony and services) and not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- the appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the 2020-2021 *Uniform Standards of Professional Appraisal Practice*.

- the appraiser has not made a personal inspection of the property that is the subject of this report.



- the Managing Director of Winston Art Group, Elizabeth von Habsburg, provided significant personal property appraisal assistance by reviewing the values and cataloguing for property that is subject in this report.

Dr. Timothy Hunter
Appraiser – Old Masters
5th day of November, 2021



SCOPE OF WORK

Purpose of Appraisal:  The appraiser was asked to prepare a Fair Market Value appraisal from images and descriptions for litigation expert disclosure purposes. This report is not valid for any other purposes.

Category of Items:  Fine art

Intended Use of Appraisal Report: Litigation

Client:  Claimants Gary Greenberg et al. c/o Luke Nikas, Quinn Emanuel Urquhart & Sullivan LLP

Owner:  Unknown to the client and appraiser

Effective Date of Appraisal:  Values expressed in this appraisal are effective as of three dates: April 30, May 31, and October 31, 2021.

Date of Report: November 5, 2021

Intended User(s) of Appraisal:  This appraisal can be used and relied upon by the client and their designates in litigation. Any other user is considered an unintended user.

Assignment Considerations:  The specialist was unable to inspect the property in person; he therefore appraised solely from images and descriptions provided by the client. The limited documentation and information relating to the property and other cataloguing that was provided by the client is included in Appendix A:

- Fact sheet (with redactions and an introductory essay, reference is made to a full dossier on the painting which has not been provided to the client or appraiser and apparently includes relevant provenance documents, the Art Loss Register report, the comprehensive conservation report, the full pre-publication scholarly essay, and a recently updated insurance replacement value appraisal)
- Letter from Sydney J. Freedberg (2 pages, handwritten, dated January 14, 1991)
- Two images of the work (pre and post restoration), plus an image of another painting by del Sarto (Portrait of a Young Man, ca. 1517-18. National Gallery, London)
- Condition report (1 page without images, the author has not been identified)
- Wikipedia entry for David Franklin (no context has been provided for this information)

The appraiser was given adequate time to research the property. Relevant comparable information is included in the document or maintained in the work file at the offices of Winston Art Group and is available upon request. The appraiser was unable to personally examine the comparable works used for

WINSTON
ART GROUP

this assignment, and thus relied on information available through online databases, dealers, and/or galleries. Not all comparables have current condition reports available for review.

**Limiting Conditions**:  This report is made at the request of the party named for his/her use. It is not an indication or verification of title of ownership. The question of title was not considered for this appraisal, at the direction of the client. The identification of the interest of the requesting party is simply that represented to the appraiser by such party and no inquiry or investigation has been made nor is any opinion given as to the truth of such representation.

The appraiser did not undertake a title search with the Art Loss Registry. Unless otherwise stated herein, value(s) expressed are based on the general expertise and qualifications of the appraiser as to the appropriate market and values for the item(s) and purpose involved. The appraised value is based on whole ownership and possessory interest undiminished by any liens, fractional interests or any other form of encumbrance or alienation. The value expressed herein is based on the appraiser's judgement based on research and is not a representation or warranty that the item(s) will realize that value if offered for sale at auction or otherwise. The value(s) expressed is based upon current information on the date made and no opinion is hereby expressed as to any future or past value, unless otherwise expressly stated.

All pages of this appraisal, from the cover page to the final page with appraiser's qualifications are considered as part of the report, the date listed on the cover sheet is the date from which the entirety of the report is valid.  Estimates of value and quality may vary from one appraiser to another with such variances not necessarily constituting an error on the part of the appraiser; therefore, statements and data contained herein cannot be considered as a guarantee or warranty. We assume no liability with respect to any action, which may be taken on the basis of this appraisal or for any unintended error or omission from this report, except in the case of fraud, willful misconduct, or gross negligence.

**Extraordinary Assumptions:**  An extraordinary assumption is defined as an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. For the purposes of this assignment at the instruction of the client, the appraiser has made the extraordinary assumptions that there is no dispute with respect to title, that the work is authentic, that the work has the provenance as described by the fact sheet, that the work has good condition, that the work has not been offered on the market previously (ie fresh to the market), that the sitter's identity is properly identified, that there are no literature or exhibition citations except as indicated in the materials provided by the client, that the work was apparently unknown to the market prior to the Freedberg examination and letter, and the appraisal is made assuming those facts on which we make no opinion. Any later disclosed, or newly discovered information or unknown information/provenance may change the value of the items. The appraiser did not inspect the property in person, he thus relied solely on images and descriptions provided by the client and assumed this information to be accurate.



The appraiser was unable to personally examine the comparable works used for this assignment, and thus relied on information available through online databases, dealers, and/or galleries and assumed authenticity, condition and value information to be accurate. When no condition report is available, the appraiser assumed comparable examples to be in good condition unless otherwise noted in the auction or retail listings. All information provided by the client is assumed to be accurate.

**Hypothetical Conditions:** A hypothetical condition is defined as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. For the purpose of analysis, the appraiser applied condition(s) contrary to known facts about physical, economic or legal characteristics; or about the integrity of data used in an analysis in. It is a hypothetical condition that the work has clear title.

**Method of Examination:** The appraiser was unable to examine the property in person; he therefore relied on the images and description provided by the client to confirm physical characteristics.

**Photography:** Images were provided by the client and have been scanned for use in the document. Photographs have been cropped and straightened for closer views. Photos may be reduced or enlarged in size. It is meant to provide identification of the property and should not be taken as an accurate representation. No other editing or modifications have been made to the photographs.

**Method of Research:** Where an appraisal is based not solely on the item(s), but also on data and/or documentation supplied to the appraiser, this appraisal shall so state by making a reference to this fact. Research was conducted in the home offices of the Winston Art Group appraiser and with on-line auction result databases, such as Invaluable, Artnet, Artprice, AskArt, Sotheby's website and catalogues, and Christie's website and catalogues and relevant retail galleries and databases when necessary to identify sale prices of comparable property. The appraiser regularly attends auction previews and sales in this genre, as well as major fairs exhibiting comparable material and discusses the market trends with auction house professionals and dealers. The appraiser consulted limited reference materials, and relied mostly on online reference materials and limited reference books in their current location, due to the ongoing travel and health restrictions imposed by COVID-19.

**Approach to Value:** The appraiser has employed the "Sales Comparison Approach (market comparison)" approach to arrive at the appraised "Fair Market Value". The "income" approach was not considered applicable as the property in this report is not used to generate income. The "cost" approach was not considered applicable as there is no need to determine the value of the subject property based on the cost of manufacturing or recreating an identical object at this time.

**Market Examined:** The "Sales Comparison Approach (market comparison)" analyzes recent sales of comparable articles at major international and regional auction houses, private and public sales, shows and exhibitions, as well as prevailing prices at retail shops and galleries where the article may normally be traded.



**Type of Valuation**:

The **Fair Market Value** is defined by the IRS as stated in the Treasury Regulation Sections 20.2031-1 (b) as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts" (IRS Publication 561). According to Technical Advisory Memorandum 9235005 [May 27, 1992], fair market value should include the buyer's premium. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. (Treasury Regulations Section 20.2031-1 (b))

**Type of Appraisal & USPAP Compliance**:  This report is considered an unrestricted appraisal according to the rules of *USPAP 2020-2021 (Uniform Standard of Professional Appraisal Practice)* and follows the guidelines of *USPAP* for providing all of the necessary information/analysis to satisfy the report writing requirements of an unrestricted appraisal.

WINSTON
ART GROUP

**Fair Market Value**



WAG #: 16089/369949                                                    $15,000,000
**D'AGNOLO, ANDREA, called ANDREA DEL SARTO (Italian, 1486
-1531)**
**Portrait of a Gentleman, possibly Ottaviano de'Medici (1484-1546),
ca. 1525**
Oil on canvas
Overall original canvas: 31 1/2" x 24 3/4"; overall stretcher size: 31 7/8" x
25 3/8"

PROVENANCE
Private Collection [family tradition and records indicate the painting was
acquired in the 19th century as one of a number of antiques that were part
of the furnishings and that accompanied the owners who moved from Italy
to New York in 1908]

AUTHENTICITY
According to information provided by the client:
"The definitive attribution to Andrea del Sarto was made by Sydney J.
Freedberg, who examined the painting in person; Freedberg communicated
his conviction about the authenticity of the painting and the attribution to
Andrea del Sarto verbally and subsequently in a hand written letter, dated
January 14, 1991. In his letter, Freedberg dates the painting to the artist's
full maturity, ca. 1525; he further notes that it is a portrait of very high
quality of an unusually handsome subject. [At the time of the writing of his
authentication letter, Sydney Freedberg was Professor Emeritus, Harvard
University; Chief Curator Emeritus, National Gallery of Art, Washington D.
C.; and author of the monographic catalogue raisonne, Andrea del Sarto
(Cambridge, Harvard University Press), 1963, 2 vols.]

Following the Freedberg authentication, the painting underwent careful
conservation and has been the subject of thorough-going art historical
research.

The painting has never been offered on the art market."

FURTHER DETAILS
Andrea del Sarto (1486-1531) was a Florentine painter of the High
Renaissance. He initially studied under Piero di Cosimo, but his early work is
in fact more directly influenced by Fra Bartolommeo. His mature work
reveals a close study of the art of Leonardo, Raphael and Michelangelo, the
latter two he may have encountered on a brief trip to Rome. Through
exposure to these artists del Sarto developed his own style incorporating a
soft 'sfumato' with a great sensitivity to color and combining idealized
beauty with a classical monumentality of form. For all his many influences,
del Sarto's work remained rooted in Florentine naturalism and at his best he
ranks among the greatest artists of the High Renaissance, seen in such
celebrated altarpieces as the 'Madonna of the Harpies' (1517; Florence,
Uffizi); and the 'Madonna della Scala' (c. 1522; Madrid, Museo del Prado);
as well as frescoes, such as 'The Birth of the Virgin' in the church of SS
Annunziata (1514); and the grisailles of the 'Life of St. John the Baptist' in
the cloister of the Compagnia dello Scalzo (1509-26). He exerted a huge
influence on contemporary artists such as Pontormo (and to a lesser extent
Bronzino), as well as a later generation of Florentines, such as Santi di Tito
and Jacopo da Empoli.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

**Fair Market Value**

In addition to religious commissions, del Sarto also executed a small number of secular portraits, such as the 'Portrait of a Young Man' of c 1517 -8 (London, National Gallery) and 'Portrait of a Man' (New York, Metropolitan Museum of Art). His sitters are depicted with a disarming naturalism, often seemingly lost in thought while engaged in some other activity. The subject work would appear to be one such rare portrait of an aristocrat, dressed in a rich red silk jacket with a black cloak and wearing a wide-brimmed hat, as he looks thoughtfully to the left while taking various items out of a box, including a wax seal and embossed stamp, suggesting some official business. Indeed the sitter has plausibly been identified as the Florentine statesman and patron, Ottaviano de'Medici (1484-1546). Ottaviano was from a minor branch of the powerful Medici family, but he gained prominence following his marriage to Francesca Salviati, a distant cousin and granddaughter of Lorenzo de'Medici. Ottaviano held several important positions in the Florentine Republic, including Gonfaloniere di Giustizia, and later after Cosimo de'Medici became Duke in 1537, Ottaviano was one of his most trusted counsellors. His son, Alessandro was made a cardinal and was later elected Pope Leo XI. Ottaviano was a major patron of the arts, he was a friend of Michelangelo's, and he also commissioned works from, among others, Titian, Sebastiano del Piombo, and del Sarto, whose 'The Medici Holy Family' (c. 1529; Florence, Pitti Palace) was painted for him.

This portrait is a new discovery, having been in a family collection for many generations, and unknown to scholars, which accounts for the fact that it has been hitherto unpublished. The composition has been compared with Raphael's 'Portrait of Baldassare Castiglione' (1514-5; Paris, Musee du Louvre), although its pose is even more reminiscent of Titian's, 'Portrait of a man, possibly Gerolamo Barberigo' (c. 1510; London, National Gallery), with the exaggerated sleeve of the sitter's left arm. It was first identified and attributed to del Sarto by Sydney Freedberg, after examining the painting in person, confirmed in a letter dated 14 January 1991, where he dates it to c. 1525.

There are very few fully attributable works by Andrea del Sarto in private hands, as most of his extant work is either still in situ in the churches for which they were commissioned, or else in major Museums and Institutions. Occasionally a new work by the artist does appear on the market, creating a great deal of interest, such as the sale in London in 2005 of a drawing by del Sarto. This was a sketch of the head of St. Joseph for the 'Holy Family' (c.1529; Florence, Pitti Palace), which made $11,426,177. Fully attributed oil paintings by del Sarto are much rarer, and those that have appeared on the market in recent years have all been religious works of the Madonna and Child. None of these could be described as a new discovery, instead they have generally been offered at auction by dealers and have been known to the market for some time already. Such was the case of 'The Madonna and Child' offered at Sotheby's, New York in 2010 with an estimate of $2-3 million, and with 'The Madonna and Child' offered at Christie's, London in 2011 with an estimate of £2.5-3.5 million ($4,021,232-$5,629,724). Neither of these works sold at the auctions, largely because they had already been offered around the market, something that normally discourages buyers from bidding at auction. For another sale of an important oil painting by the artist at auction, one has to go back over twenty years, to the sale of another 'Madonna and Child' at Sotheby's, New York, which made just over $1 million (this would no doubt be worth considerably more in today's market). One other 'Madonna and Child with the infant St John the Baptist' of c. 1513 was offered for private sale, through the dealer Clovis Whitfield in London in 2004 for a price of around £2.7 million (around $5.2 million; eventual sale price unverified).

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

**Fair Market Value**

For other comparable sales one must also consider works by other artists who were near contemporaries of del Sarto. Another 'Madonna and Child', a tondo, by Fra Bartolommeo, sold at Christie's, New York in 2013 for $12,962,500 and a 'Portrait of a man' by Bronzino, sold at Christie's, New York in 2015 for $9,125,000 (the latter was a similar type of portrait to the subject work, although of an unknown sitter). Another comparable would be Raphael's 'Portrait of Lorenzo de'Medici, Duke of Urbino', which sold at Christie's, London in 2007 for $37,313,432. Raphael is an even greater and rarer artist than del Sarto, which accounts for the high price (despite the fact that this picture was offered by a dealer and was also known to the market). Another smaller portrait roundel by Raphael sold at Sotheby's, New York in 2016 making $3,250,000. This was very small, measuring just under 5 inches diameter, and is thus not particularly comparable to the subject work. The market for high quality works of the Italian Renaissance remains strong, with both private collectors from around the world competing for works by famous artists, and Museums looking to enhance their holdings in this area, representing one of the most important periods in the history of art. The recent sale of Botticelli's 'Portrait of a young man with a roundell' at Sotheby's, New York in 2021 for a record-breaking $92,184,000 shows just how great the demand is for major Renaissance works.

Assuming that the subject work is in generally good condition for a work of this age and rarity, and assuming there is an academic consensus in agreement with Sydney Freedberg's opinion expressed in 1991 that this work is fully attributable to Andrea del Sarto, this would be a highly significant addition to del Sarto's oeuvre. It appears to have languished in a private collection for generations, unseen by the wider world and crucially unknown to the art market. The appearance of such a work on the market in the present time would be a major event, and the work would no doubt benefit from a major marketing campaign of the sort reserved for works of the highest importance. It would be of interest to both private collectors and international institutions and one would expect it to surpass the price paid for del Sarto's 'Sketch of the head of St Joseph', which was a preparatory work on paper and not as important as a fully finished oil painting.

We were asked by the client to provide Fair Market Value as of three dates: April 30, May 31, and October 31, 2021. The Fair Market Value has been set at the same level on each of the dates: $15,000,000. See Appendix B for comparables.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755



**Fair Market Value**

**Grand Total (1 Item) $15,000,000**

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

# Appendix A -
# Information provided by Client

- *Fact sheet (with redactions and an introductory essay, reference is made to a full dossier on the painting which has not been provided to the client or appraiser and apparently includes relevant provenance documents, the Art Loss Register report, the comprehensive conservation report, the full pre-publication scholarly essay, and a recently updated insurance replacement value appraisal)*

- *Letter from Sydney J. Freedberg (2 pages, handwritten, dated January 14, 1991)*

- *Two images of the work (pre and post restoration), plus an image of another painting by del Sarto (Portrait of a Young Man, ca. 1517-18. National Gallery, London)*

- *Condition report (1 page without images, the author has not been identified)*

- *Wikipedia entry for David Franklin (no context has been provided for this information)*

WINSTON
ART GROUP

## SUMMARY FACT SHEET

### Andrea del Sarto, *Ottaviano de'Medici,* ca. 1525
oil on its original tightly woven fine 'fiandrina' canvas; overall original canvas: 80 x 63 cm:
31½ x 24¾ inches; overall stretcher size:  81 x 64 cm: 31⅞ x 25⅜ inches

**Provenance:**          Private collection, NY
[family tradition and records indicate the painting was acquired in  the 19ᵗʰ century as one of a number of antiques that were part of the furnishings and that accompanied the owners who moved from Italy to NYC in 1908]

**Exhibitions:**          *Private Preview of Andrea del Sarto, Ottaviano de'Medici* [on the occasion of *Andrea del Sarto: The Renaissance Workshop in Action,* the Frick, 7 Oct 2015 – 10 Jan 2016, the first monographic exhibition on the artist in the USA],

**Authentication:**

The definitive attribution to Andrea del Sarto was made by Sydney J. Freedberg, who examined the painting in person; Freedberg communicated his conviction about the authenticity of the painting and the attribution to Andrea del Sarto verbally and subsequently in a hand written letter, dated January 14, 1991. In his letter, Freedberg dates the painting to the artist's full maturity, ca. 1525; he further notes that it is a portrait of very high quality of an unusually handsome subject. [At the time of the writing of his authentication letter, Sydney Freedberg was Professor Emeritus, Harvard University; Chief Curator Emeritus, National Gallery of Art, Washington D.C.; and author of the monographic catalogue raisonné, *Andrea del Sarto* (Cambridge, Harvard University Press), 1963, 2 vols.]

Both the attribution to Andrea del Sarto and the dating have been universally accepted by those experts and noted authorities in the arena of Italian Renaissance art who have seen the painting.

Following the Freeberg authentication, the painting underwent careful conservation and has been the subject of thorough-going art historical research.

The painting has never been offered on the art market.

[The Freedberg letter of authentication along with the full dossier on the painting (including: relevant provenance documents; the Art Loss Register report; the comprehensive conservation report; the full pre-publication scholarly essay; the recently updated insurance replacement value appraisal) are available for review by appointment during scheduled viewings of the painting]

Andrea del Sarto's portrait of *Ottaviano de'Medici* provides precious proof of Vasari's assertions in his introductory remarks on the 'Life' of the artist both about Sarto's unparalleled capacities in the medium of oil painting as well as his stature as a master painter.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP



**Vasari wrote:**    *Venne in quel tempo disidero a Baccio Bandinelli, allora disengatore molto stimato, d'imparare a colorire a olio; onde conoscendo che niuno in Fiorenza cio meglio sapea fare di esso Andrea, gli fece fare un ritratto di se, che somiglio molto in quell'eta, come si puo anco vedere; e cosi nel vedergli fare questa ed altre opera, vide il suo modo di colorire; sebben poi, o per la difficulta o per non se ne curare, non seguito di colorirre...*

["When the highly regarded draftsman, Baccio Bandinelli, decided to learn to paint in oil colors; he sought out Andrea (del Sarto) knowing that no one in Florence was more skilled.  The demonstration piece was a portrait of him ...Seeing Sarto at work on this and other paintings, Bandinelli soon gave up the idea, realizing the level of difficulty involved and his own consequent lack of interest in pursuing this study further..."]        [Vasari, Milanesi, 1973 reprint, vol. V, pp 22-23]

126 East 56th Street  |  24th Floor  |  New York, NY  |  10022  |  212.542.5755

WINSTON
ART GROUP

**Introductory Remarks:**

Vasari's lively narrative about the noted sculptor Baccio Bandinelli's choice of Sarto to teach him the art of oil painting underscores the key position held by Andrea within the Florentine artistic community, where he was already recognized by his own contemporaries as their most talented master painter. In fact by the end of the 16th century, Andrea del Sarto was ranked by contemporary authors above Raphael and Michelangelo; by the early 17th century, he was placed alongside Leonardo at the head of the Florentine School. [Julian Brooks, et.al., *Andrea del Sarto: The Renaissance Workshop in Action*, (Los Angeles; the J. Paul Getty Museum; 2015), p 1]   Grounded in the classical tenets of late 15th and early 16th century Florentine art, Sarto subjected his vision to constant aesthetic reformulation. During his tenure as the leading artist in Florence – limited only by his untimely death in 1530 – his studio, where the next generations of Florentine Mannerists were trained, was a threshold for the evolution of Florentine art.

Sarto's older contemporary, Leonardo da Vinci, had changed the course of Renaissance portraiture by favoring portraits to include more of the body; by advancing the subtle shifts and turns in the poses of his sitters; by endowing in his sitters a palpable reality and presence based on the replacement of linear elements with soft shadow plays; and especially by imbuing in his sitters a greater sense of *anima*, of 'motions of the mind.' In turn, Leonardo's younger contemporaries, among them Raphael [e.g., *La Donna Velata*, ca. 1515-16, Florence, Pitti], Titian [e.g., *Man with Blue Sleeve*, ca. 1510, London, National Gallery] and Bronzino [*Portrait of a Lady in Red*, ca. 1526, Frankfurt, Städelsches Kunstinstitut], like Sarto, offered equally masterful reconsiderations of the advances generated by Leonardo. [refer to image note attached herewith]

Indeed, our portrait of *Ottaviano de'Medici* stands as a hallmark of Sarto's significant contributions in the genre, in the exquisite orchestration of compositional devices, color and tonality which, in its moment, served as an exemplar alongside the work of his younger associate, Pontormo, in the advancement of style towards the *maniera* [i.e., Mannerism in its most elegant, decorous expression].

The unusually handsome sitter in our portrait was also the model for an earlier, very fine, graphite and wash study of a head by Sarto [often associated with the figure of St. Peter in the artist's 1526-27, *Last Supper*, fresco, Florence, Museo del Cenacolo di San Salvi], attesting to a long standing familiarity between the artist and our sitter. [refer to image note attached] The individual who inspired these stirring renderings is rightly held to be Ottaviano de'Medici. [Comparisons with the features of Ottaviano, though later in his life, as painted by Vasari (e.g., 1540, *Cena di San Gregorio*, Bologna, Pinacoteca) are quite convincing in this regard.]

Ottaviano de'Medici [hailing from a secondary branch of the Medici family] became a prominent advisor and artistic administrator to the *illustri*, the main line, ruling members of the Medici family, from the late 'teens of the 16th century to his death in 1546. Ottaviano was appointed guardian of Ippolito, Alessandro and Catherine de'Medici, as well as of the young Giorgio Vasari, whose distinguished career as an authoritative painter and, later in life, as author of the *Lives of the Artists* was made possible in good part through the constancy and support lent by Ottaviano. In his capacity as a distinguished statesman, Ottaviano also filled official positions within the Florentine government. Based on the high regard in which he was universally held, after the 1537 assassination of the extremely unpopular Medici *illustro*, Duke Alessandro, Ottaviano was offered the reins of power. He declined, and instead directed support to his nephew, the young Cosimo I, who was elected head of the Republic and appointed Duke of Florence. Ottaviano's son Alessandro, under the name Pope Leo XI, was the last member of the Medici family to ascend to the Papacy.

The stately demeanor of Ottaviano in our portrait, elegantly costumed in a rich but unadorned silk jacket and fine wool mantle [consistent with his station within the Medici family thus avoiding opulent attire] offers further support for his identity. Both the lead casing with a wax seal impression and the embossed stamp on the desk, along with the objects in the velvet lined box – the seal itself and perhaps sticks of wax – align well with the numerous official positions held by Ottaviano both within the Medici ranks and as a statesman. Given the items in the box carry the red, green and white colors typically associated with Medici emblematic devices it was likely Sarto's intention to signal Ottaviano's key role as an administrator of Medici affairs, which included major Medici commissions to Florentine artists.

WINSTON
ART GROUP

Sarto's *Ottaviano de'Medici* falls into the formal category of portraits of dignitaries, a class of portraits exemplified perfectly about a decade earlier than our portrait, by Raphael in his *Baldassare Castiglione*. [ca. 1514 – 15, Paris, Louvre; refer to image reproduced] Raphael's achievement is signaled in a rendering of his subject seemingly equally as effortlessly captured as was the diplomat and humanist, Castiglione's, command of manners which earned him the esteemed rank of quintessential courtier of his day. Indeed as rendered, both Raphael's *Castiglione* and Sarto's *Ottaviano* demonstrate those formalities hailed as paradigms of the portrayal of distinguished gentleman and statesmen.

Nonetheless, a considered evaluation of Raphael's *Castiglione* and Sarto's *Ottaviano de'Medici* refer to image p underscores an essential difference in the presentation of the sitters that sets Sarto's portrait apart. To the point in this regard is the fact that Sarto and Ottaviano, both close in age, enjoyed a comprehensively documented friendship; their association was a rich testament to an enlightened artistic dialogue that was cut short only by Sarto's untimely passing in 1530. The backdrop and impetus for the creation of our portrait of *Ottaviano de'Medici* may have been provided by the commission, arranged by Ottaviano, for Andrea del Sarto to produce an exact copy of Raphael's famous *Portrait of Leo X and His Cardinals* [ca. 1518, Florence, Uffizi], so that the original by Raphael would remain in Florence.

While secluded in Ottaviano's residence during the time required for him to copy the official, triple portrait by Raphael immortalizing members of the Medici *illustri*, Sarto may have been moved to privately pay homage to his great friend and benefactor, Ottaviano. The association of the commission for the Raphael *Leo X* copy with Mantua [where Castiglione was born, and had served the father of the Duke of Mantua from 1499 – 1504], may indeed have prompted Sarto to reference Raphael's *Castiglione* portrait, particularly in his purposeful appropriation of distinguishing the head of his sitter by framing it with a marvelous hat. Sarto amplified the function of this grand pictorial device by seamlessly integrating it into the compositional balance and counterpoint of Ottaviano's pose and the play of the draperies of his exquisite attire.

In the rendering of his figures, whether divine or human, it was Sarto's great forte to imbue them with extraordinary grace by eliding physical imperfections in favor of a level of idealization achieved without losing accessibility to the human component of his figures. It is precisely this quality which permeates this portrait of *Ottaviano de'Medici* by Andrea. Such a subtle yet stunning rendering of a rarified *persona*, marked by a level of dignity and internalized, high-minded nobility of the human spirit seldom found in Renaissance portraiture, goes well beyond the formalities associated not only with official portraiture, but supersedes the stunning aspect of the sitter in Sarto's own, much admired, London *Portrait of a Young Man* [e.g., *Portrait of a Young Man,* ca. 1517, London, National Gallery; refer to image p. ]. Indeed, the very private gift of the portrait to Ottaviano stands as a singular, extraordinary personal gesture of esteem and recognition by the artist in homage to a personage whom he held in the highest regard; as such the portrait of *Ottaviano de'Medici* holds a place among Andrea del Sarto's truly extraordinary achievements as an artist.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755





WINSTON
ART GROUP



126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755





WINSTON
ART GROUP



126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755



WINSTON
ART GROUP



**WORK OF ART**

ANDREA DEL SARTO
Italian, b. Florence 1487, d. 1530 or 1531
"Portrait of a Gentleman"
Circa 1525
Oil on canvas
Original canvas 31 x 24"
Relined with stretcher 32 x 25"

Condition: The painting is in fine and stable condition. It has undergone restoration over the past year. As a result of that restoration, Sarto's artistic concept and the vitality of his original paint surface are once again apparent. The original canvas support and its superfine and exquisite ground and paint layer have been stabilized by implementation of a constant tension stretcher. During the cleaning of the painting the tacking edges of the original canvas were found, providing important evidence, for one, that the painting (i.e. the image) has not been cut down. Removal of obfuscating layers of dirt, old varnish and overpaint revealed much of Sarto's luminous paint surface still intact. Losses and abrasions consistent with the age of the painting were carefully reintegrated without compromising the original paint surface. The losses and abrasions do not interfere with the chromatics, nor do they significantly impair the legibility of the image.

Technical examination through infrared reflectography, microscopy and cross section analyses, and energy dispersive x-ray spectrometry help to underscore the authenticity of the painting both from the standpoint of age of the materials and from the standpoint of technique. The analyses supply information which provides a new understanding and clarification of Sarto's masterful technique. This information, hitherto unknown and unpublished, will accompany a planned publication to introduce the painting into the art historical literature.

The aesthetics, chromatics and execution of the Portrait of a Gentleman are consistent with Sarto's securely attributed mature paintings. The combination of strength and refinement in the portrayal of the sitter, the handsome features given palpable reality through a wistful, introspective gaze, the elegant pose highlighted not just by the counterpoint of the face, hat and shoulders, but through the cascade of folds of the mantle and magnificent tucked sleeve, bear the stamp of the master. The extraordinary chromatic combinations and the volumes built entirely of chromatic transitions thinly painted and marking bold assurance and facility in the medium are Sarto's alone.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

# David Franklin (curator)

**David Franklin** is an art historian with expertise in Italian Renaissance art, a curator, and a former art museum director.

## Contents

Thomson Collection
Cleveland Museum of Art
National Gallery of Canada
Education and scholarship
Publications
Awards
References

## Thomson Collection

David Franklin is employed by the Thomson Collection in Toronto, Ontario. On April 8, 2015, he gave his first public lecture under this affiliation at the National Gallery of Canada's Wednesday Morning Lecture Series, focusing his remarks on Piero de Cosimo's painting.[1] Franklin helped plan the Canadian Photography Institute, which has promised gifts from David Thomson and major funding from Bank of Nova Scotia.[2][3] He is an editor of *The Canadians* (2016), a selection of photographs from *The Globe and Mail* archives.[4]

## Cleveland Museum of Art

Franklin was named director of the Cleveland Museum of Art in 2010. While Franklin was Director of the Cleveland Museum of Art, a donation at $1,000,000 was made by Leigh Carter in 2013 to the museum's endowment to fund a permanent fellowship to help the museum's director conduct research on special art historical projects.[5]

After a three-year tenure, Franklin abruptly resigned on October 21, 2013, citing personal reasons and a need "to do more research and writing".[6] Soon thereafter, the Cleveland Scene revealed that Franklin (married with two children) had been in a romantic relationship with an employee of the museum. The board of directors at the museum had been made aware of the affair when the employee was found to have apparently committed suicide in her Cleveland Heights apartment, shortly after she and Franklin were supposed to have travelled to Spain together, and one week before they were supposed to travel to Italy. According to police reports, David Franklin called the 911 himself and was the only person present at the scene. When police came to investigate the suspicious death, Franklin lied to the officers, pretending having received a text message from the woman, which, according to the Police, never happened. He claimed to have run to the apartment after receiving this text message and to have discovered the body by entering the apartment through an open door. In the course of the investigation, it became apparent that the employee's digital camera and cell phone were missing.



Police have also discovered that a major transfer of data had been done from the woman's phone shortly after she was found dead. As the family could not believe many details of the reported story, a detective was assigned to further investigate the death and Franklin's story.[7] When this revelation came to the attention of the board, Franklin was forced to resign.[8][9]

## National Gallery of Canada

Previously, Franklin served as deputy director of the National Gallery of Canada.[10] He worked at the National Gallery of Canada for twelve years, beginning as the curator of prints and eventually rising to the post of deputy director and chief curator. In 2009, the National Gallery of Canada Foundation received a donation from the philanthropists Donald and Beth Sobey for The Donald and Beth Sobey Chief Curator's Research Endowment. While at the National Gallery, Franklin became involved in a controversy involving the firing of a subordinate. His action of completely removing emails, by deleting emails from his system's trash, was seen as a move to remove evidence of wrongful termination. Franklin denied this. He was removed from his post, and after suing the institution, was restored to his position, before being fired a second time, a few days later.[11][12]

## Education and scholarship

Franklin holds a PhD from London's Courtauld Institute of Art with specialization in Italian Renaissance art.[10] He won a prize from Yale University Press for his first book, and remains active as a scholar.

## Publications

*Polidoro da Caravaggio*, London and New Haven, Yale University Press, 2018.

Contributing author to *Piero di Cosimo: The Poetry of Painting in Renaissance Florence*, Gretchen A. Hirschauer and Dennis Geronimus, eds., Washington, National Gallery of Art, 2015. (Recipient of an Honorable Mention in the category of Art Exhibitions at the 2016 PROSE awards.)

*Director's Choice: The Cleveland Museum of Art*, Scala, 2012.

*Painting in Renaissance Florence from 1500 to 1550*, London and New Haven, Yale University Press, 2001.

*Rosso in Italy: The Italian Career of Rosso Fiorentino*, London and New Haven, Yale University Press, 1994. (Recipient of the Mitchell Prize for the History of Art in the First Book, 1995.)

## Awards

The Stella della solidarietà italiana (Star of Italian Solidarity) by the Republic of Italy in 2009, in recognition of David Franklin's knowledge of Italian art and his contribution to its appreciation in Canada.[13]

## References

WINSTON
ART GROUP

2/7/2020                      David Franklin (curator) - Wikipedia

1. http://www.beaux-arts.ca/documents/content/Wednesday_Lectures_2014-15.pdf; see his related essay, "Piero di Cosimo and the Painting of his Time," in *Piero di Cosimo: the Poetry of Painting in Renaissance Florence*, Washington, National Gallery, 2015

2. "Thomson, Scotiabank team up for new photo institute at National Gallery" (https://www.theglobeandmail.com/news/national/national-gallery-creates-new-photography-institute-with-aid-from-scotiabank-david-thomson/article27506410/). Retrieved October 16, 2017 – via The Globe and Mail.

3. "Canadian Photography Institute" (http://www.gallery.ca/cpi/). *www.Gallery.ca*. Retrieved October 16, 2017.

4. "Photography book The Canadians a kind of reimagining of The Americans" (https://www.theglobeandmail.com/arts/art-and-architecture/photography-book-the-canadians-a-kind-of-reimagining-of-the-americans/article31468672/). Retrieved October 16, 2017 – via The Globe and Mail.

5. "Former B.F. Goodrich president Leigh Carter donates $1 million to the Cleveland Museum of Art for research" (http://www.cleveland.com/arts/index.ssf/2013/09/former_bf_goodrich_president_l.html). *Cleveland.com*. September 2013. Retrieved October 16, 2017.

6. "Cleveland Museum of Art Director David Franklin resigns for personal reasons, effective immediately" (http://www.cleveland.com/arts/index.ssf/2013/10/cleveland_museum_of_art_direct_1.html). *Cleveland.com*. October 2013. Retrieved October 16, 2017.

7. Allard, Sam (October 31, 2013). "David Franklin Lied to Cleveland Heights Police the Night He Found Christina Gaston's Body" (http://www.clevescene.com/scene-and-heard/archives/2013/10/31/david-franklin-lied-to-cleveland-heights-police-the-night-he-found-christina-gastons-body). *CleveScene.com*. Retrieved October 16, 2017.

8. "Cleveland Museum of Art confirms that an extramarital affair led to David Franklin's resignation as director" (http://www.cleveland.com/arts/index.ssf/2013/10/cleveland_museum_of_art_confir.html). *Cleveland.com*. October 2013. Retrieved October 16, 2017.

9. Grzegorek, Vince (October 23, 2013). "Former Cleveland Museum of Art Director David Franklin Resigns After Affair, Suicide; Cell Phone of Victim Missing" (http://www.clevescene.com/scene-and-heard/archives/2013/10/23/former-cleveland-museum-of-art-director-david-franklin-resigns-after-affair-suicide-cell-phone-of-victim-missing). *CleveScene.com*. Retrieved October 16, 2017.

10. "David Franklin of the National Gallery of Canada named director of the Cleveland Museum of Art" (http://www.cleveland.com/arts/index.ssf/2010/08/david_franklin_of_the_national.html), Steven Litt, August 27, 2010, *Plain Dealer*.

11. Austen, Ian (December 28, 2008). "Controversy and Court Filings at the National Gallery of Canada" (https://www.nytimes.com/2008/12/29/arts/design/29gall.html). Retrieved October 16, 2017 – via www.NYTimes.com.

12. "David Franklin of the National Gallery of Canada named director of the Cleveland Museum of Art" (http://www.cleveland.com/arts/index.ssf/2010/08/david_franklin_of_the_national.html). *Cleveland.com*. August 2010. Retrieved October 16, 2017.

13. "Press Releases - National Gallery of Canada" (http://www.gallery.ca/en/about/228.php). *www.Gallery.ca*. Retrieved October 16, 2017.

Retrieved from "https://en.wikipedia.org/w/index.php?title=David_Franklin_(curator)&oldid=904845283"

This page was last edited on 4 July 2019, at 23:47 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.



# Appendix  B

*Comparable Auction Sales*

WINSTON
ART GROUP

artnet price database



| | | |
|---|---|---|
| 1 | **Botticelli Sandro** | |
| | Title | Portrait of a young man holding a roundel |
| | Description | Property from an Important Private CollectionAlessandro di Mariano Filipepi, |
| | Medium | tempera on poplar panel |
| | Size | Height 23 in.; Width 15.5 in. / Height 58.4 cm.; Width 39.4 cm. |
| | Misc. | Inscribed |
| | Sale of | Sotheby's New York: Thursday, January 28, 2021 [Lot 00015] Master Paintings & Sculpture Part I |
| | Estimate | No Estimate Received |
| | Sold For | 92,184,000 USD Premium |



| | | |
|---|---|---|
| 2 | Title | Agnolo Bronzino (Florence 1503-1572) |
| | | Portrait of a young man with a book |
| | Medium | oil on poplar panel |
| | Size | Height 37 in.; Width 30.8 in. / Height 94 cm.; Width 78.1 cm. |
| | Sale of | Christie's New York: Wednesday, January 28, 2015 [Lot 00129] Renaissance |
| | Estimate | 8,000,000 - 12,000,000 USD |
| | Sold For | 9,125,000 USD Premium |



| | | |
|---|---|---|
| 3 | Title | Baccio della Porta, called Fra Bartolommeo (Florence 1472-1517) |
| | | The Madonna and Child |
| | Medium | oil on panel, a, tondo |
| | Size | Height 25.5 in.; Width 25.5 in. / Height 64.7 cm.; Width 64.7 cm. |
| | Sale of | Christie's New York: Wednesday, January 30, 2013 [Lot 00128] Renaissance |
| | Estimate | 10,000,000 - 15,000,000 USD |
| | Sold For | 12,962,500 USD Premium |



| | | |
|---|---|---|
| 4 | | Raphael |
| | Title | Portrait of Lorenzo de Medici, Duke of Urbino, holding a gold box |
| | Medium | oil on canvas |
| | Size | Height 38.2 in.; Width 31.1 in. / Height 97 cm.; Width 79 cm. |
| | Sale of | Christie's London: Thursday, July 5, 2007 [Lot 00091] Important Old Master and British Pictures (Evening Sale) |
| | Estimate | 10,000,000 - 15,000,000 GBP (20,169,423 - 30,254,134 USD) |
| | Sold For | 18,500,000 GBP Premium (37,313,432 USD) |

**WINSTON ART GROUP**

**artnet** price database



| | | |
|---|---|---|
| 5 | | Raphael |
| | Title | PROFILE PORTRAIT OF VALERIO BELLI, BUST LENGTH, FACING LEFT |
| | Description | Inscribed on the reverse Fatto dell'ano 1517 in Rom(a?) / Rafael Urbinate, in the |
| | Medium | oil on panel |
| | Year of Work | 1517 |
| | Size | Height 4.9 in. / Height 12.5 cm. |
| | Misc. | Inscribed |
| | Sale of | Sotheby's New York: Wednesday, January 27, 2016 [Lot 00008] The Collection of A. Alfred Taubman: Old Masters |
| | Estimate | 2,000,000 - 3,000,000 USD |
| | Sold For | 3,250,000 USD Premium |



| | | |
|---|---|---|
| 6 | | **Sarto Andrea del** |
| | Title | The Madonna and Child (+ sketches, verso) |
| | Description | Andrea del Sarto (Florence 1486-1530)The Madonna and Childoil on panel35 |
| | Medium | oil on panel |
| | Size | Height 35.1 in.; Width 26.3 in. / Height 89.2 cm.; Width 66.7 cm. |
| | Sale of | Christie's London: Tuesday, July 5, 2011 [Lot 00062] Old Master & British Paintings (Evening Sale) |
| | Estimate | 2,500,000 - 3,500,000 GBP (4,021,232 - 5,629,724 USD) |
| | Sold For | Bought In |



| | | |
|---|---|---|
| 7 | | **Sarto Andrea del** |
| | Title | Madonna and Child |
| | Description | oil on |
| | Medium | oil on panel |
| | Size | Height 30.1 in.; Width 25.8 in. / Height 76.5 cm.; Width 65.5 cm. |
| | Sale of | Sotheby's New York: Thursday, January 28, 2010 [Lot 00182] Important Old Master Paintings, Including European Works of Art |
| | Estimate | 2,000,000 - 3,000,000 USD |
| | Sold For | Bought In |



| | | |
|---|---|---|
| 8 | | **Sarto Andrea del** |
| | Title | Head of Saint Joseph looking down, with a subsidiary study of his features (+ Two studies of legs, verso) |
| | Medium | black and red chalk |
| | Size | Height 14.7 in.; Width 8.9 in. / Height 37.3 cm.; Width 22.5 cm. |
| | Sale of | Christie's London: Tuesday, July 5, 2005 [Lot 00014] Old Master and 19th Century Drawings incl. Andrea del Sarto's Saint Joseph |
| | Estimate | No Estimate Received |
| | Sold For | 6,504,000 GBP Premium (11,426,177 USD) |

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

**artnet** price database



|  |  |
|---|---|
| | 9 |
| **Sarto Andrea del** | |
| Title | The Madonna and Child |
| Medium | Oil on Panel |
| Year of Work | 1516-1517 |
| Size | Height 33.5 in.; Width 24.5 in. / Height 85.1 cm.; Width 62.2 cm. |
| Sale of | Sotheby's New York: Friday, January 28, 2000 [Lot 00012] Old Masters 2000 (lots 1-113) |
| Estimate | 1,000,000 - 1,500,000 USD |
| Sold For | 1,102,500 USD Premium |

WINSTON
ART GROUP

**MARKET OVERVIEW**

**Old Master and 19th Century Art**

Overall, sale totals are dramatically down from the previous year. Dealer sales have been particularly badly hit, mainly due to the closure of the world's art fairs, where dealers would traditionally expect to make most of their annual sales. Not all dealers have effective online platforms and, in any case, Old Master pictures in particular require careful study and need to be viewed before purchases are made. The extended restrictions on world travel have therefore hit this market particularly hard.

Auctions show a slightly different story, and sales have been continuing throughout last year and into this year, both in the form of online internet auctions (generally for lower value items), as well as the 'live' main auctions at the main auction houses. Sotheby's had a major success with their Old Master sale on 28 January 2021, when the 46 lots on offer totaled over $114 million (compared with totals of $61 million in 2020, and $52 million in 2019 for the same sale). The fact that most of this total was accounted for by one work, Botticelli's *Portrait of a Man with a Roundel* ($92 million), however, makes this result more difficult to interpret. There were still good prices achieved for many other works in the sale (for example, a portrait by Frans Pourbus greatly exceeded its pre-sale estimate of $70,000-90,000 to make $478,800; and still lifes by Rachel Ruysch and Ambrosius Bosschaert also did very well, both achieving prices of over $2 million). The sale was 71% sold by lot, which is fairly standard for Old Master sales of this kind. The sale of the Botticelli demonstrates that works by Renaissance Masters continued to break records and sell for exceptionally high prices despite the economic downturn caused by the global pandemic. While other sectors of the market have struggled in the wake of regional lockdowns and travel bans, works of the highest quality and the greatest rarity have continued to appreciate in value.

At Christie's, London in December 2020 their sale of 47 lots was 86% sold by lot, although its overall total of £22.9 million is well down on previous years. The highlight here was a new world record for a work by the still life painter Jan Davidsz. De Heem, which made over £5.7 million. The sale at Bonham's, London in December 2020 shows that the market for second tier Old Masters remains very selective. The sale was 60% sold by lot (with 87 lots on offer) and the highlight was a rediscovered work by Vignali, which made £162,750.

In general, the highest quality works by established masters still command high prices and seem relatively unaffected by the global pandemic. Sales of lower value Old Masters have suffered more and the general market has undoubtedly seen a decline as there are less works available to buy. It may be that this decline is short-lived and will be reversed once the market opens up again and art fairs resume trading. We may in fact see a marked increase in demand as collectors are able to travel once again and see works in person. There have also been some notable sales of 19th Century Art during this period as well, showing residual strength at the upper end of the market. Sotheby's, New York sale on 28 January 2021 in addition to Old Masters also contained some interesting 19th Century works, such as Lord Leighton's *Erato*, lot 45, which sold well, making $1,290,500, and an Italian landscape by Corot, lot 43, exceeded its estimate to make $600,000. William Bouguereau's, *Au bord du Ruisseau*, however, failed to find a buyer with an estimate of $1 million to $1.5 million, which shows that the market is selective, even at the top end.

WINSTON
ART GROUP

Christie's similarly had some success with 19th Century works during this period. They offered a single-owner collection of Pre-Raphaelites in London on 10 December 2020, which totalled £5.6 million ($7.5 million). Another single-owner collection of Orientalist pictures was offered on 18 November 2020 totalling £3.5 million ($4.6 million). The fact that this was largely achieved by one work, Gustav Bauernfeind's Warden of the Mosque, lot 19, which made £2,662,500 ($3,540,558), would suggest that this market has some way to go before it again reaches its previous high point, set in the late 1990s. Other notable 19th Century sales included a rare work by the German artist Carl Spitweg, *Der Hexenmeister*, that made$1,230,000 at Christie's, New York, 15 October 2020, and strong prices were also seen for Spanish and French works, in particular Gustav Courbet, *Landscape*, lot 2, that exceeded its estimate to make $798,000. It is harder to assess the market for lower value 19th Century European art, although it is likely that this section of the market remains highly selective, as was the case before the pandemic.

WINSTON
ART GROUP

## APPRAISAL TERMINOLOGY & DEFINITIONS

Actual Cash Value: A term that refers to market value and is generally synonymous with payment restricted to cash. Some insurance policies also define ACA as the replacement cost minus any depreciation.

Administrator: An individual appointed by the court if a decedent has died without a will, if no executor is named in the will, or in the will, or if the executor named cannot or will not serve.

Ad Valorem: Derived from the Latin, this term means "according to value" and is commonly used in relation to a tax levied on property in proportion to the value of the property.

Alternate Valuation Date: A term most frequently identified with estate appraisals. At present, it is the date six months to the day after the date of death, on which the fiduciaries of an estate can chose, legally, to have the estate valued rather than on the date of the death. In this manner, the IRS allows the estate the choice of a date that may be more advantageous for tax purposes in the event that the market or price for the objects in question has changed significantly, usually declining in value materially, from the date of the death to the date six months after the death. If the alternate date of death is chosen, then all items in the estate must be valued on that alternate date, not just personal property.

Antique: As defined by the United States Customs Department, any object that is 100 years old or older is an antique. However, the term is broadly interpreted with its definition varying from object to object and year to year. Generally speaking, the following are the most accepted definitions: 1.) an item collected or desirable due to its rarity, condition, utility or some other unique feature that is older than 100 years. Motors vehicles, in contrast, are considered antiques in the United States if they are older than twenty-five years, while some electronic gadgets of more recent vintage may be considered antiques. 2.) ancient art such as sculptures, gem, medals and seals collected from Greek and Roman civilizations.

Appraisal: As defined in the Uniform Standards of Professional Appraisal Practice (USPAP), "the act or process of developing an opinion of value; an opinion of value." According to the USPAP, value can "be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark (e.g., assessed value, collateral value)." It should be noted that the USPAP states that using any other term for an appraisal does not remove the work from being in compliance with USPAP; it is an appraisal if an opinion of value is given/

Appraisal Report: The written or oral communication of an appraiser's conclusions transmitted to the client upon completion of the assignment. The USPAP includes requirements for reporting.

Arbitration: Arbitration is a cost-effective alternative to litigation. Arbitration is the submission of a dispute to one or more impartial persons for a decision known as an "award." Awards are made in writing and are generally final and binding on the parties in the case.

WINSTON
ART GROUP

Assembled, associated or married pieces: Terms used to describe property that is composed of parts from various other pieces. A married piece is beyond a mere restoration and is often an attempt at deception unless the marriage is clearly identified as such when sold.

Blockage Discount: A principle applied to the valuation of large groups of similar and like items that, if sold during a limited period of time, might result in a depression of the prices one might expect if the items were sold separately in an ordinary market cycle.

Buyer's Premium: The percentage of the bid or "hammer" price paid by the buyer to the auction house when purchasing an item. The fee usually ranges between 5 percent and 25 percent.

Buy In (BI): Occurs at auction when an object does not meet its reserve price and fails to sell.

Catalogue Raisonné: A scholarly catalogue that should include all the known works of an artist or all of his or her known works of an artist or all of his or her known works in a specific medium at the time of the catalogue's compilation. Essential information identifying the works is included, making the catalogue a definitive reference book.

Certificate of Authentication/Authenticity: An official document that certifies that the piece in question is right, of the period, and by the creator designated. Some states (including New York) require specific information be included on a certificate of authentication.

Clear Title: Refers to ownership of property that is free from encumbrance, obstruction, burden or limitation.

Comparables: Those objects selected by the appraiser as being similar to one being appraised. An examination and analysis of sales figures for similar works or comparable objects allows the appraiser to arrive at an appraised value for the object under consideration.

Condition: Term referring to the physical state of a property and must be noted in an appraisal document.

Conservation: The treatment and preventive care of an object so that its condition does not deteriorate and will remain stable; the preservation of a piece involving careful maintenance and protection of an object, using materials and procedures that will have no adverse effect on it.

Cost Approach: A valuation approach used to determine the value of an object based upon the cost of re-creating the identical piece. This approach may be applied to a piece when the methods of construction or materials used are replicable.

Craquelure: The result of natural movement of the support (canvas) and or the shrinking of the medium during the aging process of painting. It usually appears on the surface in a spider web-like series of cracks. The surface can be stabilized by reclining the canvas and filling the cracks.



Crazing: The fine and random cracking that extends only through the surface of pottery, porcelain, stone, or concrete. Crazing can appear along or perpendicular to the length of a piece, only in polygonal shapes, or as random spider webs and is due to differential contraction between the surface and interior sections, often as a result of changes in temperature. It has no significance in terms of structure or durability, and does not by itself constitute a cause for rejection. It can, however, mark the beginning of disintegration. All ceramic and concrete products and many natural stones under varying conditions of moisture and temperature are frequently subject to crazing. In some Asian potteries and porcelains, crazing is admired and produced in a deliberate and regulated manner.

Cultural Patrimony: Objects that are associated with the Holocaust, items from past and present wars that were pillaged or removed from their homelands or owners, and those objects taken and robbed from the underdeveloped and poor countries. Today, there is an effort to prevent the continuous exploitation and export of these treasures from their homelands.

Fair Market Value (FMV): Regarding income tax, Treas. Reg. Section 1.170A-1 (c)(2) provides that the fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. Regarding estate tax, Treas. Reg. Section 20.2031-6(a) provides that a fair market value of a decedents household and personal effects is the price that a willing buyer  would pay to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. Regarding gift tax, Treas. Reg. Section 25.2512-1 of the Gift Tax Regulations provides that the value of the property is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

Forced Liquidation Market: The market in which property is quickly sold within a restricted time frame and without the freedom to consider the most appropriate marketplace, the time of exposure, or the price.

Forced Liquidation Value: The lowest range "NET" value, usually for the purpose of a quick and/or forced sale. It is defined as "the most probable price in terms of cash, or other precisely revealed terms, for which the property would change hands if sold immediately without regard to the relevant marketplace."

Form 8283: Federal tax law allows you to claim a deduction for the value of all property you donate to a qualified charity during the year provided you are eligible to itemize deductions. Generally, any nonprofit organization that promotes religious, literary, educational, scientific, humanitarian or other charitable causes will qualify. However, if the combined value of all property you donate is more than $500, you must prepare Form 8283 and attach it to your tax return.

Foxing: Brown spots caused by iron particles in the paper that "rust" and discolor the paper when it is exposed to humidity. Sometimes, mold is mistaken for foxing.

Fractional Gifts: Fractional gifts of property allow the donor to have partial possession of the object over a



specified period of time until full ownership transfers to the donee.

Hammer Price: The actual bid price at auction as the hammer falls; it does not include the buyer's premium.

Highest and Best Use: A term commonly used in appraising real estate property that has been carried over into the field of personal property appraisals. The term refers to the evaluation of personal property, when the possible, in the most appropriate marketplace that will bring the highest price.

Hypothetical Conditions: According to USPAP, those conditions that are contrary to the conditions that actually exist, but are supposed for the purpose of reasonable analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal or economic characteristics of a subject property or about conditions external to the property, such as the market conditions or trends, or about the integrity of data used in an analysis. Appraisals of damaged or destroyed objects employ hypothetical conditions. A hypothetical condition may be used in an assignment only if 1) the use of the hypothetical condition is clearly required for legal purposes, for purposes of reasonable analysis or for purposes of comparison; 2) the use of the hypothetical condition results in a credible analysis; and 3) the appraiser complies with the disclosure requirements set forth in USPAP for hypothetical conditions.

Income Approach: A valuation approach used to determine the value of an object that will be used to generate future income. This is most often done through leasing, rental or the creation of reproductions but not through a one-time only sale with transfer of title and/or copyright.

Inherent Vice: Extreme conditions of temperature, light, and humidity contribute to an object deteriorating or destroying itself. The resulting loss of value is caused by the inherent nature of the object rather than the result of an external cause or a casualty.

Inpainting: Similar to overpainting, a technique commonly used by conservations to restore a painting that has suffered the loss or deterioration of paint on a canvas or other medium. It generally implies work that is well done with a minimum of intervention by the conservator.

In the Style Of: Refers to an item that is not of the period in which it was supposed to have been made but rather was made at a later time as a copy of an earlier piece.

Lined: A term that usually refers to a painting on canvas that has been supported by another layer of canvas due to the deterioration of the original support.

Liquidation Value: A value based on the price realized in a sale situation under moderately forced or limiting conditions and under time constraints. This action may be initiated by the owner or a crediting institution. It is implicit in this definition that liquidation value will generally be lower than market value.

Loss of Value: The difference in value between the value of the property prior to damage and the value of the property after that damage has been repaired.

WINSTON
ART GROUP

Market Analysis: The study of market conditions for a specific type of personal property; sometimes both the retail and wholesale markets must be examined and analyzed.

Marketable Cash Value: The value realized, net of expenses, by a willing seller disposing of property in a competitive and open market to a willing buyer, both being reasonably knowledgeable of all the relevant facts and neither being under constraint to buy or sell.

Medium: 1.) The material from which an object is made or on which it is produced; it may include paper, canvas, board, cel (acetate), bronze; 2.) The specific tool and material used by the creator; e.g., brush and oil paint, chisel and stone; 3.) The mode of expression used by a creator; e.g., painting, sculpture, graphic arts, etc.; 4.) A liquid that may be added to a paint to increase its manipulability without decreasing its adhesive, binding or film forming properties.

Mint Condition: The condition of an object that is the same as when they were originally created. A term taken from coinage, it refers to the same condition as when a coin was minted.

Most Appropriate Market or Marketplace: The venue in which an appraiser determines that an object can be sold most easily and at the highest price. In the case of personal property, when comparables are scarce, it frequently references the most appropriate market, which can be a combination of auction and private gallery sales.

Net Value: A term commonly used in matters of equitable distribution to indicate the market value of personal property exclusive of any sales commissions or any other costs that would reduce the value of the property.

No Commercial Value (NCV): A term that usually refers to an object or a group of objects, usually in estate situations, for which it is not reasonable to assign a monetary value; for example, a mattress and a box spring.

Original Cost: Also known as the historical cost or the cost of acquiring an item of personal property.

Overpainting: A term that refers to restorative work on a painting in which is applied over already dry areas of paint. It sometimes includes the original artist's glazes. Overpainting is similar to inpainting, but inpainting only fills in areas of missing paint without covering the original paint.

Oxidation: The binding of oxygen to a metal to form rust or the binding of oxygen to wood to darken it.

Patina: A film, produced by oxidation that builds up on the surface of an object. The term also refers to the final coating that is applied to a bronze by the artist or the foundry crafting the bronze.

Personal Property: Defined by USPAP as "identifiable, tangible objects that are considered by the general public as being "personal"; for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment.

Pre-Existing Damage: Any wear, tear, repairs or other changes to new condition seen on an item of personal property prior to its evaluation in a damage and/or loss of value situation.

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

Preservation: Related to conservation and restoration, preservation actions are taken to prevent further changes to or deterioration of objects, sites or structures.

Primary Market: A market created either by the maker or the maker's agent when an object is sold for the first time, usually in galleries or stores. The secondary market is the venue for the sale of an object between a seller and a buyer when neither of them have participated in the creation or initial sale of the object. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

Primary Source: Material, used in research and data comparisons, that is gathered from first-hand witnesses and includes auctions attended, galleries, art fairs and stores visited as well as actual comparables witnessed by the appraiser.

Provenance: The history of an object that may include its past ownership as well as its exhibition and catalogue history.

Pristine/Mint/Proof Condition: Refers to an object in excellent condition, as if new, and usually in its original packaging or box.

Publication 561: A publication of the IRS designed to help donors and appraisers determine the value of property (other than cash) that is given to qualified organizations. It also explains what kind of information you must have to support the charitable contribution deduction you claim on your return. This publication does not discuss how to figure the amount of your deduction for charitable contributions or written records and substantiation required.

Qualified Appraisal: An appraisal will be treated as a qualified appraisal within the meaning of §170 (f)(11)(E) if the appraisal complies with all the requirements of §1.170A-13(c) of the existing regulations (except for the extent the regulations are inconsistent with § 170 (f)(11)), and is conducted by a qualified appraiser in accordance with generally accepted appraisal standards. See sections 3.02(2) and 3.03 of Notice 2006-96. An appraisal will be treated as having been conducted in accordance with generally accepted appraisal standards within the meaning of §170 (f)(11)(E)(i)(II) if, for example, the appraisal is consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP").

Qualified Appraiser: IRS Section 170(f)(11)(E)(ii) provides that the term "qualified appraiser" means an individual who (1) has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary, (2) regularly performs appraisals for which the individual receives compensation, and (3) meets such other requirements as may be prescribed by the Secretary in regulations or other guidance. Section 170(f)(11)(E)(iii) further provides that an individual will not be treated as a qualified appraiser unless that individual (1) demonstrates verifiable education and experience in valuing the type of property subject to the appraisal, and (2) has not been prohibited from practicing before the Internal Revenue Service by the Secretary under § 330(c) of Title 31 of the United States Code at any time during the 3-year period ending on the date of the appraisal.



requirements within the meaning of § 170 (f)(11)(E)(ii)(I) if the appraiser has successfully completed college or professional-level coursework that is relevant to the property being valued, has obtained at least two years of experience in the trade or business of buying, selling, or valuing the type of property being valued, and has fully described in the appraisal the appraiser's education and experience that qualify the appraiser's education and experience that qualify the appraiser to value the type of property being valued.

Recto: The right-hand page of a book or the front side of a leaf or picture.

Refinished Condition: When a piece has been stripped or skinned of its original patina and has received a new finish.

Related Use Rule: An IRS rule that is applied to charitable contributions and states that to receive the full allowable tax deduction, a donor must donate property to an institution whose mission explicitly includes the acquisition and use of such property.

Replacement Value: The amount it would cost to replace an item with one of similar and like quality purchased in the most appropriate marketplace within a limited amount of time.

Reproduction: Refers to a piece made as an exact copy of an original period piece, but is not made to deceive.

Resale Value: The price at which an item can be sold in the marketplace.

Reserve: The minimal amount for which a consignor agrees to sell a work at auction. By law, the reserve must not more than the low estimate. Generally, a reserve is 10-50 percent below the low estimate.

Restoration: A process whereby, if an object has lost a part and that is missing part or piece is replaced or restored to simulate the original, the object can be returned as closely as possible to its original condition.

Retail Replacement Value (RRV): A property's highest value, usually for insurance purposes, that is defined as the highest amount in terms of US dollars that would be required to replace the property with another of similar age, quality, origin, appearance, provenance and condition within a reasonable length of time in an appropriate and relevant market. When applicable, sales and/or import tax, commissions, and or premiums are included in this amount.

Retail Value: Used to establish a price guideline for retail pricing, the appraised retail value is derived from retail replacement value. It is defined as a reasonable amount in terms of US dollars that would be required to purchase a property of similar age, quality, origin, appearance, provenance, and condition within a reasonable length of time in an appropriate and relevant market. Unlike retail replacement value, a retail value does not include any fees or additional costs such as taxes, framing, conservation, restoration or additional commissions.

WINSTON
ART GROUP

Retrospective Appraisal: A type of appraisal that gives an opinion of value with an effective date that is prior to the date of the report.

Sales Comparison Approach: The most commonly applied valuation approach when appraising personal property, in which appraised value is based on achieved prices for similar works by the same artist or artisan of equal standing and related reputation (alternatively called Comparative Market Data Approach, Market Data Approach or Comparable Market Data Approach.)

Salvage Value (SV): A valuation term implying abandonment by the rightful owner with the result that the person recovering the property may be entitled to a pre-agreed percentage of any net price realized in a future sale. Although there have been some exceptions, salvage is generally the lowest or rock-bottom price realized in a sale situation. This is the net price, in cash or other precisely revealed terms, for which the property would change hands if sold immediately without regard to the relevant marketplace and appropriate use. In certain cases, this may be required to disassemble and dispose of the property in a quick, forced and expedient manner.

Scheduled Articles: A term used by insurance companies for articles of personal property that are individually listed, described and valued on an insurance policy. Although some insurance companies will accept a receipt of a recent purchase, the schedule is typically based on an appraisal. Scheduled items usually carry a lower insurance premium than items that are covered by a blanket insurance policy.

Scrap Value: The amount of money that could be realized if a property were sold for the value of its material content.

Secondary Market: Refers to the marketplace in which a used object is bought and sold. Once an item is no longer available from the original source, it is considered a secondary market item. The term usually refers to the auction market and is in no way associated with the value or the condition of the object. The secondary is the venue for the sale of an object, through an auction or a gallery, between a seller and a buyer, neither of whom has participated in the creation or initial sale of the object. In the instance of multiples, a valid secondary market cannot exist while the maker or his agent retains a supply of the original offering.

Secondary Source: Examples of secondary sources utilizing exact primary sources in research and data comparison are Artnet, ArtFact, P4a, Gordonsart, Art-Sales-Index, newel.com and other internet research tools.

Seller's Premium: The percentage of the bid or "hammer" price paid by a seller to an auction house when selling an item. The fee ranges from nothing to 35 percent and may be more negotiable than the buyer's premium.

Statement of Assumptions & Limiting Conditions: Terms or concepts generally linked together in most appraisals. An assumption is that which is taken to be true. An extraordinary assumption is an assumption, directly related to a specific assignment, that, if found to be false, could alter the appraiser's opinions or conclusions. A limiting condition refers to the conditions that limit the

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755



appraiser's examination or research of the appraised items and the appraisal assignment. Hypothetical conditions are those that are contrary to what exists, but are supposed for the purpose of analysis.

Tertiary Market: A marketplace that occurs in a forced sale situation such as a liquidation or salvage sale.

Thermoluminescence Test: The definitive way to tell the true age of pottery, stoneware, porcelain, bronze and terra cotta. There are a only a handful of laboratories worldwide that perform the thermoluminescence test, the most prominent of which is in Oxfordshire, England. Today, most large auction houses will not put an artifact on sale without a certificate showing that the test has verified the objects age. To test an object's thermoluminescence, a small sample (about 100 milligrams) is heated to extreme temperatures. Most mineral materials store up increasing amounts of radioactive energy that is drawn from radioactive decay in and around the mineral. When heated (thermo), most minerals release the stored energy in the form of light (luminescence). By measuring the amount of light released from a material, one can calculate how many years have passed since the artifact was fired. Generally, the more light released, the older the item is.

Ultraviolet Light (UV): Short, high-energy, invisible light waves beyond violet in the light spectrum, with a length of 250 to 400 nanometers.

Uniform Standards of Professional Appraisal Practice (USPAP): The appraisal standards covering the development and communication of appraisers' opinions and conclusions published by the Appraisal Standards Board of The Appraisal Foundation. First published in 1987, these standards apply to all disciplines of appraising.

Verso: The left-hand page of a book or the back side of a leaf or a picture.

Vintage: A widely used term that refers to an object that was formerly in vogue, but not more than 100 years old. This definition may vary by object; for example, a vintage fountain pen is generally thought to be one manufactured before 1965.

Work Size: The dimensions of works on panel or board. When the word "sight" is used in conjunction with work size, it refers to the dimensions of the visible image of the work.

WINSTON
ART GROUP

## TERMS AND LIMITING CONDITIONS[1]

The Appraisal is subject to these Terms and Limiting Conditions, all of which are a part of the Appraisal unless expressly set aside or limited in writing by Winston Art Group.

The intended user of the Appraisal report is the client identified in the Engagement Letter ("Client") and any use of or reliance on by third-parties is prohibited unless authorized in writing by the Appraiser. Possession of this Appraisal or its copy does not carry with it the right of publication, nor may this Appraisal be used for *any purpose* by anyone other than the Client or other authorized users without the express written consent of Winston Art Group. The Client may not use the Appraisal for any purpose other than the Purpose set forth in the Engagement Letter and Scope of Work. If the Appraisal is reproduced, copied, or otherwise used it must be done so in its entirety including the cover document and all attachments. Furthermore, no change shall be made to any item of Property, any value, or any other provision in this Appraisal except by Winston Art Group.

The Appraisal is based only on the readily apparent identity of the appraised Property, without any inquiry or investigation, and no further opinion or statement of authenticity, genuineness, attribution or authorship is made unless otherwise expressly stated in the Appraisal report. The Appraisal will not be a representation or warranty of the Property's authenticity, genuineness, condition, title, period of creation, description, legality of import and export, attribution, or provenance because, among other reasons:

- scholarship and expertise (including stylistic and scientific) may not be available with respect to many objects, making determinations of authenticity difficult;

- documents concerning title and prior ownership are often not available, are inaccurate, or require detailed and extensive research that is beyond the scope of this Appraisal;

- laws, rules, and regulations relating to import, export, and ownership of the cultural property are complex and often require information not held or provided by owners of such art or which are not otherwise available; and

- meaningful evaluations of condition often require the services of experienced conservators.

Where this appraisal is based not only on the readily apparent identity of the appraised property, but also on any factual data or documentation supplied by the Client, this appraisal report shall so state by making reference to that information, and copies of that documentation shall be retained in the appraiser's work file. However, the appraiser is not responsible for the accuracy of this information.

The appraised values are based on the whole ownership and possessory interest of the appraised property undiminished by any liens, fractional interest or any other form of encumbrance or alienation. The appraisal is not an indication or certificate of title of ownership. The identification of the ownership interest of the appraised property has been generally represented to the appraiser by the Client and no

---

[1] Except where otherwise defined, these Terms and Limiting Conditions adopt the defined terms set forth in Winston Art Group's engagement letter (the "Engagement Letter").

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

inquiry or investigation will be made by the appraiser, nor is any opinion to be given, as the truth of such representation.

The Appraisal, and any value provided therein, represents only the good-faith opinion of the Appraiser based on the information provided by Client and the assumptions set forth in the Appraisal. The values given are for the same or comparable items, and in providing Winston Art Group's opinion, Winston Art Group will assume that (i) the appraised Property is owned by Client, free from all liens, encumbrances or other third party claims; (ii) the appraised Property is authentic and correctly attributed (irrespective of any intervening changes in scholarship and/or any claims that might be asserted under the Visual Artists Rights Act or otherwise); (iii) all legal or other requirements relating to the appraised Property (including with respect to materials compliance, *e.g.*, under the Endangered Species Act and/or the Convention on the International Trade in Endangered Species of Wild Fauna and Flora) have been satisfied; (iv) Client has provided Winston Art Group with all information of which Client is aware or should be aware relating to the appraised Property that might impact its value, including without limitation in relation to its attribution or authenticity (including third party opinions with respect thereto), condition (including all past restorations), and provenance; and (v) the Appraisal has not been sought in connection with a transaction involving any purchase, sale, exchange or division of the appraised Property.

Where this Appraisal is based not only on the readily apparent identity of the appraised Property, but also on any factual data or documentation supplied by the Client, this Appraisal shall so state by making reference to that information, and copies of that documentation shall be retained in the Appraiser's work file. However, Appraiser is not responsible for the accuracy of this information or for any errors in data or documentation supplied by the Client.

Because our Appraisal is prepared for the Client, and the Client alone is the sole intended user unless otherwise stated in the Scope of Work, we cannot be responsible for any actions taken by third-parties who may come into possession of the Appraisal without our prior, written permission or for any use of the Appraisal beyond its specific Purpose. If the Appraisal is being used for investment purposes (including, but not limited to, distribution to third-parties who may acquire an interest in the subject Property), you, the Client, acknowledge and agree that the Appraisal shall not be construed as providing investment advice or be relied upon by those making investment decisions, and we and our appraisers specifically disclaim any liability to such unknown and unauthorized third-parties. In consideration of our agreement to provide the services described herein, you and your agents hereby agree to release Winston Art Group and its Appraisers from and against any and all liability arising out of or relating to the services provided pursuant to this agreement, and you agree to indemnify, defend, and hold harmless Winston Art Group and its Appraisers, directors, officers, agents, independent contractors, and employees (collectively, "WAG") from and against any and all claims, actions, damages, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees and other reasonable professional fees) arising out of, or based upon, WAG's provision of services under this agreement, including the Appraisal itself (including, but not limited to, any legal process, *e.g.*, a subpoena, served upon WAG by third-parties relating to the Appraisal). Other than due to intentional wrongdoing done in bad faith or gross negligence, WAG shall not be liable to you, any of your representatives, or any third-party, for any matter contained in the Appraisal or services that WAG provides to you under this agreement. You agree to advance any professional fees or costs deemed necessary by WAG in its sole

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

discretion within 10 days of notice by WAG that such fees and costs are required pursuant to this paragraph.

The following headings may be used in the report to describe an item of Property's authorship, but this shall not be understood as a guarantee or statement of fact as to authenticity, genuineness, attribution, or authorship:

• BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, the work is presumed to be by the named artist.

• Attributed to BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, probably a work by the artist in whole or in part but less certainty as to authorship expressed in the preceding category.

• Studio of BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, a work by an unknown hand in the studio of the artist which may or may not have been executed under the artist' direction.

• Circle of BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, a work by an as yet unidentified but distinct hand closely associated with the named artist but not necessarily his pupil.

• Style of.... Follower of BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, probably a work by a painter working in the artist's style, contemporary or nearly or contemporary, but not necessarily his pupil.

• Manner of BELLINI, GIOVANNI (Italian, 1430-1516)
In our best judgment and opinion, probably a work in the style of the artist and of a later date

• After BELLINI, GIOVANNI (Italian, 1430-1516
In our best judgment and opinion, a copy (of any date) of a known work of the artist.

The following descriptions may be used in the report to describe that a work is signed, dated, or inscribed by the artist:
"Signed..." / "Dated..." / "Inscribed..."

The following descriptions may be used in the report to describe that the signature, date, or inscription appears to be by a hand other than that of the artist:
"Bearing signature..." / "Bearing date..." / "Bearing inscription..."

Appraiser considered the physical condition of the appraised Property to be generally good and acceptable for their specific markets unless otherwise expressly stated in the Appraisal. Functional obsolescence (damage as to render the item unusable for its essential purpose) or economic obsolescence (lack of demand) of appraised Property will only be noted if applicable. The dimensions given for each item of Property were determined under field conditions and therefore should be considered approximate.



Winston Art Group prides itself on its knowledge of the fine, decorative and collectible market, and many other things that we believe will assist in providing you with an appraisal of your Property. However, this kind of property is by its very nature, unique. Tangible property is unlike other "assets" you may have, such as stocks, real estate, etc., and the market is unlike any other in a variety of respects. Neither Winston Art Group nor Appraiser gives guarantees or make promises about the future and you should not expect such. Winston Art Group's Appraisal shall represent Appraiser's reasonable judgment and opinion, based on the specified Purpose, under the then-current market conditions, but neither Winston Art Group nor Appraiser is making a statement of fact as to prices, values, etc. Winston Art Group and Appraiser do not make representations or warranties of what any individual item of Property would actually realize through a private sale or a public auction and, because myriad economic, social, and currency developments—as well as other factors unique to the market—may influence the purchase or sales price of a particular object at a particular time, we cannot predict with precision market conditions or the materiality of market variables such as ownership, market "freshness," and saturation. The values expressed in the Appraisal are based on current information and no opinion is hereby expressed as to any future value, or to any past value, unless otherwise expressly stated. Furthermore, the values expressed do not specifically account for sales tax, excise tax, packing and shipping costs, commissions, storage costs, or conservation costs, unless otherwise expressly stated in the report.

BUYER'S PREMIUM SCHEDULES FOR TOP 5 AUCTION HOUSES as of September 2020

1. Christie's: The new premium rate shall be an amount equal to 25% of the hammer price of each lot up to and including £450,000/$600,000; plus 20% of the hammer price from £450,001/$600,001 up to and including £4,500,000/$6,000,000 and 14.5% above £4,500,001/$6,000,001. The price thresholds in other currencies have been adjusted in a commensurate manner.
2. Sotheby's: The new premium rate shall be an amount equal to 25% of the hammer price of each lot up to an including £300,000/$400,000; plus 20% of the hammer price from £300,001/$400,001 up to and including £3,000,000/$4,000,000 and 13.9% above £3,000,001/$4,000,001. The price thresholds in other currencies have been adjusted in a commensurate manner. The overhead premium, a fee payable by all auction buyers in our global salesroom and online sales, which will be charged at 1% of the hammer price, plus any applicable local taxes, is an allocation of the overhead costs relating to our facilities, property handling and other administrative expenses. This fee and our buyer's premium rates exclude local taxes and any applicable artist's resale right.
3. Phillips: Phillips charges the successful bidder a commission, or buyer's premium, on the hammer price of each lot sold. The buyer's premium is payable by the buyer as part of the total purchase price at the following rates: 26% of the hammer price up to and including $600,000, 21% of the portion of the hammer price above $600,000 up to and including $6,000,000 and 14.5% of the portion of the hammer price above $6,000,000.
4. Doyle: The total purchase price to be paid by purchaser is the amount of the successful bid price plus a premium of 25% on the first $250,000 of the hammer price, 20% on the portion from $250,001 through $3,000,000, and 12% on that portion of the hammer price exceeding $3,000,000.
5. Heritage: For lots in all other categories not listed above, the Buyer's Premium per lot is twenty-five percent (25%) on the first $300,000 subject to a minimum of $49 per lot, plus twenty percent (20%) of any amount between $300,000 and $3,000,000, plus twelve point five percent (12.5%) of any amount over $3,000,000.



**TIMOTHY HUNTER, MA, DPhil (Oxon), FSA**
**OLD MASTER PAINTINGS, 18TH AND 19TH CENTURY EUROPEAN DECORATIVE AND FINE ART,**
**IMPRESSIONIST AND MODERN ART**
**SPECIALIST**

<u>**WORK EXPERIENCE**</u>
**Winston Art Group,** London, UK [England] (2019-Present)
*Senior Fine Art Specialist*

**Venator Fine Art Ltd.,** London, UK [England] (2014 – Present)
*Director and Founder*
- Art consultancy and research
- Expert consultant for the Arts Council of Great Britain
    - Expert on Reviewing Committee for the Export of Works of Art
    - Advises on the sale of archives and paintings to the nation

**Falcon Fine Art Ltd.,** London, UK [England] (2014 – 2018)
*Vice President*
- Head of Art Financing, providing loans using art as collateral

**Gurr Johns Ltd,** London, UK (2009-2014)
*Director, Senior Specialist Old Masters and 19th Century Art*

**Christie's,** London, UK [England] (1993 – 2009)
*Director, Impressionist and Modern Art*
*Head of 19th Century European Art*
*Senior Director, Old Master & British Pictures*
*Director, Valuations Department*
*Specialist, Books, Manuscripts & Archives Department*

**The Ashmolean Museum, University of Oxford,** Oxford, UK [England] (1992 – 1993)
*Curator, Department of Western Art*
*Tutor in Medieval History and Art History*

<u>**EDUCATION**</u>
**Magdalen College, Oxford**, England
- B.A. (First Class Honours), Modern History
- M.A., Diploma History of Art (Distinction)
- D.Phil, Medieval Art History

WINSTON
ART GROUP

## PUBLICATIONS

'"Quid Milites Pugnantes?" An Early Representation of *Chanson de Geste* on the Romanesque Frieze of Angoulême Cathedral Reexamined'

*Studies in Iconography*, vol. 34, (January 1, 2013): 133-174

'A pair of recently discovered late medieval embroideries, the arms of Castile, and the appearance of heraldic textiles'

*The Display of Heraldry: The Heraldic Imagination in Arts and Culture* (The Heraldry Society, London, 2019)

**Book and Exhibition Reviews**

*Variously The Burlington Magazine; Opera Now; Harpers & Queen; World of Interiors; The Art Book*

**Hidden Magdalen,** ed. D. Roberts (Oxford, 2008)

*Essays on Paintings and drawings*

**The Oxford Companion to Western Art,** ed., H. Brigstocke (Oxford, 2000)

*Various entries*

**"A Catalogue of Paintings in Magdalen College Oxford: Volume I The Brocklebank Bequest"**
*Forthcoming*

**"A Catalogue of Paintings in Magdalen College Oxford: Volume II Tudor and Stuart Portraits"**
*Forthcoming*

## ADDITIONAL INFORMATION & CERTIFICATIONS

- Member of Professional Advisers to the International Art Market (PAIAM)
- Uniform Standards of Professional Appraisal Practice (USPAP) compliant through March 2022
- Fellow of the Society of Antiquaries (elected 2014)
- Honorary member of the Senior Common Room, Magdalen College, Oxford

## EXPERT WITNESS

Dr. Hunter has provided art historical research, valuations and/or expert witness reports for the following court cases:

- The National Trust v. Hadon Young Ltd., CA 11 Aug 1994
- Avrora Fine Arts Investment Ltd. v. Christie's, Manson & Woods Ltd., CD, 27 July 2012
- The Klesch Collection Ltd., v. Richard Green (Fine Paintings), January 2020
- Mark Fisch v. Rachel N. Davidson, NY 14 July 2021
- Bloom v. Emden, NY 19-10155-RA-KHP



**ELIZABETH von HABSBURG, AAA**
**18TH, 19TH, 20TH CENTURY AND CONTEMPORARY FINE ART**
**EUROPEAN FURNITURE AND DECORATIVE OBJECTS**
**MANAGING DIRECTOR**

<u>**WORK EXPERIENCE**</u>
**Winston Art Group**, New York, NY (2010-Present)
*Managing Director and Board Member*
- Appraises Fine and Decorative Art
- Advises private clients on the purchase, sale, and maintenance of their collections
- Acts as Expert Witness
- Lectures Worldwide on all aspects of the Art Market

**Gurr Johns**, New York, NY (1992-2010)
*President and Director*
- New Business Development
- Specialist in 18th, 19th and 20th Century Fine Art, European furniture and decorative arts

**Habsburg Fine Art Auctioneers**, New York, NY (1988-1991)
*Vice President*
- Director, Estates and Appraisals Department
- General Appraiser and New Business Development

**Christie's Fine Art Auctioneers**, New York, NY (1981-1988)
*Assistant Vice President in charge of Appraisal Department*
- General Appraiser

<u>**EDUCATION**</u>
**Columbia University**, New York, M.A.
**Stanford University**, California, B.A.

<u>**PROFESSIONAL ASSOCIATIONS AND ADDITIONAL INFORMATION**</u>
- Board Member, Appraisers Association of America, NY (2002-2015)
- Certified member of Appraisers Association of America, NY (Impressionist and Modern Fine Art; Furniture and Furnishings)
- Co-Chair, Annual Awards Luncheon for Excellence in the Arts Committee, Appraisers Association of America
- Co-Chair, Advisory Council, Appraisers Association of America
- Director, Kunstadter Family Foundation
- Associate Member, IMUA (Inland Marine Underwriters Association)
- Member, ArtTable, Inc.
- Trustee of The Appraisal Foundation, Washington, DC (2008 – 2015); Vice Chair 2013; Chair 2014; Immediate Past Chair 2015
- Associate Member, STEP USA
- Fellow, Royal Institution of Chartered Surveyors

WINSTON
ART GROUP

- Fellow, Pierpont Morgan Library
- Board of Trustees, Christie's Education, 2019-2020
- Award received: "50 Most Influential Women in Wealth Management", Private Asset Management, 2015
- Uniform Standards of Professional Appraisal Practice (USPAP) compliant through February 2022

**OTHER INFORMATION**
- Lecturer/Instructor on Fine and Decorative Art, Art as an Asset Class, Art Succession Planning, and Art Market Trends – to Trusts and Estates departments of law firms, Fine Art insurance firms, Private Clients, Matrimonial attorneys, Art Fairs, Museums, Graduate Schools, and Institutions worldwide
- Qualified Expert Witness in Fine Art and in Decorative Art (New York, Philadelphia, Palm Beach, and Texas courts)
- Revised four volumes of the Antique Hunter's Guide, Black Dog and Leventhal Press, 2000/2001 (Silver/Pewter; Furniture – 2 vols; Pottery/Porcelain)
- Contributing Author, "Fine Art and High Finance", Bloomberg Press, 2010
- Contributing Author, "The Appraisal Handbook", 2013

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755

WINSTON
ART GROUP

**Elizabeth von Habsburg, Managing Director, Winston Art Group**
**Expert Witness Listing as of 2021**

Dr. and Mrs. Jose Castro v Peking Art Importers, June 1992, New York City, Judge B. Schainswit (Sale of merchandise under fraudulent conditions)

Estate of Donald Judd, via telephone to Texas courtroom, October 1996 (Market changes, changes in value over time)

Estate of John Minton, March 1999, White Plains, NY (Executor v Executor)

Coburn v Coburn, April 1999, New York City (Expert witness in European furniture and decorative objects in marital resolution)

Alter v Sills/Hunniford, June 2001, Philadelphia, PA (Expert witness in European furniture and decorative objects. Case settled prior to testifying.  Client v Decorator)

Sere v McNally, June 19, 2003, New York City US District Court (Qualified as expert witness in 20th Century Decorative Arts)

Barnes Foundation Collection, 2006, Philadelphia, PA (Qualified as expert Witness in Fine and Decorative Art)

Flaherty v Flaherty, 2008, Palm Beach, FL (Qualified as expert witness in Fine and Decorative Art in matrimonial case)

Susan Crile v Commissioner, NY, NY (Qualified as expert witness and testified in Fine Art in tax case, 2013)

Robert Rauschenberg Foundation, Ft. Myers, FL (Qualified as expert witness, deposed, testified 2014)

Kasmin v  Kasmin, 2014, NY, NY (Expert witness, Modern and Contemporary art)

Komolov v Segal, 2015, NY, NY (Deposition only; Fine art)

Syncora Guarantee, Inc  v Detroit Museum of Art, 2015 (Deposition, expert in Fine art)

Condo v Condo, 2016 (Fine Art, expert witness report, case settled prior to testimony)

Macklowe v Macklowe, 2017 (Qualified as expert witness and testified in Modern and Contemporary Fine Art, matrimonial)

Sothebys v Shagalov, 2019 (Qualified as expert witness, deposed, no trial, Contemporary art, business dispute)

WINSTON
ART GROUP

Benton v UMB, 2021 (Qualified as expert witness, still in progress and not yet deposed, American art, artist's estate dispute)

126 East 56th Street | 24th Floor | New York, NY | 10022 | 212.542.5755